# EXHIBIT 1

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


SOHYON WARNER,

               Plaintiff,

        vs.                Case No. 24-cv-12333

                             Hon. Gershwin A. Drain

                             Mag. Anthony P. Patti

GILBARCO, INC., d/b/a

GILBARCO VEEDER-ROOT,

               Defendant.

_____


     The Video-Recorded Deposition of SOHYON WARNER,

     Taken at 28411 Northwestern Highway, Suite 1100,

     Southfield, Michigan,

     Commencing at 9:40 a.m.,

     Tuesday, November 25, 2025,

     Before Jenifer Weisman, CSR-6006.

Page 2

1    APPEARANCES

2

3    JOHN J. COOPER

4    Cooper Law Firm

5    1615 W. Big Beaver Road

6    Suite 6A

7    Troy, Michigan 48084

8    248.822.2212

9    johnjcooper@sbcglobal.net

10        Appearing on behalf of the Plaintiff.

11

12   RICHARD WARREN

13   LAUREN HARRINGTON

14   Ogletree Deakins, PLLC

15   34977 Woodward Avenue

16   Suite 300

17   Birmingham, Michigan 48009

18   248.593.6400

19   richard.warren@ogletree.com

20   lauren.harrington@ogletree.com

21        Appearing on behalf of the Defendant.

22

23   ALSO PRESENT:

24   Brad Stoll

25   John Schmitzer - Video Technician

Page 3

1                    TABLE OF CONTENTS

2

3    WITNESS:                                    PAGE:

4    SOHYON WARNER

5

6        EXAMINATION BY MR. WARREN:              5

7

8                        EXHIBITS

9

10   (Exhibits attached to the transcript.)

11

12   DEPOSITION EXHIBIT 1                         106

13   DEPOSITION EXHIBIT 2                         180

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1    Tuesday, November 25, 2025

2    9:40 a.m.

3

4              VIDEO TECHNICIAN:  We are on the record at

5    9:40 a.m. on November 25, 2025.  Audio and video

6    recording will continue to take place until all

7    parties agree to go off the record.  Please note that

8    microphones are sensitive and may pick up whispering

9    and private conversations.

10             This is the video-recorded proceeding of

11   Ms. Warner taking by counsel for the Defendant.  This

12   proceeding is being held at U.S. Legal Support located

13   at 28411 Northwestern Highway, Suite 1100, Southfield,

14   Michigan.

15             My name is John Schmitzer.  I'm the

16   videographer on behalf of U.S. Legal Support.  I'm not

17   related to any party in this action, nor am I

18   financially interested in the outcome.  The court

19   reporter is Jenifer Weisman on behalf of U.S. Legal

20   Support.

21             Counsel will state their appearances for

22   the record, after which the court reporter will swear

23   in the witness.

24             MR. WARREN:  Richard Warren appearing on

25   behalf of Defendants with my colleague Lauren

Page 5

1    Harrington.

2              MR. COOPER:  John Cooper appearing for

3    Plaintiff for this deposition only.

4              SOHYON WARNER,

5    was thereupon called as a witness herein, and after

6    having first been duly sworn to testify to the truth,

7    the whole truth and nothing but the truth, was

8    examined and testified as follows:

9                        EXAMINATION

10   BY MR. WARREN:

11   Q.   Good morning, Ms. Warner.  We've met before.  My name

12        is Richard Warren.  I represent Defendant.  Today is

13        the date and time for your deposition.

14             Please state your full name for the record.

15   A.   Sohyon Kim Warner.

16   Q.   Have you ever gone by any other names other than

17        Sohyon Kim Warner?

18   A.   No.

19   Q.   Have you ever gone by SK?

20   A.   Yes.

21   Q.   Where did you go by SK?

22   A.   At Gilbarco.

23   Q.   How about anywhere outside of Gilbarco?

24   A.   Nowhere else.

25   Q.   Okay.  I just want to couple -- cover a couple of

Sohyon Warner
November 25, 2025

Page 6

1   ground rules for the deposition.  Number one, it's
2   really important that you let me finish my question
3   before you give your full answer and that I let you
4   finish your answer before I ask my next question;
5   that's because everything that we say is being taken
6   down by the court reporter.  Do you understand that?
7   A.   Yes.
8   Q.   I may remind you about that rule during the course of
9   the deposition today; not to be facetious, but just to
10  make sure that the record is clear and everybody can
11  understand what's said afterwards.  Do you understand
12  that?
13  A.   Yes.
14  Q.   Next, all of your answers need to be out loud, because
15  if I see you shake your head, I will understand what
16  you mean, but the court reporter can't take that down.
17  Understand?
18  A.   Yes.
19  Q.   Next, if you don't understand my question or need me
20  to rephrase it or repeat it, please do that, and I
21  will do so, fair?
22  A.   Okay.
23  Q.   Next question -- rule after that is if you need to
24  take a break at any point, please let me know or your
25  attorney know, and we'll go off the record.  The only

Page 7

1   rule is I will require you to finish your answer
2   before we go off the record, fair?
3   A.   Fair.
4   Q.   We will be going for probably the full seven hours
5   today, so if you need a lunch break at any specific
6   point, let your attorney know or let me know, and
7   we'll go ahead and do that, fair?
8   A.   Fair.
9   Q.   Okay.  You've brought some papers with you that are in
10  front of you at your deposition.  Could you please
11  identify for the record each document that you brought
12  with you?
13  A.   Yeah, that's your Notice for Deposition, Second
14  Amended Complaint, and two EEOC filings, and empty
15  notepad.
16  Q.   You said two EEOC filings, right?
17  A.   Correct.
18  Q.   And those are both of the charges you filed with the
19  EEOC?
20  A.   Yes.
21  Q.   Next, you've also brought with you a phone, correct?
22  A.   Yes.
23  Q.   What is the make and model of that phone?
24  A.   That's Samsung Galaxy 25.
25  Q.   How long have you had that phone for?

Page 8

1   A.   Not sure, but less than a year.
2   Q.   Less than a year?
3   A.   Yes.
4   Q.   And then what was the make and model of your previous
5   phone that you had?
6   A.   Another Samsung.  I don't know.
7   Q.   Where is that phone that you used to have?
8   A.   You trade in.
9   Q.   Did you do anything to preserve the data on that phone
10  prior to trading it in?
11  A.   Yes.
12  Q.   What did you do to preserve the data on that phone?
13  A.   I took a screenshot for our text message with my
14  colleague and I gave it to my former colleague -- my
15  counsel.
16  Q.   When you say former counsel, do you mean --
17  A.   Robert Palmer.
18  Q.   Do you know who that text message string was with?
19  A.   Tracy.
20  Q.   Do you remember the date of those text messages?
21  A.   No.
22  Q.   How many text messages were there?
23  A.   Many.
24  Q.   Do you mean more than 10?
25  A.   Yes.

Page 9

1   Q.   More than 50?
2   A.   Not sure.
3   Q.   What was the subject matter of those text messages?
4   A.   Work.
5   Q.   What specifically were they about that was work
6   related?
7   A.   She and I were working on the same project.
8   Q.   Which project was that?
9   A.   It's finance related.
10  Q.   This is when you worked for Gilbarco, correct?
11  A.   Gilbarco.
12  Q.   Is that a yes?
13  A.   Yes.
14  Q.   What did you say in those text messages to her?
15  A.   Merry Christmas, Thanksgiving, what do you think about
16  that, type of thing.
17  Q.   Why did you decide the take pictures of those text
18  messages about Merry Christmas and send those to your
19  prior lawyers?
20  A.   Because that's what they asked from me.
21  Q.   Are there any other documents, data, e-mails, or text
22  messages that you took steps to preserve from your old
23  phone?
24  A.   No.  I did have a talk with Dr. Porter as well; she's
25  a former colleague.

Sohyon Warner
November 25, 2025

Page 10

1  Q.  I don't understand your answer to my question.  I
2      asked if you took any other steps to preserve other
3      documents, data, text messages, or e-mail from your
4      old phone.
5  A.  No.
6  Q.  You didn't take any other steps to preserve any other
7      data, correct?
8  A.  I think it's transferred to your phone, right?
9  Q.  I'm asking you.
10 A.  Not sure.
11 Q.  You're not sure?
12 A.  Yeah.
13 Q.  Did you delete any documents, text messages, e-mails,
14     or data from that old phone?
15 A.  No.
16 Q.  So is it your position that any documents, e-mails,
17     text messages, or data that would have existed on that
18     old phone are now in your new phone?
19 A.  Most likely.
20 Q.  Why is there some doubt there; what --
21 A.  Because I don't transfer --
22 Q.  -- do you think was not preserved?
23 A.  -- the phone company does it.
24 Q.  So you didn't do any manual transfers --
25 A.  No.

Page 11

1  Q.  -- of data?
2           That old phone, did you have that old phone
3      during the entirety of your work for Gilbarco?
4  A.  Not sure.
5  Q.  Do you think there was another phone that you used for
6      work purposes while you were employed by the company?
7  A.  There was only personal phone.
8  Q.  Did the company provide you with a work phone?
9  A.  No.
10 Q.  Your Samsung Galaxy, tell me all the steps that you
11     took to see if there was information on that phone
12     responsive to my discovery requests in this lawsuit.
13 A.  I don't understand your question.
14 Q.  Sure.  You understand that I sent interrogatories and
15     document requests to you and your lawyers, correct?
16 A.  Yes.
17 Q.  Tell me all the steps that you took to look through
18     that phone to see if there was any data on there
19     responsive to my requests.
20 A.  I took a picture of the texts and I uploaded to
21     ShareDrive for my lawyers to access.
22 Q.  What about e-mails, did you look for e-mails on that
23     phone that were --
24 A.  No.
25 Q.  -- responsive to my discovery requests?

Page 12

1  A.  Not on the phone.
2  Q.  Did you look for e-mails that were responsive to my
3      discovery requests using some other method?
4  A.  Other than my desktop, no.
5  Q.  What steps did you take on your desktop to look for
6      e-mails, documents, and data that were responsive to
7      my document request and interrogatories?
8  A.  I received your e-mail and I replied.
9  Q.  No, but I'm asking what steps did you look to see what
10     you had on your desktop that was responsive to those
11     requests?
12 A.  I looked at the files, thumb drive that my former gave
13     me.
14 Q.  Thumb drive that your who gave me?
15 A.  My former attorney.  (Inaudible) we need the case
16     files.
17 Q.  Okay.  But I'm talking about before you got that
18     information from your attorneys; you had to give them
19     information, correct?
20 A.  Correct.
21 Q.  What steps did you take to look for and find that
22     information?
23 A.  It's in my Gmail.
24 Q.  So you have a private Gmail account, correct?
25 A.  Yes.

Page 13

1  Q.  What's the name of that Gmail account?
2  A.  Sohyon.warner@gmail.com.
3  Q.  Do you have any other Gmail accounts?
4  A.  No.
5  Q.  What are the steps that you took to look through that
6      Gmail account to find out if you had documents and
7      e-mails that were responsive to my discovery requests?
8  A.  I go by the dates.
9  Q.  Anything else?
10 A.  No.
11 Q.  Did you look in all of your mailboxes there; your
12     inbox?
13 A.  Yes.
14 Q.  Your sent box?
15 A.  Yes.
16 Q.  Your deleted folder?
17 A.  No.
18 Q.  You didn't look in your deleted folder?
19 A.  No, I didn't delete anything.
20 Q.  Why didn't you look in your deleted folder?
21 A.  There's nothing that I can use from the delete folder.
22 Q.  Are you saying it's empty?
23 A.  No.
24 Q.  I'm going to ask that you look through your deleted
25     folder after this deposition is over, not today and

Sohyon Warner
November 25, 2025

Page 14

1    not tomorrow, but that's part of your obligations for
2    discovery, is to look through that to see if there is
3    any information in that deleted folder that would be
4    responsive to discovery requests, so I'm asking that
5    you do so.  Do you agree to do so?
6  A.  Okay.
7  Q.  Okay.  Other than looking in your Gmail account, did
8    you take any other steps to locate responsive
9    information to my discovery requests in this case?
10  A.  So let me get this straight:  You asked to my former
11    and my former asked me, right?  Or are you talking
12    about when I became pro se, because I'm not sure what
13    you're asking?
14  Q.  I have no idea what your attorneys did and I have no
15    idea what you said to your attorneys, but at some
16    point I assume that your attorneys conveyed my
17    requests for documents and information to you, is that
18    right?
19  A.  Correct.
20  Q.  And then you took steps to tell them what you had that
21    was responsive to that, right?
22  A.  Correct.
23  Q.  So that's the time period I'm focusing on.
24  A.  Okay.
25  Q.  Other than looking in your Gmail folder, what are the

Page 15

1    -- and looking in the text messages on your phone,
2    what other steps did you take to locate responsive
3    information and documents to my discovery requests?
4  A.  I think those are two primary.
5  Q.  I understand those are primary, but what other areas
6    or locations did you look for responsive documents?
7  A.  I don't remember.
8  Q.  What other electronic items do you have where this
9    information could be stored?  You have a phone, you
10    had an older phone, you have a desktop; what other
11    electronic items do you have?  Do you have laptops, do
12    you have --
13  A.  Well, what I meant by desktop is my laptop, yes.
14  Q.  Do you have -- I'm confused.  Do you have a laptop and
15    a desktop --
16  A.  No, just laptop.
17  Q.  -- or just a laptop?
18  A.  Laptop.
19  Q.  And you have a thumb drive; was that provided to you
20    by your attorneys or was that your thumb drive?
21  A.  Their thumb drive.
22  Q.  When you were at Gilbarco, did you place any
23    documents, text messages, e-mails, or other
24    information on a thumb drive that belonged to you?
25  A.  No.

Page 16

1  Q.  Do you have any iPads or other tablets?
2  A.  No.
3  Q.  So the only electronic devices you have in your home
4    where you could store information would be your phone
5    and your laptop?
6  A.  Correct.
7  Q.  Nothing else?
8  A.  Correct.
9  Q.  You understand that you're under oath here today,
10    correct?
11  A.  Yes.
12  Q.  What do you understand that to mean?
13  A.  I tell the truth.
14  Q.  When you were working for the company and you put
15    things in writing, do you agree with me that you put
16    things in writing because they were true?
17  A.  I just write what happened.
18  Q.  You did it truthfully, correct?
19  A.  I describe what just happened.
20  Q.  Truthfully, right?
21  A.  I wrote what actually happened.
22  Q.  Why are you having trouble responding to this
23    question?
24  A.  I don't have a problem answering that; I said I wrote
25    what happened.

Page 17

1  Q.  Do you recall any instances where you put something in
2    writing while you were working for the company that
3    was not true?
4  A.  I don't recall.
5  Q.  Okay.  So if I see a document or an e-mail from you
6    while you worked for the company, I can assume
7    everything you said in that document is true and
8    accurate, correct?
9  A.  I wrote down what actually happened.
10  Q.  So therefore, it would be true and accurate, right?
11  A.  That's my perception of what happened.
12  Q.  Okay.  And did you put anything in a document that you
13    believed was untrue?
14  A.  I don't recall.  Again, I'm just describing what they
15    did.
16  Q.  When you were in meetings with co-workers while you
17    worked for the company, are there any instances that
18    you provided them with false information
19    intentionally?
20  A.  I don't recall.
21  Q.  So if you said something to a co-worker over text
22    message or Teams or in person, I can presume that
23    that's true, correct?
24  A.  I describe what they did.
25  Q.  Are you saying that there are things that you told

Sohyon Warner
November 25, 2025

Page 18

```
 1      co-workers while you worked for the company that are
 2      not reliable that I can't rely on?
 3   A. I just describe what they did.
 4   Q. You're not really answering my question though.
 5   A. I am answering your question.  I describe what
 6      happened.
 7   Q. Can you think of a single instance where you provided
 8      a coworker with information that was either false or
 9      reliable?
10   A. I have not provide any information that is false other
11      than what they did, which is their action, which I
12      described.
13   Q. Okay.  Is there any reason why you can't respond to my
14      questions truthfully today?
15   A. I am answering truthfully to the best of my knowledge.
16   Q. I'm not saying you're not.  I'm just saying is there
17      any reason, medical or not, why you would not be able
18      to provide truthful answers?
19   A. You're trying to jog down my memory three years ago;
20      I'm doing the best I can.
21   Q. Is there any reason medically speaking why you're not
22      able to understand and truthfully respond to
23      questions?
24   A. Can you rephrase the question?
25   Q. Yeah.  Is there any condition that you have that
```

Page 19

```
 1      prevents you from responding to questions truthfully?
 2   A. No.
 3   Q. Has any doctor told you that you are not able to
 4      undergo a deposition?
 5   A. I'm not here to provide medical opinion.
 6   Q. You are here to provide medical information because
 7      you have a claim for emotional distress damages, and I
 8      will tell you that if you don't answer my questions
 9      regarding emotional state, emotional conditions, and
10      treatment that you've received, I will move to strike
11      those claims for damages.  So I'm not saying that as a
12      threat; I'm just saying that to let you know that you
13      are under an obligation to provide those responses
14      today.
15   A. You have letters from my health provider.
16   Q. We do not have any HIPAA release forms that would
17      allow us to get copies of your records, and part of
18      this deposition and discovery will involve you signing
19      those letters so we can get those for purposes of this
20      litigation.  Of course, those will be produced and
21      kept confidential pursuant to a protective order, but
22      I need to know now, are you going to refuse to allow
23      us to get copies of your records from healthcare
24      providers or treaters?
25   A. I provided HIPAA authorization to my former.
```

Page 20

```
 1   Q. We have not received those.
 2   A. Okay.
 3   Q. So we will ask you to re-sign those either today or in
 4      the coming days.  Are you agreeable to signing those,
 5      presuming that they are kept confidential and produced
 6      pursuant to a protective order?
 7   A. No, there will be a condition.
 8   Q. What is your condition?
 9   A. Just limited to what I claim per letters that you
10      have.
11   Q. No, that's not acceptable, because one of the things
12      that we are entitled to get in discovery is if you
13      have collateral sources of emotional distress that are
14      not related to your employment with the company, that
15      is discoverable and that is relevant.  And we will be
16      obtaining that informational as well.  Are you
17      agreeable to providing that?
18   A. I'll look into it.
19   Q. You don't have a chance to look into it.  This case
20      and discovery has been ongoing for nine, ten months,
21      at least.  There has been ample time for you and your
22      prior lawyers to look into that, so I need to know now
23      if you are going to go ahead and provide that or
24      refuse to provide it.  I don't want to have to file a
25      motion, but I will if you require me to.
```

Page 21

```
 1   A. Go ahead.
 2   Q. So when you say go ahead, I just want to make sure I
 3      understand:  Is it your position that you will not be
 4      providing HIPAA releases for us to obtain your medical
 5      records --
 6   A. It is.
 7   Q. -- for your healthcare treatment?
 8          MR. COOPER:  I'm going -- you can get it.
 9      I don't see how this is relevant to the deposition.
10      You can ask questions, but I don't see how -- you
11      can't badger her about whether she's going to sign
12      a release.
13          MR. WARREN:  Relevance is not a ground to
14      refuse to answer questions.  And you may not know the
15      history of this, but there has been many months
16      attempting to get this information from your client.
17   A. I provide to my former, so I'll get back to you.
18   BY MR. WARREN:
19   Q. We will require you to provide the HIPAA releases
20      within seven days of receipt signed; otherwise, we
21      will file a motion to compel, but I'm hopeful that we
22      can get this information without discovery practice.
23   A. That's fine, but I'll have to check with my former why
24      they did not forward that to you.
25   Q. The obligation is on you to forward that.  These
```

Sohyon Warner
November 25, 2025

---

Page 22

```
 1        lawyers --
 2   A.   I forward it to my former.
 3   Q.   -- no longer representing you.
 4   A.   I forwarded to my former back in April.
 5   Q.   Have you taken any medication in the last 24 hours?
 6   A.   Yes.
 7   Q.   What medications have you taken?
 8   A.   Why is this relevant?
 9   Q.   Relevancy is not a ground to answer questions, and I'm
10        not being deposed today; you are.  So please tell me
11        what medications you have taken in the last 24 hours.
12   A.   Those are my rights.
13   Q.   I'm sorry, what do you mean?
14   A.   I will not revealing what I'm taking.
15   Q.   This is directly relevant to your claims for emotional
16        distress damages, and I will give you another chance.
17        Are you refusing to indicate what medications you are
18        taking?
19   A.   I'm here to talk about Gilbarco's conduct.
20   Q.   This will be added to a motion to compel if you refuse
21        to provide this information.  I mean, you're welcome
22        to ask your counsel --
23   A.   I don't know the name of the drug.
24   Q.   -- off the record.
25             You don't know the names of the --
```

---

Page 23

```
 1   A.   That's correct.
 2   Q.   -- drugs that you are taking?
 3   A.   Correct.
 4   Q.   How many medications are you currently taking?
 5   A.   I'm taking three.
 6   Q.   Which ones?
 7   A.   I said I don't know the name of the drugs.
 8   Q.   Do you have any of those medications with you today?
 9   A.   No.
10   Q.   When did you take them?
11   A.   Last night.
12   Q.   What are each of the three intended to treat?
13   A.   Anxiety and heart condition.
14   Q.   Who is prescribing those for you?
15   A.   My M.D.
16   Q.   Which one?
17   A.   Qamar.
18   Q.   I'm sorry?
19   A.   Qamar.
20   Q.   How do you spell that?
21   A.   I think Q-A-M-A-R.
22   Q.   What is that doctor's first name?
23   A.   Shazer (sic), Shazer.
24   Q.   Can you give a -- go ahead, take a drink.
25   A.   Yeah, I'll get back with you in a minute.  I can give
```

---

Page 24

```
 1        it to you in writing.  I don't know her name.  I will
 2        provide Dr. Qamar.  I'm not good with names.
 3   Q.   What's the approximate spelling of her first name?
 4   A.   S-H -- I'm sorry.
 5   Q.   And then where is this doctor located?
 6   A.   Warren, Michigan.
 7   Q.   And the doctor is prescribing you the heart medication
 8        and the antianxiety medications?
 9   A.   Yes.
10   Q.   Do you know if Dr. Qamar is working in conjunction
11        with a therapist to prescribe those medications for
12        you?
13   A.   They're in same health system, yes.
14   Q.   Who is the therapist?
15   A.   Lemica Fox.
16   Q.   Lemica Fox?
17   A.   Cox.
18   Q.   Cox.  And where is Lemica Cox located?
19   A.   I think Detroit office.
20   Q.   How often do you take each of those medications?
21   A.   They're supposed to be daily for my heart condition.
22   Q.   And then how about for anxiety; is that as needed or
23        on a regular basis?
24   A.   Regular.
25   Q.   When you say regular, do you mean weekly, daily, or
```

---

Page 25

```
 1        something different?
 2   A.   Daily.  I'm on this for short-term.
 3             COURT REPORTER:  I'm sorry, what was the
 4        last thing you just said?
 5             THE WITNESS:  I said short-term.
 6   BY MR. WARREN:
 7   Q.   When were you first prescribed the antianxiety
 8        medication that you are currently taking?
 9   A.   Couple weeks ago.
10   Q.   Had you been prescribed antianxiety medication before
11        then?
12   A.   No.
13   Q.   So the first time you ever took antianxiety medication
14        was two weeks ago?
15   A.   Correct.
16   Q.   Had you been prescribed any antidepressants before two
17        weeks ago?
18   A.   No.  Are antianxiety and depression the same?
19   Q.   I view them as different, but maybe you view them as
20        the same; do you?
21   A.   I don't know.
22   Q.   Okay.  So is it two -- you said you took three within
23        the last 24 hours; is it two anxiety medications and
24        one heart medication or two heart medications and one
25        anxiety?
```

Page 26

1  A.  Just one heart and one anxiety.
2  Q.  So two medications in the last 24 hours?
3  A.  Correct.
4  Q.  But you mentioned a third; is there a third
5      medication?
6  A.  That's as needed, another anxiety medication.
7  Q.  Okay.  So two anxiety medications.  Do you remember
8      the name of either one?
9  A.  No.
10 Q.  Are both being prescribed by Dr. Qamar?
11 A.  Qamar.
12 Q.  That's a yes?
13 A.  Yes.
14 Q.  What about the last week, other than those three
15     medications that you've identified, do you take any
16     other medications on a regular basis?
17 A.  No.  Vitamins.
18 Q.  Let me ask a better question.  Other than those three,
19     are there any prescription medications --
20 A.  No.
21 Q.  -- that you have taken within the last week?
22 A.  No.
23 Q.  And if I were to broaden it to the last six months,
24     are those the only three prescription medications you
25     were taking?

Page 27

1  A.  Yes.
2  Q.  Since you -- your employment with the company ended,
3      have you taken any other prescription medications
4      other than the ones that you identified?
5  A.  No.
6  Q.  You underwent a couple of interviews, at least two, in
7      response to your complaints at the company.  Do you
8      recall that?
9  A.  I think there were more than two.
10 Q.  How many do you think there were?
11 A.  I'll guess about five.
12 Q.  Five.  In any of those interviews, did you make any
13     false statements or were all of your statements
14     truthful?
15 A.  I describe what happened.
16 Q.  Did you do so truthfully?
17 A.  Yes.
18 Q.  So whatever you said during those interviews, I can
19     rely upon all of that as truthful, correct?
20 A.  Much as I can, because that's describing what they
21     did.
22 Q.  But you're not aware of any false statements that you
23     made in any of those investigatory interviews,
24     correct?
25 A.  I answered them as what happened.

Page 28

1  Q.  Okay.  Your title when you were with the company was
2      data analyst, right?
3  A.  Data analytics project manager.
4  Q.  As a data analytics project manager, what do you think
5      your strengths were?
6  A.  That the project manager being a PMP understand the
7      data, understand the flow of the data, understand the
8      quality of data, understand the data governance, and
9      understand data ingestion system --
10         COURT REPORTER:  Data, what is it?
11         THE WITNESS:  Data ingestion, and more
12     importantly, understand the business what they're
13     doing.
14 BY MR. WARREN:
15 Q.  When you say the business what they're doing, do you
16     mean the customer?
17 A.  As in Gilbarco as a manufacturing company.
18 Q.  You used the abbreviation PMP, what do you mean by
19     that?
20 A.  That's professional -- program management
21     professional.
22 Q.  Are there any other strengths that you believe you had
23     in that role other than what you've already told me?
24 A.  Yeah, it's STEM background, meaning science
25     background, engineering background, an MBA financial

Page 29

1      background, accounting background, and supply chain
2      background.
3  Q.  Anything else or is that a complete list?
4  A.  I think -- I'm sure there's more, but that's all I can
5      think of.
6  Q.  Who did you work at -- who did you work with at
7      Gilbarco that you believe would agree that all of
8      those were strengths that you had?
9  A.  Probably VP-level people.
10 Q.  Which specific people?
11 A.  Sebastian Bach.
12 Q.  Anybody else?
13 A.  Anybody at a VP level, but I don't remember their
14     names.
15 Q.  How do you spell Sebastian's last name?
16 A.  Start with B-A -- B-A, but I don't remember.
17         COURT REPORTER:  Did you say Bach?
18         THE WITNESS:  I think Bach or Bach; I don't
19     remember.
20 BY MR. WARREN:
21 Q.  All right.  Do you think Sebastian had a good beat or
22     assessment on what your strengths were?
23 A.  Yes.  Anybody in that organization with VP and up have
24     engineering plus MBA combo, which I have.
25 Q.  What opportunities for improvement do you think you

Sohyon Warner
November 25, 2025

---

Page 30

1  had as a data analyst when you were with the company?
2  A.  I cannot speculate.
3  Q.  What do you mean by that?
4  A.  It depends on what they want from me.
5  Q.  But I'm not asking what you think other people thought
6  about you; I'm asking what you thought about yourself.
7  What opportunities do you think you had for
8  improvement when you were a data analyst with the
9  company?
10  A.  I don't understand your question.
11  Q.  Sure.  If you look at your own skills --
12  A.  Yes.
13  Q.  -- and the way you perform your job duties at any job,
14  anyone would have an opportunity or an ability to say
15  here's what I'm good at, here's what I can improve at.
16  You've given me the here's what I'm good at part.  I'm
17  asking you what do you think you could have improved
18  at while you were with the company?
19  A.  Based on my job performance, I don't see any.
20  Q.  So my question to you is how could you improve at the
21  company, and your answer is impossible; you were as
22  strong as you could be with zero opportunities for
23  improvement, correct?
24  A.  My job performance speaks for itself.
25  Q.  Do you agree with me or disagree with me?

---

Page 31

1  A.  My job performance speaks for itself.
2  Q.  If I characterize your answer and say you can't tell
3  me a single thing you could have improved while you
4  worked for the company, do you agree that that's a
5  proper characterization?
6  A.  According to my job performance, I'm a leading
7  contributor.
8  Q.  But I'm asking what you thought.
9  A.  I'm not going to speculate.
10  Q.  I'm not asking for speculation.
11  A.  I was great in all performance, and I was pretty good.
12  Q.  I'm asking what you thought about your own
13  opportunities for improvement; did you think you had
14  any while you worked for the company?
15  A.  According to my job performance, I met that.
16  Q.  I'm asking what you thought, not what other people
17  told you.
18  A.  I agree with the job performance review.
19  Q.  What do you mean you agree with the job performance
20  review?
21  A.  I did a pretty good job.
22  Q.  Do you think you had any opportunities to improve
23  while you were with the company?
24  A.  Not according to job performance; I'm a leading
25  contributor.

---

Page 32

1  Q.  So the answer is no, correct?
2  A.  Correct.
3  Q.  You don't think you have any way you could've
4  improved your --
5  A.  I'm relying heavily on my job performance.
6  Q.  But what did you think in your own mind?
7  A.  I'm going to rely on what the job performance said.
8  Q.  I'm asking what you thought in your own mind.
9  A.  I agree with job performance review.
10  Q.  So your answer is there was no way for you to have
11  improved your performance --
12  A.  According to job performance reviews, correct.
13  Q.  Did the job -- when you say performance review, which
14  one are you referring to?
15  A.  Annual job performance review, entire 2022.
16  Q.  When did you receive that?
17  A.  End of December.
18  Q.  December of 20 --
19  A.  '22.
20  Q.  Are you claiming that that job performance document
21  said there was no way for you to possibly improve your
22  performance?
23  A.  I'm going to go by what job performance review said;
24  it's written.
25  Q.  Is that a yes or a no?

---

Page 33

1  A.  I answer it with yes, what's on the job performance
2  review.
3  Q.  So you rely on whatever that review says, correct?
4  A.  Correct.
5  Q.  Okay.  Do you think the work duties that you performed
6  at the company were useful?
7  A.  I cannot speculate what company thought.
8  Q.  But I want to know what you thought.
9  A.  According to job performance review, I did what they
10  asked me to do.
11  Q.  So we have a fundamental problem here because I think
12  you are interpreting my question as asking for
13  information that other people have or other people
14  told you; I'm asking for what you thought.
15  A.  I agree with the job performance review.
16  Q.  What did it say about whether your job or your tasks
17  were useful?
18  A.  I don't have document in front of me; I can only go by
19  my memory, so I don't want to answer that.
20  Q.  So what does your memory tell you?
21  A.  That I'm a leading contributor.
22  Q.  Anything else that you remember?
23  A.  I don't recall.
24  Q.  What kinds of things did you do to help your managers
25  while you were at Gilbarco?

---

Sohyon Warner
November 25, 2025

Page 34

1    A.   Whenever she asked me to create slides for her.
2    Q.   When you say she or her, are you referring to Roseanna
3         Hurst?
4    A.   Roseanna Hurst, yes.
5    Q.   So create slides; is there anything else you did to
6         help your manager, Roseanna Hurst, while you were at
7         the company?
8    A.   Whatever she ask of me.
9    Q.   Anything that you specifically recall?
10   A.   Come up with the one-pager for waterfall methodology.
11   Q.   Anything else?
12   A.   That's all I can recall.
13   Q.   In general, do you think it's important for employees
14        to follow instructions from their supervisors?
15   A.   What do you mean by that?
16   Q.   Well, you understand how supervision works:
17        Supervisors direct employees to undertake tasks or
18        projects or accomplish goals, correct?
19   A.   Correct.
20   Q.   Do you think as a general proposition it's important
21        for subordinates to follow their directives from their
22        supervisor?
23   A.   If they comply to policy and they're not breaking the
24        law, yes.
25   Q.   Okay.  Did you think it was important for you to

Page 35

1         follow instructions from your supervisors while you
2         worked for the company?
3    A.   If the supervisor's following the policy and is not
4         illegal, yes.
5    Q.   Then it was required, correct?
6    A.   What is required?
7    Q.   For you to follow those instructions.
8    A.   Again, if they're giving me illegal direction, no.
9    Q.   When you refer to policy, which policies are you
10        referring to?
11   A.   Their company policy, any law, data policy, project
12        policy; there's guidelines.
13   Q.   Can you think of any instructions or requests that you
14        were given from a supervisor at Gilbarco that you
15        thought was illegal?
16   A.   Correct.  By Ivan to break the statement of work.
17             COURT REPORTER:  Statement of work?
18             THE WITNESS:  Uh-huh.
19   BY MR. WARREN:
20   Q.   Anything else other than that one instance?
21   A.   He also forcing me to provide data to third party.
22   Q.   Anything else?
23   A.   He didn't follow the procedure of a data security.
24   Q.   So I'm going to talk over you just this once in the
25        middle of your answer.  I won't make a habit of this.

Page 36

1         But I'm asking for illegal requests; requests that you
2         thought were illegal, against the law.
3    A.   What do you mean by that?
4    Q.   Well, you told me it's important for you to have
5         followed instructions from your supervisors unless
6         they were illegal or against policy.  Do you recall
7         telling me that?
8    A.   Yes.
9    Q.   And I've asked you were there any occasions where you
10        were given a request from your supervisor or a
11        directive that was illegal, right?
12   A.   I believe I said it as any rules or policy or legal,
13        meaning that I will probably do the right thing, not
14        necessarily mean that they gave me something illegal,
15        but I'm not sure that data security is considered
16        illegal/legal because it's kind of gray, because it is
17        a global company, so they have to adhere by the global
18        data law.
19   Q.   So I'm confused by your answer.
20   A.   Okay.
21   Q.   Are you now telling me that Ivan did or did not ask
22        you to do something illegal?
23   A.   I will say illegal.
24   Q.   Okay.  And you told me two things that he said to you
25        or asked you to do that were illegal:  One was to

Page 37

1         break the statement of work?
2    A.   Correct.
3    Q.   And the second one was to provide data to a third
4         party?
5    A.   Correct.
6    Q.   Is there anything else that you believe he asked you
7         to do that you thought was illegal?
8    A.   He harassed me.
9    Q.   That's different.
10   A.   I understand.
11   Q.   And we'll get --
12   A.   That's all I can think of for right now.  Again, it's
13        three years ago.
14   Q.   What is Ivan's last name?
15   A.   Ayma.  I'm not good with names.
16   Q.   How would you try and spell it if you had to?
17   A.   It's A-Y-M-A, Ayma, Ayma, Ayma.
18   Q.   Other than Ivan, is there anybody at Gilbarco in a
19        supervisory role that asked to you do something that
20        you thought was illegal?
21   A.   I'm pretty sure, but I cannot think of right now.
22   Q.   You're not sure?
23   A.   I'm not sure; I cannot recall.
24   Q.   Okay.  Let's go to the first example.  You said that
25        Ivan asked you to break the statement of work.  What

Sohyon Warner
November 25, 2025

Page 38

1    statement of work are you referring to?
2  A.  Statement of work that he signed with the third party.
3  Q.  Who is the third party?
4  A.  I don't remember.
5  Q.  Do you remember what the name of this project was?
6  A.  Juxta.
7  Q.  J-U-X-T-A?
8  A.  Yeah, yes.
9  Q.  And how do you believe the statement of work was being
10      broken per his request?
11  A.  I read the statement of work, and he's asking me to do
12      that is outside of that work.
13  Q.  What specifically did he ask you to do that you
14      believe was outside the statement of work?
15  A.  He said certify the data.
16  Q.  When you say certify the data, what do you mean?
17  A.  That's what he asked me to do; that was not on a
18      statement of work.
19  Q.  What was your interpretation of what specifically he
20      was asking you to do?
21  A.  That my understanding what he's asking is that data is
22      quality checked.
23  Q.  So certification means quality-check it, correct?
24  A.  And good to go.
25  Q.  Did you perform the quality check to certify the data?

Page 39

1  A.  No.
2  Q.  Did you tell him you were not going to do that?
3  A.  No.
4  Q.  Why not?
5  A.  Because that responsibility is with other department.
6  Q.  Which department?
7  A.  That's under Paul Blaser.
8  Q.  Why do you think it was illegal if another department
9      was supposed to be doing it?
10  A.  Illegal is the fact that they want to use certified
11      data and give it to the third party.
12  Q.  Are you claiming that having you certify the data was
13      a breach of contract?
14  A.  No, not -- my job is not certify the data.
15  Q.  Is that why you refused to certify the data, because
16      it wasn't part of your responsibilities?
17  A.  No, I didn't comply because that's not on statement of
18      work; that's never agreed on.
19  Q.  Who drafted the statement of work, if you know?
20  A.  Ivan.
21  Q.  Ivan did.  Do you have any role in drafting statements
22      of work?
23  A.  Not for that project, no.
24  Q.  Did Ivan charge you or tell you or give you authority
25      to interpret what the statement of work meant?

Page 40

1  A.  He tried.
2  Q.  You refused?
3  A.  I go by what's in writing.
4  Q.  When did he make this request that you certify the
5      data?  You probably can't remember a day, but what was
6      the month and the year?
7  A.  Probably like September-ish.
8  Q.  Of '22?
9  A.  Yeah.
10  Q.  Did he ask you to do that in writing?
11  A.  Yeah.
12  Q.  Did you respond at all?
13  A.  Yeah.
14  Q.  What did you say?
15  A.  It's not in the statement of work.
16  Q.  Did he respond to that?
17  A.  Yeah.
18  Q.  What did he say?
19  A.  I don't recall.
20  Q.  Do you think it's possible he could have interpreted
21      that as your refusal to perform job duties?
22          MR. COOPER:  I'm going to object.  It calls
23      for speculation.  She doesn't know what --
24  A.  Yeah, I have no idea what he's thinking.
25  BY MR. WARREN:

Page 41

1  Q.  Yeah, you can answer those questions, unless he tells
2      you not to answer.
3  A.  No, I said I cannot think what he's thinking.
4  Q.  And who specifically do you think it was their
5      responsibility to certify that data?
6  A.  Come again?
7  Q.  You said another department was supposed to interpret
8      or certify that data; which department was that?
9  A.  That's Paul Blaser's department.
10  Q.  Okay.  What's his department called at this time?
11  A.  Data analytics.
12  Q.  That's what you worked in, correct?
13  A.  I'm a PMP; I'm a project manager.
14  Q.  Go ahead.
15  Q.  Go ahead.
16  Q.  No, no, you first.
17  A.  No, go ahead.
18  Q.  But your responsibility, at large, was data analytics,
19      correct?
20  A.  My primary job is project management.
21  Q.  Under the umbrella of data analytics, right?
22  A.  I have cross-functional role.
23  Q.  Do you know if anybody eventually certified that data?
24  A.  I don't know.
25  Q.  And then the other thing that you told me that you

Sohyon Warner
November 25, 2025

Page 42

1    believe he asked you to do that was illegal was
2    providing data to a third party.  What data are you
3    referring to?
4  A.  They -- he wanted third party to certify the data.
5  Q.  What data?
6  A.  The same data I'm talking about; the data that Paul is
7    supposed to be certifying, they want third party,
8    which they're not supposed to touch our customer's
9    data to certify it; that's a no-no.
10 Q.  So both of these instances relate to the same
11   underlying example, correct?
12 A.  Correct.
13 Q.  And you don't remember the name of -- this was Juxta,
14   correct?
15 A.  Juxta is -- yeah.
16 Q.  Who was the third party?
17 A.  I don't remember the company, but I know it was third
18   party.
19 Q.  How did he ask you to provide that data to a third
20   party; was it over e-mail, was it in a Teams meeting,
21   or in some other form?
22 A.  E-mail group meeting, ambushing me.
23 Q.  Why do you say ambushing you?
24 A.  It's not one-on-one e-mail.
25 Q.  I don't understand; why is an e-mail including other

Page 43

1    people an ambush?
2  A.  Because he's my direct manager.
3  Q.  I still don't understand.  Why would it be an ambush
4    for your direct manager to e-mail you and other
5    people?
6  A.  That's how we communicated.
7  Q.  Was that -- the people on the e-mail, was that part of
8    the team that was handling this project?
9  A.  No.
10 Q.  Who were the other people on the e-mail?
11 A.  Two other managers.
12 Q.  Who were they?
13 A.  Oliver and there was one more guy; I don't remember.
14 Q.  Do you recall Oliver's last name?
15 A.  No.  It will come to me a little later.
16 Q.  So what specifically did he ask you to do in that
17   e-mail?
18 A.  To step outside of statement of work.
19            COURT REPORTER:  Step outside?
20            THE WITNESS:  Outside statement of work.
21 BY MR. WARREN:
22 Q.  Can you explain that further, because I don't
23   understand.
24 A.  Let's say -- I'll give you example.  I order you --
25   you order me two-layer cake.  All of a sudden they

Page 44

1    want a three-layer cake.  That's scope breach.  So I'm
2    only in contract -- I only obligated to give you
3    two-layer cake.
4  Q.  Did you have authorization to communicate one-on-one
5    with the customer about the statement of work?
6  A.  Who's the customer?
7  Q.  I don't know who the customer is in this instance.
8  A.  So I can't answer that.
9  Q.  So on Juxta, were you charged with negotiating the
10   terms of the statement of work?
11 A.  No.
12 Q.  Who was that?
13 A.  Ivan.
14 Q.  Ivan?
15 A.  Yeah.
16 Q.  So you wouldn't have any knowledge of any negotiated
17   changes that were approved on the Juxta statement of
18   work, correct?
19 A.  Correct.  I'm only going by the latest statement of
20   work; that's the contract.  So basically he asked me
21   to break the contract.  No.
22 Q.  But you weren't involved in negotiations over that
23   contract, right?
24 A.  Correct, but contract is written.
25 Q.  And you know that sometimes contracts are modified as

Page 45

1    the work evolves --
2  A.  Correct.
3  Q.  -- right?
4  A.  So he needed to go back and change the statement of
5    work.
6  Q.  Do you know that he did not do that for a fact?
7  A.  I do not know.  I only go by what he gave me.
8  Q.  So he asked you on this e-mail to provide data to a
9    third party; you don't remember who the third party
10   is, correct?
11 A.  Correct.
12 Q.  Do you understand -- go ahead.
13 A.  I think Allata or something like that, the name of the
14   company.
15 Q.  Do you remember how that is spelled?
16 A.  It's spelled with an A-L and somewhere have a T, I'm
17   sorry.
18 Q.  Did you respond to that e-mail?
19 A.  What e-mail?
20 Q.  You said that there was an e-mail involving -- that
21   was sent to you with two managers on it regarding this
22   Juxta project, that was your testimony; do you recall
23   that?
24 A.  Yes.
25 Q.  Is that e-mail where he asked you to send the data to

Sohyon Warner
November 25, 2025

Page 46

1    a third party?
2  A. He asked me to certify the data.
3  Q. I know. We already talked about that. We're on to
4     the second example. You said you thought it was
5     illegal that he asked to you send the data to a third
6     party. Do you remember that testimony?
7  A. The -- I'm trying to go by memory. He asked me to
8     certify the data by Allata, not -- he want the third
9     party to certify the data.
10 Q. So you've given me two examples previously of illegal
11    things that he asked to you do, but now from your
12    testimony I understand this is all one example --
13 A. Correct.
14 Q. -- right?
15 A. Correct.
16 Q. Okay. So then you've already told me that you
17    responded, and how you responded, correct?
18 A. Correct. Which was, I don't know, can you rephrase it
19    for me?
20 Q. Well, let me ask a different question; that may help.
21 A. Okay.
22 Q. Do you know whether the data was ever provided to the
23    third party, and if so, by who?
24 A. I believe Ivan took it and gave it to the third party.
25 Q. Okay. But you didn't have to do it, right?

Page 47

1  A. Correct. That's also illegal.
2  Q. What's illegal?
3  A. He was not in that department to pull the data and
4     give it to the third party.
5  Q. Do you know where he got the data from?
6  A. He worked at -- before he got moved into a group
7     called Vontier, he was in another department called
8     360-something.
9           COURT REPORTER: I'm sorry, what was the
10    first group called?
11          MR. WARREN: Vontier, V-O-N-T-I-E-R.
12 BY MR. WARREN:
13 Q. My question was: Do you know where he got that data
14    from?
15 A. I do not know.
16 Q. And you don't know what steps he took to get that
17    data, correct?
18 A. No.
19 Q. And you don't -- you don't have personal knowledge
20    that that data was transmitted or how it was
21    transmitted, correct?
22 A. Correct, because I got into that project two months
23    into it.
24 Q. And this, you're all still talking about Juxta,
25    correct?

Page 48

1  A. Correct.
2  Q. Do you agree with me that if you are not following
3     your supervisor's lawful instructions that are
4     pursuant to policy, you are not meeting the company's
5     expectations?
6  A. I don't know how to speculate what they're thinking.
7  Q. You'd rely on the company for that, right?
8  A. Yeah.
9  Q. Okay. When you worked at Gilbarco, who did you
10    consider to have been your peers? And if that changed
11    --
12 A. Go back to your last question; I didn't understand.
13 Q. No, you answered it.
14 A. But I will like to re-answer it.
15 Q. Go ahead.
16 A. What was the question?
17 Q. I'm done with the question. I have a new one.
18 A. Well, you say something about -- again, I think I just
19    jotted out, but I don't recall what I just said.
20 Q. If something comes to you later, you can tell me, but
21    for this one --
22 A. Why can't you repeat the last question?
23 Q. Because you've answered it.
24 A. I want you to say it again, because I don't think I
25    answered it correctly.

Page 49

1  Q. I know, but this is my examination, not yours. If
2     your attorney wants to follow-up, he certainly can.
3           THE WITNESS: Are you going to follow that
4     up?
5           MR. COOPER: I guess I can follow that up.
6  BY MR. WARREN:
7  Q. So when you were at Gilbarco, who would you have
8     considered to have been your peers? And you can tell
9     me if that changed from time to time.
10 A. Anybody who worked in data analytics group.
11 Q. Who are those people?
12 A. I'm not finished.
13 Q. Go ahead.
14 A. And PMO group.
15 Q. Who are those people?
16 A. What's in Paul's organization chart and what's in
17    Rosie's organization chart.
18 Q. Anybody else that you would have considered to have
19    been your peer?
20 A. There was some few other department was working with
21    other projects; I don't recall their names.
22 Q. Do you remember the people of anybody who -- the names
23    of anybody who worked in data analytics that you
24    considered to be your peer?
25 A. Repeat that question.

Sohyon Warner
November 25, 2025

Page 50

| | | |
|---|---|---|
| 1 | Q. | Yep.  Do you remember the names of anybody who worked |
| 2 | | in data analytics that you believed was your peer? |
| 3 | A. | Dr. Porter. |
| 4 | Q. | What was Dr. Porter's first name? |
| 5 | A. | Tanya. |
| 6 | Q. | Anybody else? |
| 7 | A. | Shawn McClellan.  Again, it's in the org chart. |
| 8 | Q. | Anybody else that you specifically recall? |
| 9 | A. | Dr. Porter and Shawn. |
| 10 | Q. | And in the PMO group, who were the names of the people |
| 11 | | in that group that you considered to be your peers? |
| 12 | A. | Everybody in that org chart. |
| 13 | Q. | Do you recall any specific names? |
| 14 | A. | There was a lady named Amy Bath. |
| 15 | Q. | B-A-T-H? |
| 16 | A. | Uh-huh, and some others. |
| 17 | Q. | Do you remember any specific others? |
| 18 | A. | No, it's in the org chart.  Again, it's three years |
| 19 | | ago. |
| 20 | Q. | Tanya Porter; do you remember what her job title was? |
| 21 | A. | Data scientist manager -- data science manager. |
| 22 | Q. | Do you recall who she reported to? |
| 23 | A. | Paul Blaser. |
| 24 | Q. | How about Shawn McClellan, what was his title? |
| 25 | A. | He took over my title on the org chart. |

Page 51

| | | |
|---|---|---|
| 1 | Q. | Was he a contractor before he became a full-time |
| 2 | | employee? |
| 3 | A. | Correct. |
| 4 | Q. | Do you remember when he became a full-time employee? |
| 5 | A. | Before me -- no, July '22. |
| 6 | Q. | Were you responsible for hiring him on full-time? |
| 7 | A. | No. |
| 8 | Q. | Okay.  Did you play any role in that decision to bring |
| 9 | | him on? |
| 10 | A. | No. |
| 11 | Q. | Do you know the factors why the company decided to |
| 12 | | bring him on? |
| 13 | A. | No. |
| 14 | Q. | Okay.  Who did he report to? |
| 15 | A. | Rosie Hurst. |
| 16 | Q. | And then Amy Bath, what was her job title? |
| 17 | A. | Project manager. |
| 18 | Q. | Who did she report to? |
| 19 | A. | Rosie. |
| 20 | Q. | What does PMO stand for as you use that term? |
| 21 | A. | Project management office. |
| 22 | Q. | How did it differ from data analytics in terms of what |
| 23 | | each group did? |
| 24 | A. | It's project, it could be any different project; it |
| 25 | | could be data project, manufacturing project; it's |

Page 52

| | | |
|---|---|---|
| 1 | | just project, but I'm linked to data analytics. |
| 2 | Q. | And then do you know who Paul Blaser reported to? |
| 3 | A. | Martina Schoultz. |
| 4 | Q. | And then do you know who Rosie reported to? |
| 5 | A. | Jason Moorehead. |
| 6 | Q. | Do you remember Jason's title? |
| 7 | A. | VP of finance. |
| 8 | Q. | As of mid 2022, how many people would you have been |
| 9 | | working with on a regular basis? |
| 10 | A. | It varies. |
| 11 | Q. | So let me ask this question:  You were working mostly |
| 12 | | remote, correct? |
| 13 | A. | Correct. |
| 14 | Q. | How often did you come into the office? |
| 15 | A. | Zero. |
| 16 | Q. | Was there an office that you -- although you may not |
| 17 | | have gone to, that you reported in to? |
| 18 | A. | I was hired as a remote. |
| 19 | Q. | Did you ever show up at any office? |
| 20 | A. | I was -- there was a workshop in November of 2022. |
| 21 | Q. | Where was that? |
| 22 | A. | Their plant in North Carolina. |
| 23 | Q. | What city? |
| 24 | A. | Greensboro. |
| 25 | Q. | So at no point, other than that, did you show up and |

Page 53

| | | |
|---|---|---|
| 1 | | work your normal workday out of a Gilbarco office, |
| 2 | | correct? |
| 3 | A. | I was not hired to do that; I was remote fully. |
| 4 | Q. | But that's a no, right? |
| 5 | A. | Correct.  I was hired remotely. |
| 6 | Q. | Do you know if you were organized onto a specific team |
| 7 | | involving other people? |
| 8 | A. | I don't understand the question. |
| 9 | Q. | Who did you work with regularly to perform your job |
| 10 | | duties? |
| 11 | A. | It varied, because several different projects. |
| 12 | Q. | Maybe we can start there.  Which projects did you work |
| 13 | | on from start to finish during your employment? |
| 14 | A. | I start with the Core Data Lake; that's what I was |
| 15 | | hired to do. |
| 16 | Q. | What next? |
| 17 | A. | They demote me and put me into a PCI project.  I had |
| 18 | | nothing to do with that. |
| 19 | Q. | What after that? |
| 20 | A. | Demand Planning -- then I went to Juxta; then they put |
| 21 | | me back on Demand Planning. |
| 22 | | COURT REPORTER:  What is the name of it? |
| 23 | | THE WITNESS:  Demand Planning. |
| 24 | | COURT REPORTER:  Demand Plenty? |
| 25 | | THE WITNESS:  Planning. |

Sohyon Warner
November 25, 2025

Page 54

1                    COURT REPORTER:  Planning.  Sorry.
2    A.   Just to let you know, I worked on it, but there was a
3         project that is not initiated at the time, so just to
4         let you know there was several projects and I only do
5         stuff that is initiated, so that's the progression.
6    BY MR. WARREN:
7    Q.   After Demand Planning, did you work on any projects
8         prior to your termination?
9    A.   No.
10   Q.   Okay.  So four total projects that you worked on while
11        you were at Gilbarco?
12   A.   It's not project.  There's program and there's
13        projects underneath.  Do you understand the hierarchy?
14   Q.   So what are you terming these:  programs --
15   A.   These are program level.
16   Q.   -- or projects?
17                    COURT REPORTER:  I'm sorry, you
18        interrupted; what is the answer?
19                    THE WITNESS:  Program level.
20                    COURT REPORTER:  Thank you.
21   BY MR. WARREN:
22   Q.   Other than those four, did you work on any programs
23        while you worked for Gilbarco?
24   A.   Programs, no; projects, yes.
25   Q.   All right.  What projects did you work on?

Page 55

1    A.   I get pulled into data quality project as I needed --
2         get help, they want my input, stuff like that, but
3         it's not considered major program, if that makes
4         sense.
5    Q.   Would these projects have fallen under the umbrella of
6         each one of these --
7    A.   Let me --
8    Q.   Let me finish my question.
9    A.   Okay.
10   Q.   And I'm not doing that to be rude; I'm just trying to
11        make sure the record is clear.
12             Would these projects that you worked on
13        have fallen under the umbrella of one of those four
14        programs that you worked on?
15   A.   Yes.
16   Q.   Okay.
17   A.   Not as a project manager, but they just -- I'm not in
18        the project, but they call me for just asking
19        questions, so I go to, once or twice, meetings, so
20        it's not really fully project, but my input was
21        required, if that makes sense.
22   Q.   So I cut you off.  You were going to explain
23        something; go ahead.
24   A.   That's what I meant.  I'm not saying I'm in the
25        project; I'm pulled into a certain project to put my

Page 56

1         input, so I'm not really in the projects.
2    Q.   So when you say you're pulled in, is this on a
3         temporary basis like a week or a month or is it to
4         provide on-the-spot answers?
5    A.   On-the-spot answer.
6    Q.   So you would be pulled in to provide on-the-spot
7         answers and then your involvement would be over,
8         right?
9    A.   Correct.
10   Q.   The Core Data Lake project, who was in charge of that?
11   A.   Product owner was Paul Blaser.
12   Q.   How about PCI?
13   A.   There wasn't any -- everybody was finger-pointing;
14        nobody wanted to take on that project.
15   Q.   So I think you are saying what happened in
16        practicality, but was there someone in charge of that
17        project by name?
18   A.   It was sponsored by Martina Schultz.
19   Q.   And then Juxta; that's Ivan?
20   A.   No.  The Juxta guy, I think his name is Barack.
21   Q.   B-A-R-A-C-K?
22   A.   Just like --
23   Q.   Barack Obama.
24             And then Demand Planning?
25   A.   That's Sebastian.

Page 57

1    Q.   You mentioned that you thought PCI was a demotion.
2    A.   Correct.
3    Q.   Tell me why you thought it was a demotion.
4    A.   It's not data analytics, no resource, no visibility,
5         no team, and I'm not an expert.
6    Q.   Any other reason why you thought it was a demotion?
7    A.   Because it is nothing to do with what I hired, low
8         visibility, meaning that I'll probably never going to
9         get promoted, nobody know what I'm doing.
10   Q.   Anything else or is that a complete list?
11   A.   Probably set me up to fail.
12   Q.   How long did you spend on the PCI project program?
13   A.   I'd say somewhere in beginning part of May to like
14        middle of August.  I'm not sure.  I think it's around
15        there.
16   Q.   So your total time in that program, the PCI program,
17        was May to August of 2022, correct?
18   A.   Yes.
19   Q.   And then let's go back to Core Data Lake; when did you
20        start and end your work on that program?
21   A.   I believe I was hired in December and I was demoted
22        from that role in May.
23   Q.   2022?
24   A.   May 2022.
25   Q.   When you were placed on the PCI program, did that

Sohyon Warner
November 25, 2025

Page 58

1    cause a reduction in your pay?
2  A.  No.
3  Q.  Did that cause a reduction in your benefits?
4  A.  No.
5  Q.  Did you get suspended or disciplined in conjunction
6      with being moved to that project?
7  A.  No.
8  Q.  Did your hours on that project change?
9  A.  No.
10 Q.  Other than what you told me, did any other term and
11     condition of your employment change as a result of
12     being put on the PCI program?
13 A.  I'm no longer in high visible top program.
14 Q.  Between you and the company, who do you think had the
15     authority to decide what program to put you on?
16 A.  I cannot speculate.
17 Q.  When you hired in, you didn't come in with the
18     understanding that you would be able to tell the
19     company which projects you would work on and which
20     projects you would not, correct?
21 A.  Yeah, but this is based on the protected activity that
22     I enter in April; they retaliated me.
23 Q.  We'll get to that.  But you understand, as a general
24     proposition, that when you hire in to work for a
25     company, the company will tell you where to work and

Page 59

1      what to work on, correct?
2  A.  Not according to the job description I sign onto.
3  Q.  Where is that job description?
4  A.  In my file on the Bates that you produced on my
5      on-boarding document.
6  Q.  Is it your position that the company can never change
7      someone's job description?
8  A.  I'm the only one with that job description.
9  Q.  You haven't answered my question though.  Do you agree
10     with me that companies generally have the right to
11     change --
12 A.  I don't know.
13 Q.  -- job descriptions?
14 A.  I don't know what companies do.
15 Q.  You're not sure?
16 A.  I'm not sure.
17 Q.  Okay.  So you were on the PCI program from May to
18     August of 2022, and then you moved to Juxta?
19 A.  Correct.
20 Q.  That would have been in August of '22?
21 A.  Yes.
22 Q.  And then when did you leave Juxta?
23 A.  October.
24 Q.  And then you went to Demand Planning, correct?
25 A.  That was given to me.

Page 60

1  Q.  You say that was or was not given to me?
2  A.  Given to me.  I did what they told me to do.
3  Q.  And you started then on that program August of 2022
4      until when, your termination?
5  A.  Which one, Juxta?
6  Q.  No, Demand Planning.
7  A.  October to January.
8  Q.  January of '23?
9  A.  Yes.
10 Q.  Would you characterize Juxta as a high-visibility or a
11     low-visibility project?
12 A.  High visibility.
13 Q.  So you went from PCI, which you thought was low
14     visibility, to a high visibility project a few months
15     later, correct?
16 A.  Yeah, without the requisition.
17 Q.  What did you say, without the requisition?
18 A.  Correct.
19 Q.  What do you mean by that?
20 A.  I was going from Gilbarco to Vontier as a
21     corporate-level person; they never pulled the
22     requisition.
23 Q.  Why is that significant to you?
24 A.  Because of higher pay.
25 Q.  Are you saying you should have been entitled to more

Page 61

1      pay?
2  A.  Correct.
3  Q.  Who makes that decision as to what pay you're entitled
4      to?
5  A.  Company, I guess.
6  Q.  Okay.  And then Demand Planning, was that high
7      visibility or low visibility?
8  A.  High visibility.
9  Q.  Even if you think the PCI project was a demotion, you
10     got two successive high-visibility projects after
11     that, correct?
12 A.  What do you mean by successive?
13 Q.  One right after the other.
14 A.  Oh, yes.
15 Q.  Okay.  Do you know who made the decision to assign you
16     to Core Data Lake?
17 A.  Don't know.
18 Q.  Do you know who made the decision to assign you to
19     PCI?
20 A.  Don't know.
21 Q.  Do you know who made the decision to assign you to
22     Juxta?
23 A.  Don't know.
24 Q.  Is your answer the same for the final program that you
25     were on?

Page 62

1  A.  Don't know, because that's original; Demand Planning
2      was with me from day one.
3  Q.  You were not in any rooms where decisions were made
4      about what programs to put you on, correct?
5  A.  Correct.
6  Q.  So you would not have personal knowledge as to the
7      reasons why the company made those decisions, correct?
8  A.  I cannot speculate for the company, yeah.
9  Q.  Okay.  Any other demotions that you think that you had
10     other than what we've already talked about?
11 A.  They also pulled me out of the Demand Planning
12     project; they also did not pull the requisition.
13 Q.  Where did you go after Demand Planning?
14 A.  Nowhere.
15 Q.  How much time did you spend, as you say, nowhere in
16     between Demand Planning and your termination?  Let me
17     ask it a better way.
18 A.  Okay.
19 Q.  When did you come off of Demand Planning, what month?
20 A.  January.
21 Q.  January of 2023.  What work were you doing between
22     January of 2023 and your termination?
23 A.  I do know they put me on pay leave, so January is
24     gone; February until probably March.
25 Q.  What work were you doing between February and March?

Page 63

1  A.  AX.
2  Q.  What is AX?
3  A.  It's another financial stuff that I worked on before
4      Juxta, stuff that I worked on before Juxta, I probably
5      got it back.
6  Q.  Were you qualified to did that AX work or unqualified
7      to do it?
8  A.  I would say it was not my expertise.
9  Q.  But were you qualified to do it?
10 A.  Yeah, I'm program manager.
11 Q.  Okay.  Do you know who made the decision to remove you
12     from Demand Planning?
13 A.  Paul.
14 Q.  How do you know that?
15 A.  You have a writing.
16 Q.  What writing are you referring to?
17 A.  E-mail from the program manager for that program told
18     me that Paul removed me.
19 Q.  Who was the person that told you that?
20 A.  I think his name was Brendan.
21 Q.  Did Brendan tell you why?
22 A.  No.
23 Q.  One of the things that you had asked for prior to your
24     deposition was periodic breaks.
25 A.  Yeah.

Page 64

1  Q.  You can ask for those whenever you're ready.  I'd like
2      to keep going, but whenever you need a break, you can
3      ask for it.
4  A.  Yeah, I will take a break.  It's really warm in here.
5  Q.  Five minutes good?
6  A.  Yeah.
7          VIDEO TECHNICIAN:  Going off the record.
8      The time is 10:47 a.m.
9          (Off the record at 10:47 a.m.)
10         (Back on the record at 10:56 a.m.)
11         VIDEO TECHNICIAN:  We are back on the
12     record.  The time is 10:56 p.m.  Please proceed.
13 BY MR. WARREN:
14 Q.  Before we took a break, earlier you had told me about
15     a statement of work that Ivan had asked you to do
16     something about, and you said it went outside the
17     statement of work.  Do you recall that testimony?
18 A.  Yes.
19 Q.  Was that a statement of work that was between two
20     teams within the company?
21 A.  I think with third party.
22 Q.  And you don't know who the third party is, right?
23 A.  That Allata.
24 Q.  Allata?
25 A.  Yeah, that's the name of it.

Page 65

1  Q.  Okay.  Had you seen the statement of work?
2  A.  Yes.
3  Q.  How was it provided to you?
4  A.  It was given by Ivan.
5  Q.  To you and others on the team?
6  A.  Everybody had a copy of statement of work.
7  Q.  How did you get it, electronically or paper copy?
8  A.  Electronic; I'm remote.
9  Q.  And then do you know how many pages it was?
10 A.  I don't recall.
11 Q.  I've never seen one of those.  Maybe you can tell me,
12     are they five pages typically, are they ten pages, are
13     they 100 pages?
14 A.  There's no length, but usually have a project scope,
15     usually have what's supposed to be delivered; it's
16     almost like a contract; like ordering a cake, like I
17     want cake by certain day with blue frosting or yellow
18     frosting, that type of thing.
19 Q.  The one that you're referring to, does it look more
20     like a purchase order or does it look more like a
21     legal document to you?
22 A.  Statement of work is legal document.
23 Q.  Okay.  So it has defined terms?
24 A.  Correct.
25 Q.  And then is it signed?

Sohyon Warner
November 25, 2025

Page 66

1   A.   I don't recall.  I don't remember.
2   Q.   Do you recall this particular one was signed?
3   A.   I think when you get a statement of work, you get a
4        package of other stuff in it.  I know they signed
5        that.  So statement of work is part of this whole
6        total package, if that makes sense.
7   Q.   Okay.
8   A.   Okay.  Because other stuff, payment agreement and
9        stuff like that.
10  Q.   Back to the programs:  Core Data Lake, PCI project,
11       Juxta, and Demand Planning, did you request to move to
12       any of these?
13  A.   Nope.
14  Q.   You applied for Core Data Lake, correct?
15  A.   I apply for Data Lake data analytics program manager,
16       which says something about data ingestion in the job
17       description.
18  Q.   Was Core Data Lake part of the job application process
19       that you --
20  A.   Yes.
21  Q.   -- underwent?
22  A.   Yes.
23  Q.   How so?
24  A.   It's on the job description.
25  Q.   But you didn't get the job description until after you

Page 67

1        applied and were hired --
2   A.   No --
3   Q.   -- right?
4   A.   -- I apply for job description, I apply and hire for
5        that job, and that was the job description that I sign
6        onto.
7   Q.   Did you ever work on the Jira project, J-I-R-A?
8   A.   It's not a project; it's a tool.
9   Q.   Did you ever work with it or on it?
10  A.   Yes.
11  Q.   When?
12  A.   From Core Data project.
13  Q.   Okay.  Do you know if any of your peers also moved
14       from project to project or were they all assigned to a
15       single program and that's all they did?
16  A.   Just me and Dr. Porter, only two minority females
17       moved around.
18  Q.   Were was Dr. Porter moved from?
19  A.   Out of that project, Core Data.
20  Q.   Core Data.  Do you know where -- what other projects
21       or programs Dr. Porter worked on?
22  A.   No, because she told me that after that project, she
23       had nowhere to go.
24  Q.   You didn't supervise her, right?
25  A.   No.

Page 68

1   Q.   Do you know who did supervise her?
2   A.   Paul Blaser.
3   Q.   Were you present at any meetings during which Paul or
4        anyone else discussed reasons why Dr. Porter was
5        moved?
6   A.   I don't recall.
7   Q.   Is that a yes or a no?
8   A.   No.
9   Q.   So you would not know the reasons why the company
10       moved her from one project to another, correct?
11  A.   No.
12  Q.   Do you know how long she was employed by the company?
13  A.   Oh, I will say she was there at least three or four
14       years before me.
15  Q.   Do you know when her employment ended, if it did, by
16       the time you left?
17  A.   No, she ended this month.
18  Q.   Are you saying her Gilbarco employment ended this
19       month?
20  A.   Yeah.
21  Q.   How did you know that?
22  A.   She said -- LinkedIn have open to work, and she had
23       end date onto her LinkedIn.
24  Q.   Have you communicated with her at all on LinkedIn?
25  A.   Yeah.

Page 69

1   Q.   When did you start communicating with her on LinkedIn?
2   A.   When I was working there.
3   Q.   And then since your termination at Gilbarco, have you
4        communicated with her on LinkedIn?
5   A.   Yeah, we got together as a friend.
6   Q.   I'm not asking about get-togethers; I'm asking about
7        communicating through LinkedIn.
8   A.   Oh, no.  I just say hello, I'll call you, and we call.
9   Q.   And then have you exchanged any text messages with her
10       since your employment at Gilbarco ended?
11  A.   Yeah, to meet up here in Michigan.
12  Q.   When did you last meet with her?
13  A.   I think last year, July.
14  Q.   Have you communicated with her at all since last July?
15  A.   Yeah, just last week when I saw the LinkedIn, just to
16       see what's going on.
17  Q.   And how did you communicate with her?
18  A.   How's everything going?
19  Q.   I guess I'll ask a better question.  What method did
20       you use to communicate?
21  A.   Call.
22  Q.   Call?
23  A.   Uh-huh.
24  Q.   Have you ever discussed your lawsuit with her?
25  A.   Yes.

Page 70

1   Q.   When was the last time you did that?
2   A.   I think when I met her in July last year.
3   Q.   What did you tell her?
4   A.   That the lawsuit is filed.
5   Q.   How did she respond?
6   A.   Just matter of fact.
7   Q.   Have you taken any written statements from her?
8   A.   No.
9   Q.   Have you asked her to give you any written statements?
10  A.   She gave me a -- she was a reference to my job,
11       contract job I had once.
12  Q.   Of the people that you worked with, how many or which
13       ones would you classify as being skilled or good
14       employees?
15  A.   In what aspect?
16  Q.   Any aspect.
17  A.   I would say the knowledge competence, Dr. Porter;
18       Jasmine; and tech lead for Alatta.
19  Q.   I'm going to ask you to spell the last name.  You said
20       tech lead, who?
21  A.   Her name is Kim Nyugen.
22  Q.   Anybody else that you thought was competent or skilled
23       or a good employees?
24  A.   Sarah, Sebastian Bach, I'm pretty sure there are more;
25       that's all I can recall.

Page 71

1   Q.   Any supervisors that you thought were competent or
2        good at what they did?
3   A.   Sebastian Bach and people in VDS system, which I don't
4        remember their names.  Barack was good at Juxta.  I'm
5        talking about just the competence, the knowledge
6        level.
7   Q.   Anybody else or is that a complete list?
8   A.   That's all I can recall.  I'm pretty sure there's
9        more.
10  Q.   Of the people that you worked with, which did you find
11       to be truthful?
12  A.   What do you mean by that?
13  Q.   Did you run across any employees that you did not
14       believe ever lied to you?
15  A.   I cannot speculate.
16  Q.   As an employee with the company, the company placed
17       expectations on you, correct?
18  A.   Correct.
19  Q.   What were those expectations?
20  A.   It's on job performance review.
21  Q.   What do you recall?
22  A.   That I'm a leading contributor.
23  Q.   No, not your rating; what were are the expectations
24       that were reflected on that document?
25  A.   That I was competent, great communicating; I'm just

Page 72

1        speculating because I don't have that in front of me,
2        everything positive.
3   Q.   So your recollection of the expectations the company
4        placed on you is perform your job duties competently
5        and communicate well?
6   A.   I'm going by job description.  I complied to job
7        description and what it says on the job performance.
8        It varies.
9   Q.   Anything else that you recall?
10  A.   It's on the job description.  I delivered.
11  Q.   You would refer to that job description --
12  A.   Yeah.
13  Q.   -- as to what was expected of you?
14  A.   Yeah, delivered.
15  Q.   And your supervisors were responsible for setting
16       expectations for you, correct?
17  A.   Correct.
18  Q.   What was your -- while you worked for Gilbarco, what
19       was your physical work location each day; was it your
20       house?
21  A.   Yes.
22  Q.   Were you allowed or did you work outside your house,
23       like while you were traveling?
24  A.   When I traveled to North Carolina once, yeah.
25  Q.   Were you required to attend conferences?

Page 73

1   A.   Yes.
2   Q.   Which conferences did you attend?
3   A.   It was a workshop for Demand Planning.
4   Q.   Where was that?
5   A.   Inside of plant of Gilbarco in North Carolina.
6   Q.   So the attendance in North Carolina that you were
7        referring to earlier and this specific conference is
8        one and the same, correct?
9   A.   Correct.
10  Q.   Any other conferences that were not put on by the
11       company that you attended in the scope of your work?
12  A.   I don't recall.
13  Q.   Okay.  You may not know the answer to this, but do you
14       know which employees at Gilbarco had the ability to
15       look at your personnel records?
16            COURT REPORTER:  You have to answer.
17  A.   No, maybe just HR.
18  BY MR. WARREN:
19  Q.   Which HR employees are you referring to?
20  A.   I'm assuming Emily.  Again, I'm assuming.  I don't
21       know.
22  Q.   What's Emily's last name?
23  A.   Houser.
24  Q.   And again, you may not know this answer:  Do you know
25       which employees at Gilbarco had the ability to look at

Page 74

1    any investigation records regarding complaints that
2    you made?
3 A. Other than investigator?
4 A. Yes.
5 A. Don't know.
6 Q. Okay. Are you claiming that anybody at Gilbarco gave
7    your termination notice or termination reasons to any
8    third parties?
9 A. I have no idea.
10 Q. Okay. And you're not claiming that Gilbarco was out
11    telling third parties not to hire you for any reason,
12    correct?
13 A. I have no idea.
14 Q. Okay. No prospective employer has told you, look, we
15    can't hire you because here's what Gilbarco said about
16    you, correct?
17 A. No.
18 Q. You never participated in managing other employees or
19    supervising other employees, correct?
20 A. At Gilbarco?
21 Q. Yes.
22 A. No.
23 Q. What about elsewhere?
24 A. I managed somebody in India once for a very short
25    period of time.

Page 75

1 Q. Was that before your Gilbarco employment? Yes?
2 A. Yes.
3 Q. Who was -- who did you work for at the time?
4 A. A company called Conduin (sic).
5          COURT REPORTER: What is it?
6 BY MR. WARREN:
7 Q. How do you spell that?
8 A. Conduent, like Conduent, Conduent.
9          COURT REPORTER: Conduit?
10 BY MR. WARREN:
11 Q. Where were they based?
12 A. It's global company, but the Michigan office was in
13    Renaissance Center.
14 Q. When did you work there?
15 A. 2022 -- no, no.  20 --
16 Q. '23?
17 A. No, no, no, no, no. It was one of those '17 -- I
18    don't know. I don't know. I say 2012, that's what I
19    mean. I don't know.
20 Q. How many years did you work there for?
21 A. About a year and a half.
22 Q. How did your employment there end?
23 A. Laid off.
24 Q. Do you know if you were the only person laid off or
25    whether there were others laid off?

Page 76

1 A. Don't know.
2 Q. Who was your supervisor there?
3 A. They have a really weird reporting structure, because
4    I moved around there too, so I don't know. I don't
5    remember.
6 Q. When you say you moved around there too, what do you
7    mean?
8 A. It's like also project based, so there was not really
9    structure-structure.
10 Q. Does that mean you were moved from project to project
11    like you were at Gilbarco?
12 A. That's what happened in that company; everybody moved
13    around.
14 Q. Is that a yes?
15 A. Yes.
16 Q. And if you can give an estimate, how long did you
17    spend on any particular project; was there an average:
18    couple months, six months, longer?
19 A. I have a project that I dealt with for like two years,
20    to two months; it depends on the project scope. It
21    could be a short-term. When it becomes a longer
22    project, it becomes a program, not say project.
23 Q. Was this data analysis work as well?
24 A. It's finance. Yes, it's purchasing data, yeah.
25 Q. And then when did your employment there end, what

Page 77

1    year? '24 -- I'm sorry, 2014?
2 A. It's in the teens. It's in the teens.
3 Q. You never experienced -- or you never were part of any
4    decision-making team to discipline or terminate
5    someone at Gilbarco, correct?
6 A. Correct.
7 Q. While you were there, are you aware of anyone else
8    being terminated other than you?
9 A. That I know of; I hear some people were let go, but
10    that's it. Which, I have no idea who those people
11    are.
12 Q. So let me confine this question, first of all, to
13    personal knowledge, those that you know for certain
14    were terminated.
15 A. No.
16 Q. Okay. And then I gather you have heard that others
17    were terminated?
18 A. People I don't know, yeah.
19 Q. Do you know or recall any names?
20 A. No.
21 Q. Do you know how Dr. Porter's employment at Gilbarco
22    ended?
23 A. LinkedIn have open to work, sign, and the end date on
24    the Gilbarco.
25 Q. But do you know how it ended, whether it was voluntary

Sohyon Warner
November 25, 2025

Page 78

| | |
|---|---|
| 1 | or involuntary? |
| 2 | A. She said she was laid off. |
| 3 | Q. Have you had your deposition taken before today? |
| 4 | A. Yes. |
| 5 | Q. How many times? |
| 6 | A. This is my second time. |
| 7 | Q. When was the first time? |
| 8 | A. With -- like five -- five years ago or so. No, no, |
| 9 | no, like four years ago. |
| 10 | Q. Who was your attorney at the time? |
| 11 | A. Robert Palmer. |
| 12 | Q. What kind of proceeding was it? |
| 13 | A. Also discrimination. |
| 14 | Q. So it was an employment claim against an employer of |
| 15 | yours, correct? |
| 16 | A. Correct. |
| 17 | Q. Who were you suing? |
| 18 | A. Flex. |
| 19 | Q. F-L-E-X? |
| 20 | A. Yes. |
| 21 | Q. What was your position at Flex? |
| 22 | A. Senior global program manager. |
| 23 | Q. When did you start working there? |
| 24 | A. 2017. |
| 25 | Q. And when did your employment there end? |

Page 79

| | |
|---|---|
| 1 | A. 2020. |
| 2 | Q. How did your employment end? |
| 3 | A. What do you mean by that? |
| 4 | Q. Voluntary or involuntary? |
| 5 | A. Involuntary. |
| 6 | Q. Were you laid off or terminated? |
| 7 | A. They say laid off. |
| 8 | Q. What do you say? |
| 9 | A. Terminated. |
| 10 | Q. Were you given a reason why you were terminated by |
| 11 | Flex? |
| 12 | A. Nope. |
| 13 | Q. Were you given a termination notice? |
| 14 | A. What -- I don't even know what that is. |
| 15 | Q. Were you given a written document that summarized the |
| 16 | reasons for your termination? |
| 17 | A. No. |
| 18 | Q. Who told you that you were terminated or laid off? |
| 19 | A. HR and the VP of program management. |
| 20 | Q. And did you file an EEOC charge against them? |
| 21 | A. Yes. |
| 22 | Q. What was the disposition of that EEOC charge? |
| 23 | A. Retaliation. |
| 24 | Q. Let me ask a better question. |
| 25 | A. Okay. |

Page 80

| | |
|---|---|
| 1 | Q. How did that charge get resolved? |
| 2 | A. Right to sue. |
| 3 | Q. Did you list any other cause of action in the charge |
| 4 | other than retaliation? |
| 5 | A. You know what, I don't remember. It was a |
| 6 | discrimination as well, a harassment as well; so Asian |
| 7 | hate. |
| 8 | Q. I missed the last thing. |
| 9 | A. Asian hate. |
| 10 | Q. Asian hate? |
| 11 | A. It's COVID. |
| 12 | Q. What specifically did you claim that you did in the |
| 13 | EEOC charge that caused the retaliation? |
| 14 | A. I filed a complaint. |
| 15 | Q. What did you complain about? |
| 16 | A. Disparity in treatment. |
| 17 | Q. How so? |
| 18 | A. That man can say whatever, but I cannot say whatever, |
| 19 | that I cannot have opinion. |
| 20 | Q. Did the company investigate that? |
| 21 | A. They -- I'm not sure. |
| 22 | Q. Did the company tell you that there was any outcome |
| 23 | regarding your complaint; whether they found it to be |
| 24 | substantiated or not? |
| 25 | A. I don't think they investigated. |

Page 81

| | |
|---|---|
| 1 | Q. What harassment did you claim to have been subjected |
| 2 | to at Flex? |
| 3 | A. They pulled me and put me in some project that is |
| 4 | nonvisible, very similar. |
| 5 | Q. What was the name of that project? |
| 6 | A. I don't recall. |
| 7 | Q. So you got a right to sue letter. Do you recall |
| 8 | whether it was soon after you filed the charge or was |
| 9 | there a period of time when the EEOC investigated? |
| 10 | A. I don't think there was investigation. I think it |
| 11 | went straight to right to sue. That was during COVID |
| 12 | time. |
| 13 | Q. I'm sorry? |
| 14 | A. During COVID, yeah. |
| 15 | Q. And then after there was a right to sue letter issued, |
| 16 | did you and your lawyer file a lawsuit? |
| 17 | A. Yes. |
| 18 | Q. Where was it filed, what court? |
| 19 | A. I don't remember. |
| 20 | Q. Do you know whether it was in federal or state court? |
| 21 | A. I don't remember. |
| 22 | Q. If I told you it was in the United States Court for |
| 23 | the Eastern District of Michigan, would that sound |
| 24 | familiar? |
| 25 | A. I don't remember. |

Sohyon Warner
November 25, 2025

Page 82

1   Q.   There was a lawsuit filed though, right?
2   A.   Correct.
3   Q.   Do you know whether it was in Wayne County Circuit
4        Court?
5   A.   I don't remember.
6   Q.   What county did you live in at the time?
7   A.   Oakland.
8   Q.   Oakland.  Did you ever see a judge in that case?
9   A.   No.
10  Q.   Do you know how long that lawsuit lasted?
11  A.   I don't recall.
12  Q.   Do you remember the firm that opposed you or
13       represented Flex?
14  A.   No, I don't remember.
15  Q.   And then when was your deposition taken; four years
16       ago, five years ago?
17  A.   Something like that.
18  Q.   And how soon after your deposition was taken did the
19       lawsuit end?
20  A.   Like a couple months.
21  Q.   Do you know if your lawyers deposed anybody in that
22       lawsuit?
23  A.   Yes.
24  Q.   How many depositions?
25  A.   I cannot give you a quantity, but it was -- I'll say

Page 83

1        more than five.
2   Q.   Okay.  Do you know if the court ruled on the merits of
3        your claims?
4   A.   I don't know.
5   Q.   Were your claims in the lawsuit the same as what were
6        in the EEOC charge:  retaliation, discrimination,
7        harassment?
8   A.   Again, I was not so close with that lawsuit; it was
9        taken care of by Palmer.
10  Q.   Did you make a disability claim?
11  A.   I don't -- you mean emotional distress?
12  Q.   No.  I mean, did you claim that you had a disability
13       and that you were discriminated against by that
14       company --
15  A.   No.
16  Q.   -- due to that disability?
17  A.   No.
18  Q.   Did you claim emotional distress?
19  A.   Yes.
20  Q.   And how did that lawsuit resolve?
21  A.   We settled.
22  Q.   Did you sign any sort of an agreement as a result of
23       the settlement?
24  A.   I do recall signing something, but I'm not sure what
25       that is.

Page 84

1   Q.   How much were you paid?
2   A.   Six figure.
3   Q.   Do you still have any of that money left or has it
4        been spent or invested?
5   A.   I have no idea.
6   Q.   And then that was your only deposition, correct?
7   A.   Correct.
8   Q.   Have you ever sat on a jury or acted as a witness in a
9        case before?
10  A.   No.
11  Q.   Other than that lawsuit, have you sued anybody else?
12  A.   No.
13  Q.   Have you ever been sued?
14  A.   No.
15  Q.   What about any divorce proceedings, have you been a
16       party to any of those?
17  A.   I'm divorced once.
18  Q.   Okay.  When did your divorce take place or when it was
19       final, if that's easier?
20  A.   Why is this relevant?
21  Q.   It's relevant to emotional distress damages.
22  A.   That is 2004 -- 2007, 2007.
23  Q.   What county was the divorce in?
24  A.   I was in Oakland, so I'm going to guess Oakland, but
25       I'm not sure.

Page 85

1   Q.   Do you recall who your attorney was?
2   A.   No, I filed it myself.
3   Q.   So you had no lawyer?
4   A.   No.
5   Q.   How long did it take to resolve; was it quick or was
6        it longer?
7   A.   It was quick.
8   Q.   Was it a joint decision to divorce or was it your
9        decision?
10  A.   I think it was joint.
11  Q.   And then who was your spouse at the time?
12  A.   You need his name?
13  Q.   Yes.
14  A.   Sebastian.
15  Q.   What was Sebastian's last name?
16  A.   Kobessi.
17  Q.   How do you spell that?
18  A.   K-O-B-E-S-S-I, Kobessi.
19  Q.   And then at the time, did you have any children?
20  A.   No.
21  Q.   What did you do to prepare for your deposition today?
22  A.   Just read over EEOC filing a little bit and my second
23       Amended Complaint.
24  Q.   Anything else that you did to prepare today?
25  A.   Not really.

Sohyon Warner
November 25, 2025

Page 86

1  Q.  Now, I can't get anything that you have said to any of
2      your lawyers in this case, but I will ask you:  Did
3      you meet with your lawyer today?
4  A.  Just today.
5  Q.  How long did you meet for?
6  A.  Just when I walked in.
7  Q.  Okay.  Had you met with your lawyer prior to today?
8  A.  We have a phone call.
9  Q.  How long was that phone call?
10  A.  About 30 minutes.
11  Q.  Did you discuss any specific documents during that
12      call?
13  A.  Yes.
14  Q.  You can't tell me what you discussed, but you can
15      identify the documents.
16  A.  Second Amended.
17  Q.  Anything else that you discussed document-wise?
18  A.  Yesterday when I was trying to file something.
19  Q.  Okay.  Other than with your lawyer, have you sent or
20      received text messages to anybody in the last six
21      months about your deposition?
22  A.  No.
23  Q.  Other than with your lawyer, have you sent or received
24      text messages to anybody in the last year about this
25      lawsuit?

Page 87

1  A.  No.
2  Q.  Other than what you've already identified, do you have
3      any electronic notes on your phone about this case?
4  A.  No.
5  Q.  When did you first retain your second lawyer in this
6      case to represent you?
7  A.  I think after my EEOC, second EEOC filing.
8  Q.  You're referring to Mr. Palmer's firm, right?
9  A.  Correct.
10  Q.  I'm asking about this lawyer that's with you today,
11      Mr. Cooper.
12  A.  Couple weeks ago, yeah.
13  Q.  When did you first decide to pursue legal action
14      against Gilbarco?
15  A.  When they fired me.
16  Q.  The day of your termination?
17  A.  Yes.
18  Q.  What's your current residence?
19  A.  City?
20  Q.  City and address.
21  A.  It's in my filing.
22  Q.  But I'm asking you for the record.
23  A.  Okay.  2841 Lamplighter Lane, Bloomfield Hills.
24  Q.  How long have you lived there for?
25  A.  More than ten years.

Page 88

1  Q.  Who lives there with you?
2  A.  My husband and my son.
3  Q.  Anybody else that lives with you?
4  A.  A cat.
5  Q.  You can leave animals out.  Any other people?
6  A.  No.
7  Q.  Okay.  Has your mother ever lived with you there at
8      that residence?
9  A.  No.
10  Q.  And when did you get remarried?
11  A.  2008.
12  Q.  And what's your husband's name?
13  A.  James.
14  Q.  Last name?
15  A.  Chryssikos.
16  Q.  How do you spell that?
17  A.  C-H-R-Y-S-S-I-K-O-S.
18  Q.  And your son is how old?
19  A.  He's 15, today.
20  Q.  And is his last name Warner or is it Chryssikos?
21  A.  Chryssikos.
22  Q.  Okay.  Do you own that home or do you have a mortgage
23      on it?
24  A.  We still have a mortgage.
25  Q.  How many years left on the mortgage?

Page 89

1  A.  Oh, I don't know.
2  Q.  Who pays for that, you or your husband?
3  A.  We both did.
4  Q.  But who physically arranges for the payments?
5  A.  It's an automatic, so...
6  Q.  From a joint account or from an individual --
7  A.  Joint account.
8  Q.  What is the monthly mortgage payment?
9  A.  We don't have escrow, so 1,350.
10  Q.  Do you know whether it's a 15, 30-year mortgage?
11  A.  It's 15.
12  Q.  Okay.  And then what do you do for hobbies or leisure
13      time, assuming you have any of that with a teenager?
14  A.  Work on my case.
15  Q.  You have no hobbies outside of working on your case?
16  A.  I'm a homemaker right now, so yes.  I got -- I don't
17      have hobby to think of.
18  Q.  Presumably your son is in school, right?
19  A.  Correct.
20  Q.  So what do you do during the course of the school day?
21  A.  Take care of the house.
22  Q.  Anything else?
23  A.  Take care of my mother.
24  Q.  How old is your mother?
25  A.  She's 84.

Sohyon Warner
November 25, 2025

Page 90

1   Q.   Where does she live?
2   A.   Royal Oak.
3   Q.   Royal Oak?
4   A.   Yes.
5   Q.   Does she live on her own or with somebody else?
6   A.   She has a boyfriend.
7   Q.   How old is the boyfriend?
8   A.   Don't know.
9   Q.   And what do you do -- let me ask this question first:
10       Do you take care of your mother on a regular basis
11       during the day when your son's at school?
12  A.   Not a regular basis; as-needed basis.
13  Q.   What type of care does she need or do you provide?
14  A.   Taking her to the hospital, office visits, sometimes
15       groceries, family get-together; any equipment break
16       down, I hire a contractor, a lot of caregiving.
17  Q.   You are not the sole caregiver for your mother,
18       correct?
19  A.   What do you mean by that?
20  Q.   Does her boyfriend give her any form of care in terms
21       of driving her to appointments, the hospital, and
22       groceries?
23  A.   Yeah, we share.
24  Q.   And then is your mom able to walk and ambulate
25       normally or is she in a wheelchair or some other

Page 91

1        walker?
2   A.   She has -- sometime walker, sometime not, depends on
3        the day.
4   Q.   How is her health generally?
5   A.   Okay.
6   Q.   How many times a week, on average, do you drive her to
7        the hospital or to medical appointments or to get her
8        groceries?
9   A.   Once a week the most, because she has a boyfriend.
10  Q.   This once a week, is that -- has that been typical for
11       the last year or different?
12  A.   It varies.  Sometimes it's couple times a week,
13       sometimes I don't see her at all, you know what I
14       mean.
15  Q.   Okay.  How would you describe your current financial
16       condition?
17  A.   I guess okay.
18  Q.   How so?
19  A.   We can pay the bills.
20  Q.   Your husband works, I assume?
21  A.   Yes.
22  Q.   No missed mortgage payments or missed bills?
23  A.   Not at this moment.
24  Q.   Do you get any sort of remuneration for helping your
25       mom?

Page 92

1   A.   What do you mean?
2   Q.   Whether it's Medicare or Medicaid or payment from your
3        mom.
4   A.   No.
5   Q.   Okay.  Have you ever filed for bankruptcy?
6   A.   No.
7   Q.   Have you contemplated filing for bankruptcy in the
8        future?
9   A.   No.
10  Q.   Have you ever filed for a personal protection order
11       against anybody else?
12  A.   No.
13  Q.   Ever had one filed against you?
14  A.   No.
15  Q.   And how many vehicles do you and your husband
16       currently have?
17  A.   One each.
18  Q.   What does he drive and what do you drive?
19  A.   He drives Lexus hybrid and I drive Genesis GV 80.
20  Q.   I don't know what the Genesis GV 80 is; is that an SUV
21       or something different?
22  A.   I think it's SUV.
23  Q.   How old is your car?
24  A.   It's 2023.
25  Q.   And your husband's?

Page 93

1   A.   I don't know, but it 2020 something.
2   Q.   Are those owned or leased?
3   A.   Owned.
4   Q.   Do you know how much the payments are for those?
5   A.   My car payment is about 650.
6   Q.   Do you know your husband's?
7   A.   It's paid off.
8   Q.   And how much is left on the term for your car loan?
9   A.   Oh, I don't know.  20 or 30 grand left, ballpark.
10  Q.   Do you know how many months the term is for?
11  A.   Oh, it was -- it was more than five years, I remember,
12       so I'm not sure.
13  Q.   Do you own any boats or other recreational vehicles?
14  A.   No.
15  Q.   No snowmobiles or anything like that?
16  A.   No.
17  Q.   Are you active or have you been active in the last
18       year in any nonprofit groups or community
19       organizations?
20  A.   No.
21  Q.   What about any activities for your son's school:
22       fundraising, planning; any activity there?
23  A.   No.
24  Q.   Other than what we've already talked about, do you
25       have any pending personal loans?

Sohyon Warner
November 25, 2025

Page 94

1   A.   No.
2   Q.   How about your husband?
3   A.   Not sure.
4   Q.   Most people keep some kind of revolving credit card
5        debt.  Do you have credit card debt or are you a
6        person that pays it off at the end of every month?
7   A.   Pays it off.  I cannot speak for him.
8   Q.   You have some idea, right?
9   A.   I have no idea.
10  Q.   Okay.  We talked about your personal Gmail account and
11       I think you've given that to me, the address.  Do you
12       have any other personal e-mail accounts, and I'm first
13       going to say ones that are active?
14  A.   I have a sohyonw@yahoo.
15  Q.   No other active accounts other than the Yahoo and the
16       Gmail account?
17  A.   Correct.
18  Q.   What do you use the Yahoo e-mail for?
19  A.   Like shopping stuff.
20  Q.   Then what is the Gmail primarily used for?
21  A.   More professional.
22  Q.   Then how about inactive e-mail addresses; do you
23       maintain any of those that you have in your name that
24       you don't really use anymore?
25  A.   Those are the two e-mail address I have.

Page 95

1   Q.   No others?
2   A.   No.
3   Q.   What social media accounts are you currently active
4        on?
5   A.   Facebook.
6   Q.   LinkedIn?
7   A.   Yeah.
8   Q.   What about X or Bluesky?
9   A.   Just YouTube, watching YouTube videos.
10  Q.   Do you post any content on YouTube or just watch?
11  A.   Just watch.
12  Q.   What do you watch?
13  A.   News, bakeries, cooking.
14  Q.   Which news channels in particular do you watch?
15  A.   It's called Break Points.
16  Q.   Anything else?
17  A.   No.  I mean, they have short videos, it's almost like
18       a TikTok, and you get sucked in.
19  Q.   And then I think you've answered this:  You don't --
20       do you have an X account?
21  A.   No.
22  Q.   Do you have a Mastodon account?
23  A.   I don't know what that is.
24  Q.   Bluesky?
25  A.   No.

Page 96

1   Q.   Threads?
2   A.   I don't even -- no.
3   Q.   Instagram?
4   A.   I have Instagram.
5   Q.   Do you use Instagram?
6   A.   No.
7   Q.   When I say use, I don't mean just post; do you watch?
8   A.   No.
9   Q.   Do you have any professional accounts other than
10       LinkedIn?
11  A.   No, that's it.
12  Q.   When you did your search for documents in this case,
13       did you search any of your social media accounts to
14       see if there's anything on there related to your
15       employment or your lawsuit?
16  A.   What do you mean by that?
17  Q.   Have you ever posted anything --
18  A.   No.
19  Q.   -- or communicated with somebody else like through
20       DMs --
21  A.   No.
22  Q.   -- on any of those?
23  A.   No.
24  Q.   Have you ever used social media accounts to
25       communicate with anybody regarding your employment at

Page 97

1        Gilbarco?
2   A.   No.
3   Q.   Can you identify for me any privilege log that you or
4        your attorneys have provided to me in this matter?
5   A.   I have no idea.
6   Q.   Have you ever put together a privilege log?
7   A.   No.
8   Q.   So that means I can assume you're not claiming
9        privilege as to any documents, right?
10  A.   Again, I have no idea.
11  Q.   You have no idea if you're claiming privilege?
12  A.   I have no idea what my former provided to you as a
13       privilege log.
14  Q.   Okay.  I can tell you I never received a privilege log
15       from your prior lawyers.
16  A.   They didn't say anything about privilege log when
17       answering?
18  Q.   Nothing.
19  A.   Then that's fine.
20  Q.   Does that mean you're not claiming privilege or work
21       product as to anything?
22  A.   Work product, no.
23  Q.   Okay.  Does that mean that you are not withholding any
24       responsive records from me on the basis of privilege
25       or a doctrine?

Sohyon Warner
November 25, 2025

Page 98

1   A.   Whatever my former asked me to provide them, I
2        provided.
3   Q.   Okay.  So you would agree with me that if you have not
4        provided a privilege log and your attorneys have not
5        provided me with a privilege log, there's nothing
6        privileged that you have or that's subject to any sort
7        of a doctrine?
8   A.   I have not providing a privilege log to them, but I
9        don't know what they provided to you, because I asked
10       for the communication between you two and he never
11       provide it, so I have no idea.
12  Q.   And I can tell you, I've never gotten --
13  A.   Okay.
14  Q.   -- a privilege log from your prior counsel.
15  A.   Okay.
16  Q.   Are you aware of any records that you are withholding
17       on the basis of a privilege or a doctrine?
18  A.   I don't recall.
19  Q.   Okay.  Can you think of any that you have in your
20       possession that you're not providing on the basis of a
21       privilege or a doctrine?
22  A.   I don't recall.  I have no idea.
23  Q.   Okay.  Have you ever used generative AI in your
24       handling of this case?
25  A.   We acknowledged that, yes.

Page 99

1   Q.   When you say we, who are you referring to?
2   A.   During the hearing, you and I with Judge Patti.
3   Q.   So you have used generative AI in your handling of
4        this case, correct?
5   A.   What do you mean by handling?
6   Q.   In your day-to-day processing of this case, your tasks
7        that you complete for this case.
8   A.   No, I just ask them to help me draft; that's it.
9   Q.   Which generative AI tools have you used?
10  A.   ChatGBT.
11  Q.   Anything else other than ChatGBT?
12  A.   That's it.
13  Q.   And you have an account with ChatGBT, correct?
14  A.   Yes.
15  Q.   What's the cost of that account?
16  A.   20 bucks a month.
17  Q.   And what is your understanding of what it offers to
18       you over and above a free account?
19  A.   That's it.  I don't understand what you're asking.
20  Q.   Well, you understand that there are free and paid
21       accounts for ChatGBT, correct?
22  A.   Correct.
23  Q.   And what do you understand you get over and above the
24       free account?
25  A.   I think free account you get limited prompt, yeah.

Page 100

1   Q.   Do you understand whether or not you get access to a
2        later version of ChatGBT, like 5 versus 4?
3   A.   Yeah, they give you option to choose.
4   Q.   And do you know if you get enhanced results as a paid
5        user?
6   A.   I have no idea.
7   Q.   Okay.  What queries have you asked generative AI,
8        ChatGBT, for this case?
9   A.   I ask for procedural, like after this, what should I
10       file; that's it.
11  Q.   And presumably you have a record of all the queries
12       that you have asked ChatGBT regarding this lawsuit,
13       correct?
14  A.   Not all of it.
15  Q.   Why would you not have all of it?
16  A.   Because there's a memory limitation, so it slows down,
17       so I have to delete often.
18  Q.   So you -- does that mean you have deleted queries that
19       you have made since this lawsuit has started?
20  A.   Those are my work product, yes.
21  Q.   We just established that you told me that you're not
22       withholding anything based on work product?
23  A.   Okay, if that's considered work product, yes, I have
24       deleted for my memory need.
25  Q.   Is there any way for me to find out which queries you

Page 101

1        have deleted.
2   A.   No.
3   Q.   So that's gone permanently?
4   A.   I mean, it's in your private sector, so I'm not sure.
5   Q.   So my understanding is it is gone.
6   A.   Yeah, my work product's gone.
7   Q.   And that -- that's not work product, because for it to
8        be work product, you would have had to place it on a
9        log, correct?
10  A.   I don't even know what that means.
11  Q.   You understand what a privilege log is, right?
12  A.   Correct.
13  Q.   Because --
14  A.   No, I don't; I don't know what privilege log is;
15       that's something that you and I cannot share.
16  Q.   So I don't understand your answer because you have
17       filed several filings asking us to provide a privilege
18       log and items on that privilege log; are you telling
19       me that what you filed you have no understanding of
20       what it is?
21  A.   The privilege log is something that you got to
22       withhold from me, right?
23  Q.   So you understand what that is, correct?
24  A.   That's my definition of it.  Is that correct?
25  Q.   So why have you not provided me a privilege log if you

Sohyon Warner
November 25, 2025

Page 102

1    have items that you are not providing because you
2    claim they are your work product?
3    A.  Okay, so you want me to provide you privilege log; I
4        can do that.
5    Q.  No, no, I'm asking why you haven't provided one up
6        until -- at all.
7    A.  Because you didn't ask it.
8    Q.  You are under an obligation and your attorneys were to
9        provide me with a privilege log if you are withholding
10       documents.  And the upshot of you not doing so is you
11       have withheld relevant queries with no disclosure to
12       the Defendant if you have done so.
13   A.  It's me working with myself.  Are you trying to say I
14       have to disclose what I wrote on my paper on my own?
15       No, you can't; that's not discoverable.
16   Q.  What I am telling you is you have provided queries to
17       a third-party tool; you have not disclosed that to me
18       --
19   A.  That's not a query, it's prompt; there's a difference.
20   Q.  You have claimed that that is protected by a work
21       product doctrine and you have not placed that on a
22       privilege log.
23   A.  No, those are my thinking strategy.
24   Q.  And you have not disclosed that to me, correct?
25   A.  No, I disclosed that I worked -- used ChatGBT.

Page 103

1    Q.  Point out to me where you have produced in discovery
2        your queries that you placed into the ChatGBT
3        regarding this lawsuit.
4    A.  It's in ChatGBT.
5    Q.  But you haven't produced it to me, have you?
6    A.  Why do I need to do that?
7    Q.  That's a yes or no question.
8    A.  That's broad.
9    Q.  You haven't produced it to me, correct?
10   A.  Produced what?
11   Q.  Your queries.
12   A.  You have a filing from me.
13   Q.  Can you identify for me any privilege log that you
14       have provided to me that contains what you claim was
15       covered by the work product doctrine?
16   A.  I don't understand your question.
17   Q.  I think you understand it; I think you don't know how
18       to answer it because you haven't upheld your
19       obligation.
20   A.  I don't understand your question.  I don't understand.
21   Q.  We've already established that you have queries
22       regarding this lawsuit.
23   A.  Not a query, prompt; do you know the difference?
24   Q.  You can call it whatever you want.
25   A.  Okay.

Page 104

1    Q.  We can call it prompts, if you like.
2    A.  Sure.
3    Q.  So you have disclosed to me that you have made
4        prompts, that you submitted those to ChatGBT about
5        this lawsuit.
6    A.  Correct.
7    Q.  Those prompts are relevant because they could contain
8        admissions that can be used against you.
9    A.  Such as?
10   Q.  Are with you me so far?
11   A.  No, I don't.
12   Q.  We know that you put prompts in the ChatGBT regarding
13       this lawsuit, right?
14   A.  Correct.
15   Q.  And you've also told me today --
16   A.  And you do not use ChatGBT -- you don't use AI
17       yourself?
18   Q.  I don't use ChatGBT.
19   A.  I understand.
20   Q.  I have not used AI for this lawsuit.
21   A.  Okay.
22   Q.  But I'm asking you:  We've established, number one,
23       you do have queries or prompts that you put into
24       ChatGBT regarding this lawsuit --
25   A.  Yes.

Page 105

1    Q.  -- right?
2        You've also established that you have not
3        produced those, because you are claiming they're your
4        work product, correct?
5    A.  That is my work product.
6    Q.  And you have not produced them to me, correct?
7    A.  Are you going to produce your work product/privilege
8        log, all of your work product?
9    Q.  So I'm not suing my employer; you are suing your
10       employer --
11   A.  No, my point is --
12   Q.  -- so I'm asking the question.
13   A.  Are you going to provide --
14           THE WITNESS:  What?
15           COURT REPORTER:  You guys are talking on
16       top of each other.
17           THE WITNESS:  Okay, sorry.
18           Why aren't you producing your work
19       product/privilege log?
20   BY MR. WARREN:
21   Q.  I'm not answering your questions today --
22   A.  Okay.
23   Q.  -- unless they have to do with clarifying my question.
24   A.  I don't understand the need to produce work product
25       when it's not privileged.

Sohyon Warner
November 25, 2025

Page 106

1  Q.  I'm going to show you as an exhibit a copy of your
2      responses to my second request for production of
3      documents and my second interrogatories. I'll have
4      this marked as Exhibit 1. I only have one copy, so
5      you can share it.
6                 MARKED FOR IDENTIFICATION:
7                 DEPOSITION EXHIBIT 1
8                 11:44 a.m.
9  BY MR. WARREN:
10 Q.  So these are my second set of discovery requests to
11     you, correct?
12 A.  Correct.
13 Q.  And these were answered by you after you fired and
14     terminated the relationship with your prior lawyers,
15     correct?
16 A.  I didn't fire them; they abandoned me. There's
17     difference.
18 Q.  You prepared those on your own, correct?
19 A.  Correct.
20 Q.  And you have used words -- you have not produced any
21     documents in response to those, correct?
22 A.  What was it again?
23 Q.  You have not produced any documents in response to
24     those questions, correct?
25 A.  Which document; this? I wrote it.

Page 107

1  Q.  Right. You haven't given me any of the documents that
2      are responsive to those questions --
3  A.  Correct.
4  Q.  And in those responses, you were asserting privilege,
5      right?
6  A.  No, it says vague, overbroad, unduly burdensome,
7      harassing, irrelevant.
8  Q.  And you're also asserting work product doctrine,
9      right?
10 A.  No, it says this seeks information protected as a work
11     product; yes.
12 Q.  And even though you wrote those words, you have not
13     provided me with a privilege log identifying a single
14     one of those records, correct?
15 A.  I'm not understanding.
16 Q.  You're understanding; you just don't have a good
17     answer --
18 A.  No.
19 Q.  -- other than to say no.
20 A.  If you have your work product, you didn't give me your
21     privilege log of your work product, why do I need to
22     produce work product what I've been doing; it's
23     different case here.
24 Q.  I see. So your position is you don't have to produce
25     a privilege log, is that right?

Page 108

1  A.  It's your -- my understanding is that you didn't
2      produce your privilege log to me.
3  Q.  Do you believe you have an obligation to provide me
4      with a privilege log if you are withholding documents
5      based upon privilege?
6  A.  I'm not withholding any document.
7  Q.  We've already established that you are. You told me
8      you have prompts and records of those prompts that
9      exist of what you asked ChatGBT about this lawsuit.
10 A.  So you want me to file a privilege log that I worked,
11     as a work product, is that what you're asking?
12 Q.  I believe the time for you to have provided me with a
13     privilege log has long since passed.
14 A.  I was never asked, and know the procedure that I have
15     to.
16 Q.  So how many documents and records are you withholding
17     on the basis of privilege or work product doctrine? I
18     have no (inaudible) because you haven't told me.
19 A.  Okay.
20                 MR. COOPER: I'm going to --
21                 THE WITNESS: Go ahead.
22                 MR. WARREN: Is there an objection?
23                 MR. COOPER: I'm just going to object as to
24     asked and answered. Go ahead.
25 BY MR. WARREN:

Page 109

1  Q.  How many documents have you not produced and withheld
2      on the basis of the attorney/client privilege or the
3      work product doctrine?
4  A.  I don't know.
5  Q.  Have you ever searched for those?
6  A.  I don't know.
7  Q.  You have a record of those?
8  A.  Yes, it's probably at home.
9  Q.  How many records do you think you possess?
10 A.  I do not know.
11 Q.  Do you think it's more than ten?
12 A.  I don't know.
13 Q.  Do you think you've made five prompts to ChatGBT about
14     this lawsuit?
15 A.  I do not know.
16 Q.  You have no clue?
17 A.  No clue at this moment. I'm not going to speculate
18     off memory.
19 Q.  Well, it's not speculation because you did these
20     things. These are --
21 A.  Yes, I did. Thanks, but I don't know the quantity.
22 Q.  So if I were to file a motion with the court, I
23     wouldn't know if there were five prompts or one
24     query --
25 A.  Go ahead and do so.

Sohyon Warner
November 25, 2025

---

Page 110

1  Q.  -- or 20 prompts or 50 prompts.
2  A.  Go ahead and do so.
3  Q.  How many times do you think you've used ChatGBT for
4       this lawsuit?  Let's put aside the prompts.
5  A.  I do not know.
6  Q.  But we know there's a record of it, right?
7  A.  Yes.
8  Q.  Except for the ones you deleted, correct?
9  A.  Because of memory, yes.
10 Q.  How many records do you think you've deleted from
11      ChatGBT --
12 A.  I don't know.
13 Q.  -- that relate to this lawsuit?
14 A.  I don't know.
15 Q.  Do you know there's a problem with you deleting
16      evidence?
17 A.  That's not evidence, it's my work product, it's my
18      thought process.
19 Q.  Do you know that you are not supposed to delete
20      evidence in lawsuits?
21 A.  That's not evidence --
22 Q.  But I'm trying --
23 A.  -- that's my thought process.
24 Q.  I'm trying to --
25 A.  Do you want me to give you what I think?

---

Page 111

1  Q.  I'm trying to find out what you were aware of.
2  A.  So is that discoverable to get what I think?  You
3       cannot discover what I think; that's my thought
4       process.
5  Q.  Are you claiming that it's okay for you to delete
6       evidence in a lawsuit?
7  A.  I do not delete evidence; that's my thought process.
8       It's your thought process that you were providing to a
9       third party.
10 A.  Which third party?
11 Q.  Do you own ChatGBT?
12 A.  No, I do not.
13 Q.  Do you own OpenAI?
14 A.  No, I do not.
15 Q.  That's a third party, isn't it?
16 A.  Yeah, but as you say, give me a policy said that --
17      what I put in going into a public, it doesn't.
18 Q.  When can I expect this privilege log that you sat on
19      for nine, ten months now?
20 A.  What do you mean nine, ten months?  I just became pro
21      se in end of July, and it was a stay.
22 Q.  Well, when did you start using ChatGBT?
23 A.  When I became pro se.
24 Q.  What date was that?
25 A.  I guess September.

---

Page 112

1  Q.  How many times do you think you've used ChatGBT
2       since --
3            MR. COOPER:  I'm going to say asked and
4       answered.  This is -- you've asked the same question I
5       think five or six times now, and she's given you an
6       answer.
7            MR. WARREN:  Because I keep get
8       mealymouthed answers that don't respond to the
9       question.
10 A.  I say I didn't know.  I don't know how many times;
11      that's an answer.
12 BY MR. WARREN:
13 Q.  So what kind of a timeframe do you think it would take
14      you to provide a privilege log --
15 A.  I don't know.
16 Q.  -- with these items listed?
17          You can't tell me how long it will take you
18      to put together a privilege log?
19 A.  I can put a privilege, but let me see; this is
20      Thanksgiving week.
21 Q.  And if I ask you the questions as to each document you
22      would put on there, who it was sent to, who it was
23      received from, how many pages it is, what the content
24      is, what the reason is for withholding it, can you
25      tell me any of those questions?

---

Page 113

1  A.  I do not know.
2  Q.  How many times have you taken documents and uploaded
3       them to ChatGBT related to this lawsuit?
4  A.  I just type in what I think it should be on the draft.
5  Q.  But I'm asking you, have you taken any documents
6       related to your employment --
7  A.  What are the documents?
8  Q.  -- at Gilbarco -- you have to let me finish my
9       question.
10          Have you taken any documents related to
11      your employment at Gilbarco or this lawsuit and
12      uploaded them to ChatGBT?
13 A.  I uploaded my e-mails.
14 Q.  When did you do that?
15 A.  What do you mean when?  Many times.
16 Q.  But what dates?
17 A.  I don't know.
18 Q.  Before September or after September?
19 A.  After September.
20 Q.  Was it before the court entered a protective order
21      about uploading documents to ChatGBT or after?
22 A.  Yeah, before.
23 Q.  Have you taken any steps to retrieve those documents
24      from ChatGBT or OpenAI?
25 A.  I think when you run out of space for memory, that's

---

Page 114

1    it.
2  Q.  Have you reached out to ChatGBT or OpenAI to find out
3      what is the process for clawing those documents back?
4  A.  No.
5  Q.  Do you have any sense of urgency to do that noting
6      that there may be some confidential information in
7      those documents that are now --
8  A.  It's gone.
9  Q.  -- sitting on a third party's server?
10 A.  What confidential?  You never provide any confidential
11     information to start with.
12 Q.  But the answer to my question is you haven't done
13     anything --
14 A.  No, you have not provide me --
15 Q.  -- with OpenAI or ChatGBT to recover those documents?
16 A.  You have provide me no confidential information.
17 Q.  Have you taken any actions to remove those documents
18     from the OpenAI server?
19 A.  Do you even know how OpenAI works?
20 Q.  I'm not answering questions today; you are, Ms.
21     Warner.
22 A.  Yes, because you're asking -- that's not what they do.
23 Q.  I'm asking if you have taken any steps to remove --
24 A.  I don't need to.
25 Q.  -- those documents?

Page 115

1  A.  I don't need to.
2  Q.  Have you been provided with written assurances from
3      OpenAI or ChatGBT that every document and e-mail
4      you've uploaded has been deleted from their server?
5  A.  Not deleted; they say they don't share it.
6  Q.  Can you give me a copy of all those responses that
7      you've gotten from them?
8  A.  You mean on the ChatGBT policy?
9  Q.  Yes.
10 A.  You can get it yourself.
11 Q.  Direct me to it.  Where would I find that?
12 A.  It's called policy at ChatGBT.
13 Q.  Where would I find the responses that OpenAI has sent
14     you in response to your request that that --
15 A.  They didn't send me anything; it's go read the terms
16     and condition.
17 Q.  So you've gotten no assurances from them that any
18     documents you uploaded are no longer on their servers,
19     correct?
20 A.  Not that particular question.
21 Q.  Okay.  Why do you seem so unconcerned about your
22     inability to have provided a privilege log when you
23     are also filing a motion to compel a production of
24     items on our privilege log?
25 A.  That is from your Defendant that you're privileged;

Page 116

1      it's not what you did or not what I did as a work
2      product, we're talking about your client.
3  Q.  But don't you understand you have reciprocal
4      obligations to provide and send us a privilege log if
5      you are withholding documents --
6  A.  So do you.
7  Q.  But I'm asking your understanding of your own
8      obligations.
9  A.  No, we're talking about fairness.
10 Q.  What is your understanding of your obligation to
11     prepare and provide a privilege log?
12 A.  They're withholding HR investigations; that is regular
13     business course of operation.
14 Q.  You're not responding to my question.
15 A.  I don't understand your question.
16 Q.  My question is:  What is your understanding of your
17     obligation to provide me with a privilege log as to
18     items that you are withholding?
19 A.  That is my thought process.  Why I have to be --
20     disclose that to you?
21 Q.  Is it your understanding that because it's your
22     thought process, you don't have to list it on a
23     privilege log?
24 A.  Correct; it's my thoughts.
25 Q.  What's your basis for that understanding?

Page 117

1  A.  That's my prompts.
2  Q.  Anything else?
3  A.  That's it.
4  Q.  So does that mean you will not be providing me with a
5      privilege log listing these items?
6  A.  Those are my thoughts, those are not discoverable.
7  Q.  I just need a yes or no.  Are you going to provide it
8      on privilege log or not?
9  A.  Those are my thoughts.
10 Q.  I don't understand your response.  Are you going to
11     provide a privilege log or not; yes or no?
12 A.  Those are my thoughts and those are not discoverable.
13 Q.  Will you provide a privilege log?
14         MR. COOPER:  This just keeps going on and
15     on, back and forth.  It's been asked and answered.
16     And like I said, I -- really I don't see what the
17     point of a privilege log is with regard to this, but I
18     mean, I think she's responded.
19         MR. WARREN:  You don't see the point of a
20     privilege log when your client is telling you she's
21     withholding documents on the basis of privilege?
22 A.  Those are my thoughts; I'm not giving you my thoughts.
23         MR. COOPER:  Like I said, it would seem
24     like you can file a motion to compel with regard to
25     ChatGBT, which would serve the same purpose as a

Sohyon Warner
November 25, 2025

Page 118

1   privilege log.  I mean, her objection seems to provide
2   -- serve the same purpose, but like I said...
3           MR. WARREN:  So do I have you on record as
4   saying that her objection on the record here is
5   equivalent to what's required under Sixth Circuit law
6   regarding a privilege log; is that what you're saying?
7           MR. COOPER:  I'm not saying anything.  I'm
8   just saying that this is -- it would seem like that
9   would be the same.  Maybe it is, maybe it's not.  It's
10  not this, but it seems like this question has been
11  asked and answered six times, and I don't see how it
12  is relevant to a deposition.
13          THE WITNESS:  Thank you.
14          MR. COOPER:  This is -- we're talking about
15  a claim here, not about like what her understanding of
16  Sixth Circuit law is --
17          THE WITNESS:  Which I'm not going to
18  speculate.
19          MR. COOPER:  -- or procedure.
20          MR. WARREN:  You know relevance is not
21  ground to answer.
22          MR. COOPER:  I'm not saying -- I'm not
23  saying -- I know it's not ground to answer.  I'm just
24  putting the objection on the record and like I said --
25          THE WITNESS:  We agreed to not to put a

Page 119

1   confidential document into AI and we agreed to it, and
2   it's over.
3           MR. WARREN:  My suggestions mean nothing to
4   you, but I would suggest you take your client outside,
5   put her back on the record, and say yes, she's going
6   to provide a privilege log, if she's claiming things
7   are covered by privilege.
8           THE WITNESS:  I don't think that it's
9   privileged; my thoughts.
10  BY MR. WARREN:
11  Q.  I agree with you; it's not privileged, so produce it.
12  A.  I said there's not privilege worth it; it's my
13      thoughts.  It's not discoverable.  To the point that I
14      don't have to provide privilege log.  Does that make
15      sense?
16  Q.  Well, I'm going to give you seven days to provide a
17      privilege log.  If you do not provide a privilege log,
18      I will ask you for a meet and confer to discuss
19      whether you really don't intend to provide one.
20  A.  That's fine.
21  Q.  And if we can't get that resolved, we will file a
22      motion to compel since you are clearly asserting
23      privilege that doesn't exist for you and a work
24      product doctrine that doesn't apply, and you're
25      withholding documents based --

Page 120

1   A.  Fine.
2   Q.  When it comes to your employment at Gilbarco, who do
3       you think were the most knowledgeable employees about
4       what company policy required?
5   A.  I cannot speculate.
6   Q.  You don't know?
7   A.  No.
8   Q.  Do you think you were the most knowledgeable person
9       about which policies applied to which person?
10  A.  I cannot have a comment on that.
11  Q.  So you don't think that, right?
12  A.  I don't know.
13  Q.  Do you think that you were a better-performing
14      employee than anybody else that you worked with at
15      Gilbarco?
16  A.  I don't know.
17  Q.  Did you ever provide training to anybody else at the
18      company?
19  A.  I don't recall.
20  Q.  You don't recall providing training?
21  A.  I don't recall.
22  Q.  Did anybody provide you with training at the time?
23  A.  I don't recall.
24  Q.  Would you rely upon the company's records to show what
25      training you received?

Page 121

1   A.  You mean the policy training, yes.
2   Q.  Okay.
3   A.  That's what you meant, okay.
4   Q.  Did you get any training regarding discrimination and
5       harassment and retaliation?
6   A.  It was part of the policy, yeah.
7   Q.  Part of a written policy?
8   A.  No, it was a video training.
9   Q.  Okay.  Who provided that to you or was it just all
10      online?
11  A.  All online.
12  Q.  How many times did you receive that training?
13  A.  As needed.
14  Q.  Do you remember how many times during your employment
15      that you got it?
16  A.  Probably once.
17  Q.  Was it at the beginning of your employment?
18  A.  I don't recall.
19  Q.  And then did you get access to written employment
20      policies about discrimination, harassment, anything
21      else?
22  A.  Repeat that again.
23  Q.  Did you receive any written policies while you were at
24      Gilbarco?
25  A.  You have something you can download from that

Sohyon Warner
November 25, 2025

Page 122

1    training.
2    Q.   That means yes, that you could have downloaded it
3         after the training?
4    A.   Yes.
5    Q.   Okay.  What about any general employee handbooks, did
6         you receive those while you were at Gilbarco?
7    A.   They were just given, yes.
8    Q.   Who gave those to you?
9    A.   On-boarding process.
10   Q.   Did you get them in writing or like a PDF?
11   A.   I think it was PDF.
12   Q.   And then did you ever ask anybody questions about
13        those policies?
14   A.   I don't recall.
15   Q.   Other than the training that we've already talked
16        about, did you get any sort of one-on-one training
17        from anybody?
18   A.   No.
19   Q.   Did you believe that you needed more training than you
20        got?
21   A.   I didn't get any training.
22   Q.   Did you believe that you would have benefited from
23        additional training at the company?
24   A.   I don't know.
25   Q.   Okay.  I didn't ask about your father; is he still

Page 123

1    alive or is he passed away?
2    A.   He passed.
3    Q.   How long ago did he pass away?
4    A.   More than ten years.
5    Q.   Do you have any siblings?
6    A.   No.
7    Q.   You filed a grievance against the lawyers that were
8         hired to represent you, correct?
9    A.   Yes.
10   Q.   Against Mr. Palmer?
11   A.   Yes.
12   Q.   Who else?
13   A.   His co-counsel.
14   Q.   Channing Robinson Holmes?
15   A.   Yes.
16   Q.   Anybody else?
17   A.   No.
18   Q.   What is the current status of that grievance?
19   A.   Don't know.
20   Q.   What were you claiming in the grievance?
21   Q.   Why is this relevant to my case?
22   A.   Because it could contain admissions that would bear on
23        your claims and my defenses.
24   A.   I don't understand.
25   Q.   What were you claiming in your grievance?

Page 124

1    A.   Their misconduct.
2    Q.   What was the misconduct?
3    A.   Not informing me.
4    Q.   Not informing you of what?
5    A.   What's going on with the case.
6    Q.   Anything else that you alleged in the --
7    A.   Make decision without me.
8    Q.   Which decision?
9    A.   Dismiss Vontier.
10            COURT REPORTER:  What is it?
11            THE WITNESS:  Vontier.
12   BY MR. WARREN:
13   Q.   You said dismiss Vontier?
14   A.   Correct.
15   Q.   Any other decisions?
16   A.   They threatened to compel you and they didn't; they
17        given you exceptional extension to your discovery;
18        dismissing Shawn from the ESI search, and probably
19        some others that I cannot think.
20   Q.   Did you testify in front of any attorney grievance
21        board?
22   A.   Not yet.
23   Q.   And how many submissions did you make in writing?
24   A.   Few, which was supplemented.
25   Q.   Do you mean like three or five or more than that?

Page 125

1    A.   I don't remember.
2    Q.   And what documents did you include?
3    A.   My communication with them.
4    Q.   Anything else?
5    A.   The e-mail they sent me.
6    Q.   Are you currently seeing a therapist?
7    A.   Yes.
8    Q.   Who are you seeing?
9    A.   Lemica Cox.
10   Q.   We've already talked about, right?
11   A.   Yep.
12   Q.   When did you start seeing Ms. Cox?
13   A.   I start seeing her in August.
14   Q.   August of '25?
15   A.   Yes.
16   Q.   Had you seen her prior to that?
17   A.   No, I had a different therapist.
18   Q.   Who was your therapist before that?
19   A.   Maria Yoo.
20   Q.   How do you spell her last name?
21   A.   Y-O-O.
22   Q.   When did you start seeing Maria Yoo?
23   A.   Last year.
24   Q.   When did you stop seeing her?
25   A.   August.

Sohyon Warner
November 25, 2025

Page 126

1  Q.  Why did you discontinue seeing Maria Yoo?
2  A.  That's the Henry Ford policy.
3  Q.  When you say Henry Ford policy, does that mean you no
4     longer had insurance coverage to see her?
5  A.  No, they realize that my condition was getting worse,
6     so they put me in long-term.
7  Q.  Do you have documents from Henry Ford that tell you
8     that?
9  A.  It's in that letter.
10 Q.  But I'm asking, do you have documents that you
11    received from Henry Ford that told you you had to
12    discontinue seeing Maria Yoo?
13 A.  It was verbal.  My former therapist told me that's
14    what's going to happen, and that's what happened.
15 Q.  But did you get any documents from Henry Ford --
16 A.  No.
17 Q.  -- saying that?
18 A.  No.
19 Q.  Have you ever gotten any documents from Henry Ford
20    about seeing Maria Yoo?
21 A.  What do you mean?
22 Q.  Has Henry Ford ever sent you any explanation of
23    benefits form or any other forms regarding therapy?
24 A.  Can you give me examples?
25 Q.  I just did.

Page 127

1  A.  What do you mean?
2  Q.  There's something called an explanation of benefits
3     form that tells you what percentage of the charge is
4     covered, what's uncovered, and what you owe.
5  A.  You mean EOB, yes.
6  Q.  Yes.  Have you ever gotten any of those?
7  A.  No.
8  Q.  Was any of your payments or charges from Maria Yoo,
9     was that covered by insurance?
10 A.  Not all of it.  I had a copay.
11 Q.  What was your copay?
12 A.  About $50.
13 Q.  Per office visit?
14 A.  Yes.
15 Q.  And Henry Ford covered the rest of the cost, right?
16 A.  You mean the insurance?
17 Q.  Yes.
18 A.  Yes.
19 Q.  Who was the insurer, if you know?
20 A.  Blue Shield Blue Cross (sic), HMO.
21 Q.  And who do you have that insurance through; is it
22    through your husband?
23 A.  Yes.
24 Q.  So I'm confused.  Did Henry Ford or Blue Cross Blue
25    Shield tell you you had to discontinue seeing Maria

Page 128

1     Yoo?
2  A.  It was my therapist who told me that she's considered
3     short-term, that I need to go into a long-term care.
4  Q.  Okay.  And who is paying for your therapy coverage
5     through Ms. Cox, BCBSM?
6  A.  Yes.
7  Q.  Is your copay the same?
8  A.  Yeah.
9  Q.  Is that a yes?
10 A.  Yes.
11 Q.  Then what did Maria Yoo diagnose you with?
12 A.  Major depression, anxiety disorder, adjustment
13    disorder.
14 Q.  When did she give you those diagnoses?
15 A.  She did it like in writing this year when she seen me
16    for about a year.
17 Q.  Do you remember what month?
18 A.  May or June; not sure.
19 Q.  And she had never given you a diagnosis before then?
20 A.  She gave me verbally.
21 Q.  Was what she told you verbally different than what she
22    told you in writing?
23 A.  About the same.
24 Q.  Okay.  And then had you seen a therapist prior to
25    Maria Yoo?

Page 129

1  A.  Long time ago.
2  Q.  Do you remember what year or what years?
3  A.  Probably 2016.
4  Q.  Who was the therapist?
5  A.  I don't know.
6  Q.  How long had you seen that therapist for?
7  A.  Couple times; that's it.
8  Q.  Do you remember who that therapist was associated
9     with, like the name of the clinic?
10 A.  The one in 2016?
11 Q.  That's right.
12 A.  No.
13 Q.  And then what did that therapist provide you or
14    diagnose you with?
15 A.  Calming methods.
16 Q.  What was your reason for seeking treatment from that
17    therapist?
18 A.  I don't recall.
19 Q.  Those are records that you will allow us to get with a
20    HIPAA release so we can find those answers out, right?
21 A.  Again, I have no problem providing you whatever my
22    diagnosis is.
23 Q.  But we're entitled to the records.  Are you saying
24    you're not going to provide the records?
25 A.  I say you can get the records of what I'm diagnosed

Sohyon Warner
November 25, 2025

Page 130

1    with and what I'm claiming.
2  Q.  So here are copies of the records -- of the releases.
3    These are not general; they're specific to -- I'll
4    write it in here, Lemica Cox and Maria Yoo.
5  A.  And my M.D. for my hypertension.
6  Q.  I'm sorry, what?
7  A.  Hypertension.
8  Q.  Which one did you see for hypertension?
9  A.  Qamar.
10 Q.  That's the doctor we talked about already, right?
11 A.  Correct.
12 Q.  I'll let you sign these two.
13 A.  I'm not signing right now.
14 Q.  When are you going to sign them --
15 A.  I'll send them.
16 Q.  -- during a break?
17 A.  Yeah.
18 Q.  During a break today?
19 A.  No, I'll send it to you.  I got to read it over.
20 Q.  You can read it during a break with your lawyer.
21 A.  I'm not wasting time on my break; I'm going to have a
22    break.
23 Q.  I'm not going to leave today without you signing one
24    of these releases.
25 A.  You do whatever you got to do.

Page 131

1  Q.  Because we have been waiting for these for almost a
2    year now.
3  A.  Again, I need to go and check with my former whether
4    they forwarded that to you or not.
5  Q.  How many days do you think it will take you to give us
6    the signed releases?
7  A.  Let me go talk to my former, whether they forwarded
8    that to you or not.
9  Q.  Would you agree to provide the signed releases within
10    a week?
11 A.  I'll do my best.
12 Q.  If you need more time, tell me how much more time you
13    need.
14 A.  I do not know their schedule.
15 Q.  I can tell you we have not received a single signed --
16 A.  I understand.
17 Q.  -- release from them.
18 A.  I'd like to check with them, because I know I provide
19    it.
20 Q.  Well, I'll leave these in front of you and later --
21 A.  Sure.
22 Q.  -- hopefully you'll have a chance to look with your
23    lawyer and read those.
24    Any other therapists that you have seen
25    other than Lemica Cox, Maria Yoo, or this other

Page 132

1    unknown person that you saw in 2016?
2  A.  I think that's about it.
3  Q.  Have any of those therapists ever given you guidance
4    or advice about things that you need to improve upon?
5  A.  I will not -- what do you mean by that?
6  Q.  Things that you had to focus on.
7  A.  No.
8  Q.  I suppose we would know that answer if we had your
9    records, right?
10 A.  Correct.
11 Q.  When you were at Gilbarco, you started at one point
12    forwarding documents and e-mails to your personal
13    Gmail account, right?
14 A.  Right.
15 Q.  Do you know whether that violated any company
16    policies?
17 A.  I don't know.
18 Q.  You don't know?
19 A.  I don't know.
20 Q.  Did you check any company policies to make sure that
21    was okay?
22 A.  I didn't check.
23 Q.  What was the reason why you started forwarding those?
24 A.  Those are my e-mails.
25 Q.  Did you forward anything other than e-mails?

Page 133

1  A.  That's it.
2  Q.  Did you forward any e-mails that people sent to you to
3    your Gmail account?
4  A.  What did you mean?  Those are just my e-mails.
5  Q.  You would have received e-mails from other people,
6    correct?
7  A.  Correct.
8  Q.  Did you forward any received e-mails to your Gmail
9    account?
10 A.  I'm on the thread, yes.
11 Q.  Okay.  What's your estimation as to how many e-mails
12    or strings that you forwarded to your Gmail account?
13 A.  I don't know.
14 Q.  Do you think it was more than 25?
15 A.  Yes.
16 Q.  Do you think it was more than 50?
17 A.  I don't know.
18 Q.  Do you think it was more than 100?
19 A.  I don't know.
20 Q.  Do you recall forwarding any documents to yourself
21    that were exclusive of e-mails?
22 A.  What do you mean by that?
23 Q.  Did you forward any standalone documents to your Gmail
24    account?
25 A.  What kind of standalone?

Sohyon Warner
November 25, 2025

Page 134

1  Q.  Any documents that were not attached to e-mails.
2  A.  I don't think so.
3  Q.  Okay.  Have you ever sent to or received from anything
4      to your therapist, text messages?
5  A.  Other than me calling and saying get onto the video;
6      yes, that's it.
7  Q.  And I'm asking outside of scheduling text messages.
8  A.  No, no.
9  Q.  Have you ever sent text messages to or received text
10     messages from any family member related to this
11     lawsuit or your employment with the company?
12 A.  No.
13              MR. WARREN:  Off the record.
14              VIDEO TECHNICIAN:  Going off record.  The
15     time is 12:13 p.m.
16              (Off the record at 12:13 p.m.)
17              (Back on the record at 12:53 p.m.)
18              VIDEO TECHNICIAN:  We are back on the
19     record.  The time is 12:53 p.m.  Please proceed.
20 BY MR. WARREN:
21 Q.  Ms. Warner, we took a break for lunch; we're back now.
22     One of the questions I meant to ask you but didn't is
23     about your husband's occupation.  What does he do for
24     a living?
25 A.  He's an attorney.

Page 135

1  Q.  What kind of attorney?
2  A.  Family law.
3  Q.  So like divorce law?
4  A.  Yes.
5  Q.  And then what type of practice does he work for; does
6      he own the practice, work for a different firm, or
7      something different?
8  A.  He owns the firm.
9  Q.  What's the name of his firm?
10 A.  Chryssikos Law.
11 Q.  And where is that located?
12 A.  Currently, Troy.
13 Q.  And is he an attorney that is representing you in this
14     matter or not representing you?
15 A.  Not representing me.
16 Q.  Okay.  Have you ever recorded through audio, video, or
17     generative AI note-taking tools any conversations
18     you've had with lawyers in this matter?
19 A.  No.
20 Q.  What about any former lawyers; same answer or
21     different?
22 A.  No.
23 Q.  Okay.  And then have you ever recorded through audio,
24     video, or generative AI tools any conversations with
25     Gilbarco employees?

Page 136

1  A.  No.
2  Q.  Have you ever recorded through audio, video, or
3      generative note-taking tools any conversations that
4      you've had with judges or magistrate judges?
5  A.  No.
6  Q.  Okay.  What about with any employees who work for a
7      state or federal court; any recordings of those folks?
8  A.  No.
9  Q.  Have you ever recorded any conversations with former
10     Gilbarco employees?
11 A.  Dr. Porter.
12 Q.  Dr. Porter?
13 A.  Yes.
14 Q.  Anybody else?
15 A.  I think that's it.
16 Q.  And when did you record a conversation with Dr.
17     Porter?
18 A.  When I was at Gilbarco.
19 Q.  In 2022?
20 A.  Yeah.
21 Q.  How long was that conversation?
22 A.  Like ten minutes.
23 Q.  What was the conversation about?
24 A.  What I'm going through and what she was going through.
25 Q.  Was it face-to-face or was it over the phone?

Page 137

1  A.  Over the phone.
2  Q.  And how did you mechanically accomplish the recording;
3      was it through Teams or something else?
4  A.  I think I used Microsoft Word -- no, actually my
5      phone.
6  Q.  Just the regular record feature on your phone?
7  A.  Yes.
8  Q.  It is that phone or your prior phone?
9  A.  Prior phone.
10 Q.  Do you still have a copy of that recording?
11 A.  Yeah, I think I gave it to my former.
12 A.  I don't think we have a copy of a recording.
13 Q.  Okay.
14 Q.  Do you still have access to it?
15 A.  I'm not sure.
16 Q.  Can you check and --
17 A.  I'll check.
18 Q.  I guess he's only representing you for your
19     deposition, right?
20 A.  Correct.
21 Q.  So I'll ask you then; could you please check and then
22     send it to me if you find it?
23 A.  Okay.
24 Q.  Do you recall what was discussed on the phone
25     specifically in that recorded conversation?

Sohyon Warner
November 25, 2025

Page 138

1   A.   Whether they talked to her about my investigation.
2   Q.   When you say they, do you mean HR or compliance --
3   A.   I don't know.
4   Q.   -- or anybody?
5   A.   Anybody.
6   Q.   So you wanted to know did the company speak to you
7        about my complaint that was being investigated, right?
8   A.   You mean my complaint.
9   Q.   I don't mean mine; I mean yours.
10  A.   Yeah, yeah.
11  Q.   Okay.  What did she say?
12  A.   She say they did and it was about hour and a half
13       long, and she told me that she provide 38-pager to
14       them.
15  Q.   So you say that Dr. Porter told you that Dr. Porter
16       provided a 38-page document to the company?
17  A.   Correct.
18  Q.   Did she send that 38-page document to you?
19  A.   No.
20  Q.   Did she say what was in that 38-page document?
21  A.   Her disparate treatment.
22  Q.   So Dr. Porter, based on your understanding, felt like
23       she was being treated disparately, correct?
24  A.   Correct.
25  Q.   Did she tell you why?

Page 139

1   A.   No.
2   Q.   Had you experienced or seen firsthand any disparate
3        treatment against Dr. Porter?
4   A.   Yes.
5   Q.   What did you observe?
6   A.   That they pulled her out of the project.
7   Q.   That's what we've already talked about, right?
8   A.   Yeah.  And also block Demand Planning.
9             COURT REPORT:  Also what?
10            THE WITNESS:  Demand Planning.
11  BY MR. Warren:
12  Q.   When you say block Demand Planning program, what do
13       you mean?
14  A.   She was also working on Demand Planning project --
15       program; she was also blocked by Paul Blaser.
16  Q.   In other words, you mean she wanted to be on that
17       project and was not put on it or she was taken off of
18       it?
19  A.   Taken off of it in my aspect; that's how I took it.
20  Q.   Is that something you already talked about today?
21  A.   I think the second one, because Core Data was -- she
22       also got pulled off.
23  Q.   And you didn't play any role in those decisions to
24       pull her off those projects --
25  A.   I'm not manager.

Page 140

1   Q.   -- right?
2   A.   No.
3   Q.   I'm not doing this to be rude.  I know you know where
4        my questions are going, but could you please wait
5        until I finish before you give your answer, just so
6        she can take it down?
7   A.   Okay.
8   Q.   So you -- go ahead.
9   A.   Go ahead.
10  Q.   So you don't know the reasons why she was taken off of
11       those projects, correct?
12  A.   No.
13  Q.   Did you comment to her about -- during that
14       conversation about any disparate treatment that you
15       saw of her?
16  A.   When you talk about it, she just forward her e-mail to
17       me that she got pulled off.
18  Q.   Did she tell you specifically what she told the
19       company during the investigation?
20  A.   I have no idea.
21  Q.   Why did you choose to record that conversation with
22       her?
23  A.   That is -- the recording was before that.  That was
24       happening in January when she forward me the e-mail
25       that she got pulled off of Demand Planning, was in

Page 141

1        January.
2   Q.   Right, but the recording that you took of the
3        conversation with her on your phone, why did you
4        choose to record that conversation?
5   A.   Because it was important.
6   Q.   Why was it important to you?
7   A.   Because she was in my complaint.
8   Q.   Okay.  No other recordings that you have or had other
9        than --
10  A.   I don't recall.
11  Q.   -- other than what we've already discussed, right?
12  A.   I don't recall.
13  Q.   Do you maintain a collection of notes that you've made
14       about this case, either handwritten or electronic?
15  A.   Collection, not a collection, it's spread out.
16  Q.   Spread out in physical form like a chart or something
17       different?
18  A.   Like somewhere in my computer.
19  Q.   Is it a Word document or something else?
20  A.   Gmails.
21  Q.   Are these notes that you made yourself?
22  A.   Yes.
23  Q.   Are they in the form of e-mails to yourself?
24  A.   No, just -- no.
25  Q.   What I'm trying to figure out is where did you create

Sohyon Warner
November 25, 2025

Page 314

1  A.  You know, it was a salary drop from where I used to
2      work to Gilbarco, and I'm just being realistic, my
3      market rate probably close to -- comparable to there,
4      like 150.
5  Q.  Is that the bottom range of what you are accepting or
6      what you were aiming for?
7  A.  That's just a range around there, what the market is
8      around.
9  Q.  And have you looked for any jobs outside of your
10     specific industry?
11  A.  No, like what kind, other than project management and
12     data related?
13  Q.  Have you had to tap into your 401(k) for any money to
14     live on since your employment ended?
15  A.  Not at this time.
16  Q.  Have you ever engaged the services of a head hunter or
17     recruiter?
18  A.  There's not many recruiters out there.
19  Q.  Is that a yes or a no?
20  A.  No.
21  Q.  Have you ever engaged anybody that could consult with
22     you on interview techniques or resume building or
23     resume drafting?
24  A.  Again, that Never Search Alone group, they have a
25     template that you can use as a group that voluntarily

Page 315

1     help each other.
2  Q.  Have you asked anybody to be a witness in this case on
3     your behalf?
4  A.  Not at the moment, other than probably Dr. Porter.
5  Q.  Have you asked her or you have not asked her?
6  A.  I don't think I asked.
7  Q.  Okay.  I have no other questions.  Is there anything
8     that you have that you believe supports any of your
9     claims other than what you've already told me?
10  A.  I probably going to go through your Bates and see what
11     I can find, although it's not organized.
12  Q.  But I need to know what you are aware of right now.
13  A.  That there was retaliation.
14  Q.  Is that all you have to add or is there more?
15  A.  Based on what is written, retaliation, there's
16     discrimination, harassment, retaliatory harassment,
17     exclusion, blocking promotion.
18  Q.  These are all things you've already told me today,
19     right?
20  A.  Right, and lack of accommodation.
21         MR. WARREN:  No other questions.
22         MR. COOPER:  I don't have any questions at
23     this time.
24         MR. WARREN:  You're done.  Thank you for
25     your time.

Page 316

1         VIDEO TECHNICIAN:  This concludes today's
2     deposition.  The time is 4:39 p.m.  We are off the
3     video record.
4         (The deposition was concluded at 4:39 p.m.
5         Signature of the witness was not requested by
6         counsel for the respective parties hereto.)

Page 317

1            CERTIFICATE OF NOTARY
2  STATE OF MICHIGAN )
3           ) SS
4  COUNTY OF OAKLAND )
5
6         I, JENIFER WEISMAN, certify that this
7     deposition was taken before me on the date
8     hereinbefore set forth; that the foregoing questions
9     and answers were recorded by me stenographically and
10     reduced to computer transcription; that this is a
11     true, full and correct transcript of my stenographic
12     notes so taken; and that I am not related to, nor of
13     counsel to, either party nor interested in the event
14     of this cause.

20                            Jenifer Weisman
22     JENIFER WEISMAN, CSR-6006
23     Notary Public,
24     Oakland County, Michigan.
25  My Commission expires:  August 17, 2027