**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SOHYON WARNER,

                        Plaintiff,

v.

GILBARCO, INC., GILBARCO, INC. (d/b/a
GILBARCO VEEDER-ROOT), and
VONTIER CORPORATION,

                        Defendants.

Case No. 24-12333
Hon. Gershwin A. Drain
Mag. Judge Anthony P. Patti

---

## <u>PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff, Sohyon Warner, Pro Se, respectfully submits this memorandum in opposition to Defendants' Motion for Summary Judgment. Defendants seek to portray the facts as undisputed, but the record reflects multiple genuine disputes of material fact regarding the basis for Plaintiff's removal and Defendants' shifting explanations. Because a reasonable jury could return a verdict in Plaintiff's favor, the Court cannot resolve these disputes at summary judgment.

                        **Respectfully submitted,**
                        /s/ Sohyon Warner
                        Sohyon Warner, Plaintiff, in Pro Se
                        2841 Lamplighter Lane

Bloomfield Hills, MI 48304
sohyon.warner@gmail.com
248.210.5504

Dated: March 24, 2026

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SOHYON WARNER,

                    Plaintiff,

v.

GILBARCO, INC., GILBARCO, INC. (d/b/a
GILBARCO VEEDER-ROOT), and
VONTIER CORPORATION,

                    Defendants.

Case No. 24-12333

Hon. Gershwin A. Drain

Mag. Judge Anthony P. Patti

---

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

iii

# TABLE OF CONTENTS

I. INTRODUCTION ……………………………………………………… 1

II. SUMMARY JUDGMENT STANDARD …………………………….. 3

III. CONSOLIDATED STATEMENT OF MATERIAL FACTS…………... 4

    A. Plaintiff's Strong Performance Record.…………………………. 4

    B. Protected Activity and Retaliatory Response ………………………... 4

    C. Direct Evidence of Retaliatory Animus……..………………………. 9

    D. Additional Material Facts Supporting Plaintiff's Claims 10

*IV. LEGAL ARGUMENT* ……………………………………………….... 15

    *A. Plaintiff Has Established a Prima Facie Case of Retaliation* …………. 15

    *B. Defendants' Proffered Reasons Are Pretext* ………………………. 19

    *C. Plaintiff Has Established a Prima Facie Case of Discrimination* …….. 22

    *D. The "Same Actor" Inference Does Not Apply*………………………. 25

    *E. Defendants' Reliance on Privileged Investigations Is Unavailing*……. 26

    *F. Defendants Failed to Accommodate Plaintiff's Medical Condition*…….. 27

*V. CONCLUSION*……………………………………………………. 29

## **TABLE OF AUTHORITIES**

**Cases**                                                 **Pages**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ………………….. 3, 30

*Beck-Wilson v. Principi*, 441 F.3d 353 (6th Cir. 2006) ……………….... 25

*Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568 (6th Cir. 2022)…3

*Bryson v. Regis Corp.*, 498 F.3d 561 (6th Cir. 2007) ………………….…18

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) ………...17

*Chen v. Dow Chem. Co.*, 580 F.3d 394 (6th Cir. 2009) ………………….20

*Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579 (6th Cir. 2002) ……….25

*DiCarlo v. Potter*, 358 F.3d 408 (6th Cir. 2004) ………………….………18

*Johnson v. Univ. of Cincinnati*, 215 F.3d 561 (6th Cir. 2000) ...…………21

*Laster v. City of Kalamazoo*, 746 F.3d 714 (6th Cir. 2014) ……………...15, 19, 22

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ………………22

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008) ………..17

*Montell v. Diversified Clinical Servs.*, 757 F.3d 497 (6th Cir. 2014) …….19

*Muflihi v. U.S. Steel Corp.*, No. 22-cv-12609, 2024 WL 5172912 (E.D. Mich. Dec. 16, 2024) ………………………………………………….3,15,19, 21,27

*New Breed Logistics, EEOC v.*, 783 F.3d 1057 (6th Cir. 2015) ………….21

*Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555 (6th Cir. 2004) ……4, 17

*Smith v. Ameritech*, 129 F.3d 857 (6th Cir. 1997) ………………………..21, 29

*Smith v. Leggett Wire Co.*, 220 F.3d 752 (6th Cir. 2000) ………………...20

*Talley v. Family Dollar Stores*, 542 F.3d 1099 (6th Cir. 2008) ………….29

*Tolan v. Cotton*, 572 U.S. 650 (2014) ………………………………….3, 30

*Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003) …...22, 25

**Statutes**

42 U.S.C. § 12102(1)............................................................................. 28

42 U.S.C. § 2000e-3(a)......................................................................... 16

Mich. Comp. Laws § 37.2701...............................................................16

**Rules**

Fed. R. Civ. P. 56(a)..............................................................................3

## STATEMENT OF ISSUES PRESENTED

**1. Whether Plaintiff Can Demonstrate A Prima Facie Case of Race, National Origin, Age, and Gender Discrimination?**

Plaintiff's Answer: Yes.

Defendants' Answer: No.

This Court Should Answer: Yes.

**2. Whether Plaintiff Can Demonstrate A Prima Facie Case of Retaliation?**

Plaintiff's Answer: Yes.

Defendants' Answer: No.

This Court Should Answer: Yes.

**3. Whether Plaintiff Can Demonstrate That Defendants' Proffered Reasons Are Pretext for Discrimination or Retaliation?**

Plaintiff's Answer: Yes.

Defendants' Answer: No.

This Court Should Answer: Yes.

**4. Whether Plaintiff Can Demonstrate a Genuine Issue of Material Fact on Her Hostile Work Environment Claim?**

Plaintiff's Answer: Yes.

Defendants' Answer: No.

This Court Should Answer: Yes.

## 5. Whether Defendants Failed to Accommodate Plaintiff's Medical Condition in Violation of the ADA?

Plaintiff's Answer: Yes.

Defendants' Answer: No.

This Court Should Answer: Yes.

## 6. Whether Plaintiff Can Demonstrate That Defendants' Internal Investigations Were Shoddy and Constitute Evidence of Pretext?

Plaintiff's Answer: Yes.

Defendants' Answer: No.

This Court Should Answer: Yes.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SOHYON WARNER,

|  |  |
|---|---|
|  | Case No. 24-12333 |
| Plaintiff, | Hon. Gershwin A. Drain |
| v. | Mag. Judge Anthony P. Patti |

GILBARCO, INC., GILBARCO, INC. (d/b/a
GILBARCO VEEDER-ROOT), and
VONTIER CORPORATION,

Defendants.

---

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

**I. INTRODUCTION**

Defendants' Motion presents a manufactured narrative that Plaintiff was a

"chronically insubordinate and underperforming" employee, yet the

contemporaneous record, largely Defendants' own emails and internal documents,

tells a different story.  The evidence establishes:

1. **Strong Performance**: Plaintiff was hired as a Data Analytics Project Manager

   in a unique enterprise-level leadership role. She received a 2022 rating of

   "Leading Contributor," an above-average merit increase of 4%, and a full ICP

   bonus payout, all awarded weeks before her termination.

1

2. **Repeated Protected Activity**: Beginning April 28, 2022, up to her termination, Plaintiff repeatedly complained about discrimination, harassment, data compliance violations, and retaliation.

3. **Documented Disability**: Diagnosed with hypertension on August 26, 2022.  On October 2, 2022, Plaintiff informed HR that the hostile environment was causing " a mental and psychological disturbance...it is affecting me physically as well." On January 26, 2023, Plaintiff informed HR that Defendants were "further impairing my heart condition again and again." She repeatedly requested accommodation, including written communication and separation from the individuals she had reported for discrimination and retaliation. Rather than providing reasonable accommodations as required by the ADA, Defendants denied the requests. They later disciplined Plaintiff for declining to meet with the same individuals whom she reported, thus exacerbating her condition.

4. **Immediate Retaliation**: Each complaint triggered swift adverse actions: gag order; removal from executive meetings; reassignment to a white male contractor; forced administrative leave; exclusion; denied accommodations; escalating retaliation; and termination on March 30, 2023.

5. **Defendants' Own Words Prove Pretext**: Emails show managers coordinating to 'avoid another Speak Up'; admitting no written justification for Plaintiff's

2

removal; the CIO calling Plaintiff 'sneaky'; and mocking Plaintiff's #stopasianhate hashtag with '#stopscandohate??'

Just weeks ago, in *Muflihi v. U.S. Steel Corp.*, No. 22-cv-12609, 2024 WL 5172912 (E.D. Mich. Dec. 2024), this Court denied summary judgment under similar circumstances, holding that deficiencies in an employer's investigation can create triable issues. Here, Defendants' own contemporaneous records create multiple disputes of material fact regarding motive, credibility, and the basis for Plaintiff's removal. Under Rule 56, such disputes are for the jury, not the Court.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome; a dispute is "genuine" if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party and may not weigh evidence or make credibility determinations. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014); *Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568, 578 (6th Cir. 2022).

Employment discrimination cases often turn on issues of intent and credibility, questions typically resolved by a jury, not at summary judgment.

3

*Singfield v. Akron Metro. Hous.* Auth., 389 F.3d 555, 563-64 (6th Cir. 2004) (reversing summary judgment and holding that 'caution should be exercised' because motivations are difficult to ascertain).

### III. STATEMENT OF FACTS

### A. Plaintiff's STRONG Performance Record

Plaintiff (Asian female, South Korean origin, over 50) was hired in December 2021 as **Data Analytics Project Manager**, a unique enterprise-level role with no internal candidate available. (ECF 95-5; Ex. B at 2) Her performance was consistently excellent. On April 20, 2022, leadership discussed including Plaintiff in bi-weekly sprint meetings and replacing Blaser as a presenter. (Ex. C at 6) She was rated "Trending Toward Leading Contributor" in Q2 and received a year-end **"Leading Contributor"** rating with praise for project leadership, Agile execution, and collaboration. (Ex. B at 6-15) On March 7, 2023, **3 weeks before termination**, the CEO issued her a **4% merit increase** and a **full bonus**. (Ex. B at 16-17) This contemporaneous recognition contradicts Defendants' post-hoc narrative.

### B. Protected Activity and Retaliatory Response (April 2022–March 2023)

### 1. April–May 2022: Initial Complaints and Immediate Retaliation

On April 28, 2022, Plaintiff forwarded a hostile Microsoft Teams thread in which Blaser accused her and Dr. Tanya Porter (the only other minority woman with

4

advanced credentials over 40) of 'bothering people' and falsely claimed 'we no longer have a data team.' (Ex. C at 17, 20) Hurst escalated the matter to her manager, CIO Schoultz. (Ex. C at 20) Schoultz is a manager of both Hurst and Blaser. On May 4, Plaintiff objected to Blaser blocking her from presenting to executives despite the CFO Morhead's request for her involvement. (Ex. C at 16) Retaliation came within 48 hours. On May 5, Hurst ordered Plaintiff to 'not send anything' to leadership or Blaser's team (Ex. C at 27); that same day, her executive meeting attendance was changed from 'required' to 'optional' (Ex. C at 28); and on May 6, her Core Data Lake responsibilities were transferred to Shawn McClellan, a white male contractor without PMP credential with a prior relationship to Blaser. (Ex. C at 29)

### 2. August–September 2022: Structural Removal, Promised Promotion Denied, and Health Consequences

By August 2022, months before any performance criticism, Defendants planned Plaintiff's replacement. On June 13, 2022, the management approved converting McClellan into a full-time employee (Ex. F at 14). On August 2, Hurst emailed Schoultz outlining the Vontier transfer and backfill. (Ex. C at 32) Schoultz called it a "win-win" because Plaintiff was **"a lot cheaper than Jesus."** (Ex. C at 33) The move was without an interview, a title change, or a pay upgrade, and Plaintiff was told that a requisition would be pulled before the move. (Ex. D at 2-5)

On **August 26, 2022, Plaintiff was diagnosed with hypertension.** (Ex. C at 45) By September, the promised requisition proved false. On September 22, Plaintiff verbally raised concerns to the VP of HR (Doherty): no requisition, unclear title/pay, and planned elimination of her position at the end of the year. (Ex. D at 2-5) On September 27, Ayma complained to Hurst that Plaintiff protects GVR customer data and refuses improper access, framing compliance as a problem (Ex. D at 6-9), and Hurst immediately planned to downgrade Plaintiff's Q3 review. (Ex. D at 10) By October 4–5, Ayma explicitly requested Plaintiff's removal **because she raised scope and data governance concerns**, stating he would "rather run the project without this person." (Ex. D at 11-18)

**3. October 6, 2022: Formal Race Discrimination Complaint**

On October 6, Plaintiff filed a **formal complaint** alleging a hostile work environment, race discrimination, and data security misconduct. (Ex. D at 21-26) On October 10, **HR (**Heuser, Doherty) **and Compliance** (Gibson) **discussed placing Plaintiff on a PIP** but admitted coaching had not yet occurred, **acknowledging no basis for discipline**. (Ex. D at 41) Heavy internal management, HR, and Compliance coordination followed. (Ex. D at 43-45) Plaintiff returned to Gilbarco on October 17 but was **not reinstated** to her Core Data Lake role. (Ex. D at 19)

**4. December 2022 – January 2023: Narrative Building and Exclusion**

6

By December, internal communications reveal coordinated pretext-building. On December 12, Hurst followed up with Compliance Investigator Gibson regarding Plaintiff's 'Speak Up' complaint. (Ex. D at 74) On December 14, Hurst praised Plaintiff as a '**team-player**.' (Ex. D at 77) On December 15, Schoultz formalized Plaintiff's replacement by acknowledging McClellan as 'PM of Data & Analytics.' (Ex. D at 80) On December 19, Hurst escalated to Compliance, calling Plaintiff 'unbearable' and 'toxic' and demanding it 'stop ASAP' (Ex. D at 82), the same day colleagues called her 'a great manager' and 'awesome lead.' (Ex. D at 86) On December 22, HR closed her October complaint as unsubstantiated. On December 27, Hurst falsely told an FP&A manager that Plaintiff was 'disruptive' and 'not accomplishing goals.' (Ex. D at 90)

**5. January 06–18, 2023: Protected Complaints and Immediate Forced Leave**

On January 6, 2023, the Demand Planning program led by the VP of Operations (Sebastian Hatch) was approved, with the Plaintiff in the Data Analytics role. (Ex. E1 at 2) On January 9, Dr. Porter was removed. On January 13, Plaintiff was also removed. (Ex. E1 at 8) **Plaintiff filed an internal complaint alleging discriminatory reassignment**. (Ex. E1 at 15-16) **Same-day retaliation followed** with travel denied and an order to **"stop any engagement"** on Demand Planning. The project was reassigned to McClellan (Ex. E1 at 10, 13-14), and

7

Blaser instructed the VP of Operations: **"Please do not include either Tanya Porter or Sohyon Warner."** (Ex. E1 at 9)

On January 17, Plaintiff discussed her concerns with HR. The following day, she filed a formal written retaliation and discrimination complaint against Hurst and Blaser. (Ex. E1 at 17-18) Immediately thereafter, HR (Heuser) placed her on involuntary paid leave. (Ex. E1 at 19) Critically, HR admitted there was '**not much that I can find on the 'why' in writing**' thereby confirming that there was no documented justification for Plaintiff's removal. (Ex. E1 at 22-23) Hurst conceded the January 13 conversation was 'verbal' with 'no additional documentation.' (Ex. E1 at 22)

On January 26, Plaintiff told Heuser in writing that Defendants were "**setting me up to go through psychological disturbance**, **further impairing my heart condition again and again**." (Ex. E1 at 24-25) That day, Plaintiff requested: (1) transfer to another department; (2) objective evidence supporting management's claims; and (3) direct reporting to CIO Schoultz. All requests were denied. Heuser (HR) further stated that there was no discrimination. (Ex. E1 at 24-25)

6. **February - March 2023 EEOC Charge, Accommodation Request, and Termination.**

On February 3, 2023, Plaintiff filed EEOC Charge No. 435-2023-00395. (Ex. E1 at 36-37) On March 1, she notified Blaser of her accommodation request, requesting that communication be limited to the minimum and necessary. (Ex. E2

8

at 6) On March 2, she filed a formal complaint alleging discrimination, retaliation, and denial of accommodation, and requested email-only communication due to documented distress. Plaintiff had "no live projects" after being stripped of Data & Analytics assignments and requested participation in VBS Ignite as a constructive alternative. (Ex. E2 at 1, 6-7) Leadership responded with animus. That same day, HR circulated pre-drafted disciplinary communications (Ex. E2 at 19), and the CIO mocked Plaintiff's #StopAsianHate hashtag, writing: "Should I also start signing my mails with **#stopscandohate?? (Sorry I couldn't resist**….)" (Ex. A at 25)

On March 3, leadership denied Plaintiff's request to be assigned to Ignite, despite VBS confirming there was **"time and space to add another candidate."** (Ex. E2 at 8-9, 12, 15) On March 6, the CIO called Plaintiff **"sneaky"** and HR scripted termination warnings. (Ex. E2 at 12, 19) On March 7, Blaser issued a written warning threatening termination drafted by HR. (Ex. E2 at 20) On March 24, the CIO threatened termination, stating: **"As an immigrant female over 40 myself, I resent your comments that the situation has any bearing on <u>ethnical</u> background."** (Ex. E2 at 35) On March 30, HR scheduled a same-day "Critical meeting" without an agenda, refused Plaintiff's requests for delay or written communication, and terminated her. (Ex. E2 at 42-43) **Critically, every alleged "refusal to attend meetings" occurred only after**

**Plaintiff disclosed a medical condition, requested written communication, and objected to meetings with her alleged harassers**.

## C. THE "DIRECT EVIDENCE OF RETALIATORY ANIMUS":

| Exhibit | Date | Statement | Significance |
|---|---|---|---|
| A-1, A-2 | 8/2/2022 | "a lot cheaper than Jesus." "lessons learned from SK scenario" | Economic exploitation, not performance |
| A-5; E-1-7 | 1/13/2023 | "avoid another 'Speak Up'" | Explicit retaliation linkage |
| A-10,11; E1-22-23 | 1/19/2023 | HR admits no written "why" for removal | No objective basis |
| A-25; E2-5 | 3/2/2023 | "#stopscandohate?? (Sorry I couldn't resist...)." | Mockery of discrimination allegations |
| A-33; E-2-12,17 | 3/3/2023 | CIO calls Plaintiff "sneaky." | Direct animus from the decision-maker |
| A-37; E2-19 | 3/6/2023 | HR pre-drafted discipline | Scripted retaliation |
| B-16, 17 | 3/7/2023 | CEO merit increase + full bonus | Contradicts performance narrative |
| A-38-42; E2-35 -40 | 3/24/2023 | CIO termination threat | Direct threat after discrimination allegations |

## D. Additional Material Facts Supporting Plaintiff's Claims

## 1. Structural Replacement & Economic Exploitation

**a)** Requisition materials reflect that no internal candidate was available to fill this role at the time of Plaintiff's hire. (Ex. B at 3)

**b**) Shawn McClellan was working as a contractor prior to and during Plaintiff's onboarding. (Ex. F at 13)

**c**) On May 6, 2022, formal transition instructions redistributed Plaintiff's Core Data Lake responsibilities to McClellan (Ex. C at 29)

**d**) On June 13, 2022, management approved converting Shawn McClellan from contractor to full-time employee. (Ex. F at 14)

**e**) On June 22, 2022, Hurst forwarded Plaintiff's resume to Robert Steffler (Vontier VP of Data & Analytics), Ayma's manager, initiating discussions about moving Plaintiff out of Gilbarco. (Ex. C at 34)

**f**) On August 2, 2022, Schoultz called Plaintiff's transfer a "win-win" because Plaintiff was "a lot cheaper than Jesus." (Ex. C at 33)

**g**) On October 25, 2022, an organization chart showed McClellan as Data & Analytics lead. (Ex. D at 68)

## 2. Selective Enforcement: Defendants' Own Conduct Contradicts Their Performance Narrative

**h**) On January 31, 2022, despite Plaintiff signing her emails with "SK" and her email address clearly displaying her name, McClellan replied addressing Plaintiff as "**Soyhan** –". (Ex. C at 1)

**i**) On February 11, 2022, Hurst emailed Blaser: "I don't see you as part of this call at all," noting Blaser missed his own program meetings. (Ex. C at 2-3). Blaser was

11

never disciplined. Plaintiff, by contrast, was terminated for alleged meeting refusal after requesting accommodation.

**j)** On March 24, 2022, Plaintiff documented that Julia Furey, a white female under 40, was "grandfathered in" despite producing no deliverables. (Ex. E2 at 37)

**k)** On April 11, 2022, Starr Cruise stated: **"This should have already been done, but Julia and Shawn are not analysts."** (Ex. C at 8)

**l)** On October 27, 2022, Plaintiff reported that Shawn McClellan and Patricia Bisbee falsely claimed PMP certification. (Ex. D at 91-100)

**m)** On November 2, 2022, Hurst stated Plaintiff was moved from her Data & Analytics role because "Main reason being was her well-being." (Ex. D at 70)

**n)** On December 13, 2022, Compliance Investigator Gibson requested written materials to support Hurst's "well-being" claim. (Ex. D at 73-74)

**o)** On January 18, 2023, Hurst again claimed Plaintiff's removal was for her "well-being." (Ex. E1 at 20)

**p)** On December 19, 2022, Hurst escalated to HR, CIO, and Compliance, calling Plaintiff "becoming unbearable... toxic... needs to stop ASAP." (Ex. D at 82)

**q)** On December 19, 2022, Hurst confirmed she gave Plaintiff a "Leading" rating. (Ex. D at 85)

**r)** On January 19, 2023, Hurst confirmed in writing no documentation existed to support any performance-related reason for Plaintiff's removal. (Ex. E1 at 22)

**s)** On January 19, 2023, HR Business Partner Heuser acknowledged the lack of written justification: **"There is not much that I can find on the 'why' in writing to SK directly."** (Ex. E1 at 23).

**t)** On January 26, 2023, Plaintiff requested that HR produce objective evidence supporting management's claim that she asked to be removed from her Data Analytics PM role. **HR could not produce any such evidence** and instead characterized the issue as "she said, he said." (Ex. E1 at 24-25).

### 3. Explicit Discriminatory & Retaliatory Animus

**u)** On October 10, 2022, Blaser stated: "**If this were a Catholic school, Sister Rosie would have separated those two already. Sigh** ..." referring to Plaintiff and Dr. Porter. (Ex. D at 44)

**v)** On January 9, 2023, Blaser asked to remove Plaintiff (Asian female over 40) and Porter (Black female over 40) from Demand Planning: "I asked him to remove them and replace them with Raul and Oliver", white males. On January 13, 2023, the project was reassigned to Shawn McClellan, a white male (Ex. E1 at 1-2, 10)

**w)** On January 9, 2023, Hurst told Blaser: "Documenting these scenarios with SK... Unbelievable... **these two just don't get it**." Blaser confirmed "**these two**" referred to Plaintiff and Dr. Porter. (Ex. E1 at 1)

### 4. VBS Ignite – Capacity Existed, Denied with Animus

13

**x)** On March 1, 2023, VBS leadership encouraged Plaintiff to join Ignite. (Ex. E2 at 15-16).

**y)** On March 2, 2023, Plaintiff requested approval to participate in VBS Ignite Cohort E, expressly referencing "reasonable accommodation" after being removed from all live projects. (Ex. E2 at 1).

**z)** On March 3, 2023, Schoultz emailed HR and Blaser stating that Ignite Cohort E was full but that the program administrator **"would squeeze in one for me, if I asked very nicely (which I am obviously not going to do…)."** This exchange confirmed that **capacity existed** for Plaintiff's requested accommodation, but management deliberately chose not to pursue it. (Ex. E2 at 9).

**aa)** On March 6, 2023, VBS confirmed **"time and space to add another Ignite Candidate."** That same day, Schoultz called Plaintiff **"sneaky"** for attempting to enroll. (Ex. E2 at 12, 14-15)

## 5. Pre-Determined Termination: HR, Compliance, and CIO Coordinated to Terminate Plaintiff

**bb)** On March 6, 2023, HR pre-drafted discipline threatening termination: **"discipline of performance up to termination."** (Ex. E2 at 19).

**cc)** On March 13, 2023, Martorell informed Plaintiff "Speak Up" complaint was closed and "not substantiated due to lack of evidence." (Ex. E2 at 27-28)

**dd)** On March 24, 2023, Schoultz (CIO) sent a draft termination threat to HR for review, stating: **"As an immigrant female over 40 myself, I resent your**

14

**comments that the situation has any bearing on <u>ethical</u> background"**, using her own protected status to dismiss Plaintiff's race and national origin discrimination claims. (Ex. E2 at 35-36)

## 6. Termination – Refusal to Accommodate Medical Distress

**ee)** On March 30, 2023, Plaintiff reported an elevated heart condition and migraine, requesting written communication due to "retaliatory harassment". **HR refused and terminated her 36 minutes later by email.** (Ex. E2 at 42-45)

## 7. Post-Termination – Settlement Offer and Turnover

**ff)** In November 2023, **Defendants offered Plaintiff $90,000** to settle before filing this lawsuit. (Decl. of Plaintiff via former counsel).

**gg)** Every individual Plaintiff identified as having participated in adverse actions is **no longer with the Company**, including Schoultz, Blaser, Hurst, Heuser, Martorell, Steffler, and McClellan.

## IV. LEGAL ARGUMENT

### A. Plaintiff Has Established a Prima Facie Case of Retaliation

To establish a prima facie case of retaliation, Plaintiff must show: (1) protected activity; (2) employer knowledge; (3) adverse action; (4) causal connection. *Laster v. City of Kalamazoo,* 746 F.3d 714, 730 (6th Cir. 2014); *Muflihi v. U.S. Steel Corp.,* No. 22-cv-12609, 2024 WL 5172912, at *16 (E.D. Mich. Dec. 16, 2024) (applying same four-part test)

15

**1) Protective Activities and 2) Employer knew:**

| Date | Protected Activity | Exhibit |
|---|---|---|
| 4/28/2022 | Reported Blaser targeting Plaintiff and Dr. Porter | C-17, 20, 21 |
| 5/4/2022 | Objected to being blocked from the PM role | C-23 |
| 9/22/2022 | Raised job security concerns to HR (no requisition) | D- 2-5 |
| 9/27/2022 | Objected to data security/compliance issues | D- 6 |
| 10/6/2022 | Formal race/national origin hostile environment complaint | D- 21-26 |
| 1/13/2023 | Discrimination notices to executives regarding reassignment | E1-15, 16 |
| 1/18/2023 | Formal harassment/discrimination complaint to HR | E1-17 |
| 1/18/2023 | Email to HR requesting Kaizen participation | E1-17 |
| 1/18/2023 | Formal retaliation and discrimination complaint against Hurst and Blaser | E1-17 |
| 1/26/2023 | Disclosed heart condition to HR; requested reporting change; documented denial of requests | E1-24, 25 |
| 1/30/2023 | Email to Compliance stating EEOC is now involved | E1-27 |
| 2/3/2023 | EEOC Charge No. 435-2023-00395 | E1-36, 37 |
| 3/2/2023 | Formal discrimination complaint + accommodation request | E2-7 |
| 3/6/2023 | Constructive termination notice referencing EEOC | E2-10-16 |

Each constitutes "opposition to any practice made an unlawful employment practice" under Title VII, 42 U.S.C. § 2000e-3(a), and protected activity under the ELCRA, Mich. Comp. Laws § 37.2701. Defendants' knowledge is undisputed; complaints were directed to HR, HR Compliance, and senior executives.

**3) Adverse Actions:**

| Date | Adverse Action | Evidence |
|---|---|---|

16

| 5/5/2022 | Communication suppression: "Do not send anything" gag order | C-27 |
|---|---|---|
| 5/5/2022 | Exclusion: Executive meeting status changed from required to optional | C-28 |
| 5/6/2022 | Role stripping: the unique Data Analytics PM role (**the only such position at Gilbarco)** transferred to McClellan, a white male contractor | C-29 |
| 8/2/2022 | Structural replacement: Backfill planning before any performance process | C- 32-37 |
| 1/18/2023 | Forced leave: Involuntary administrative leave immediately after the complaint | E1-19 |
| 9/27/22; 3/15/23 | Managers coordinated retaliation; an after-hours meeting to pressure | D-10; E2-29 |
| 3/2/2023 | Accommodation denial: Refusal of a written-only communication request | E2-2, 3, 6 |
| 3/6/23; 3/24/23 | Discipline escalation: Pre-drafted warnings; termination threats | A-37,38-42; E2-19, 35-40 |
| 3/30/2023 | Termination | E2-42 |

An adverse action is one "that might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Retaliation "is not limited to actions that affect the terms and conditions of employment"; anything that "would deter a reasonable employee" suffices. *Id.* at 64.

**4) Causal Connection:** Temporal proximity alone can establish causation where the adverse action follows **'very close'** in time to protected activity. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). The Sixth Circuit has found causation based on gaps of three, four, and even five months. *See Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (three

months); *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) (four

months); *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (five months)

 The record reflects a pattern of adverse actions occurring immediately after

Plaintiff engaged in protected activity:

| Gap | Protected Activity  --> | Adverse Action | Evidence |
|---|---|---|---|
| **Same day** | 4/28/22, reported Blaser targeting her and Dr. Porter | 4/28/22, reassigned to PCI compliance (unfunded, untracked project) | C-17, 20,21 → C-22; 31 |
| **7 days** | 4/28/22, reported Blaser targeting | 5/5/22 to 5/6/22, gag order and role removal | C-17,20,21 → C-27, 29 |
| **48 hrs** | 5/4/22, complaint (blocked from Data Analytics PM role) | 5/5/22 to 5/6/22, gag order and role removal | C-23 → C-27; C-29 |
| **Same day** | 9/22/22, verbal complaint to HR (no requisition, job security) | 9/22/22, Hurst begins planning to downgrade the Q3 performance review | D-2-5 → D-10 |
| **7 days** | 9/22/22, 2022 verbal complaint | 09/27/22, Ayma complains Plaintiff "protects GVR customer data" (framing compliance as problem) | D-2-5 → D-6 |
| **4 days** | 10/6/22, formal complaint (race, harassment, data security) | 10/10/22, PIP discussions initiated; HR admits no prior coaching | D-21-26 → D-41,42 |
| **Same day** | 1/13/23, complaint (discrimination notice to executives) | 1/13/23, travel denied; "stop any engagement" order; project reassigned to McClellan | E1-15,16 → E1-9,10 |
| **5 days** | 1/13/23, complaint | 1/18/23, forced leave | E1-15,16 → E1-19 |
| **31 days** | February 3, 2023, EEOC Charge | March 6, 2023, pre-drafted discipline circulated | E1-36,37 → A-25; E2-19 |

| 24 days | 3/6/23, constructive termination notice | 3/30/23, termination | E2- 10-11 → E2-42 |

Here, Plaintiff's protected activity was followed by adverse actions on the same day, within 48 hours, within 4 days, within 5 days, and within 7 days. gaps far shorter than those the Sixth Circuit has repeatedly found sufficient. If three-to-five-month gaps are sufficient to support causation, the same-day and multi-day gaps shown here readily permit a reasonable jury to infer retaliation. See *Montell v. Diversified Clinical Servs.*, 757 F.3d 497, 505 (6th Cir. 2014) (holding that temporal proximity alone can establish causation).

The record shows far more than temporal proximity. It reveals a **retaliatory, hostile work environment marked by an escalating pattern**: each complaint triggered increasingly severe retaliation, gag orders, exclusion, reassignment, coerced meetings, role removal, false discipline, forced leave, termination threats, '#stopscandohate' mockery, and ultimately termination. This consistent pattern permits a reasonable jury to infer a retaliatory motive. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). This Court's recent decision in *Muflihi* is directly on point

## B. Defendants' Proffered Reasons Are Pretext for Retaliation

Because Plaintiff has established a prima facie case, the burden shifts to Defendants to articulate legitimate, non-retaliatory reasons. *Muflihi,* 2024 WL 5172912, at 16. Even if they do, Plaintiff has produced overwhelming evidence of

pretext. Pretext can be shown by demonstrating the employer's reason: (1) has no basis in fact; (2) did not actually motivate the conduct; or (3) was insufficient to warrant it. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). All three paths lead here.

**First, the Defendants' performance narrative lacks a factual basis.** Plaintiff's 2022 "Leading Contributor" rating (Ex. B at 6-15), CEO-approved a full bonus awarded weeks before termination (Ex. B at 16-17). HR's admission of "not much that I can find on the 'why' in writing" (Ex. A at 10) undermines any claim of performance issues. Hurst's contemporaneous explanation that Plaintiff's removal was for her "well-being" (Ex. D at 70) is itself a shifting justification. Where "the employer's asserted reason for termination is completely absent from the contemporaneous record," pretext is established. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 762 (6th Cir. 2000).

**Second, the evidence shows retaliation, not performance, actually motivated Defendants' actions.** The pattern is unmistakable: each protected complaint triggered immediate adverse action. The "avoid another 'Speak Up'" email (Ex. A at 5) explicitly links removal decisions to protected activity. The "stopscandohate??" mockery (Ex. A at 25) and CIO's "sneaky" comment (Ex. A at 33) reveal retaliatory animus from senior decisionmakers.

**Third, Defendants' reasons are insufficient to warrant termination**. This Court in *Muflihi* rejected summary judgment after a "shoddy investigation." Slip Op. at 18. Here, the independent "investigations" produced no findings, were used as a "sword" in the EEOC and Answer to FAC, yet were privileged so that Plaintiff cannot evaluate them, "shield." It is another questionable and shoddy investigation.

**Fourth, Defendants' "meeting refusal" Narrative Is an Accommodation Dispute.** Defendants frame Plaintiff's objections as insubordination, but the record shows the opposite. By January 2023, Plaintiff had disclosed a medical condition aggravated by the hostile environment and repeatedly requested reasonable accommodations, written communication and separation from her alleged harassers. Defendants refused. When Plaintiff objected to confrontational meetings and requested written alternatives, Defendants treated that request as misconduct.

This was not insubordination; it was a request for reasonable accommodation under the ADA, itself a protected activity. *Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997) (requesting reasonable accommodation is protected activity). Moreover, requesting that she communicate in writing about matters involving her harassment complaints constitutes protected opposition. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579-80 (6th Cir. 2000); *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015). Defendants' decision to punish

21

Plaintiff for seeking an accommodation and opposing harassment is itself evidence of unlawful retaliation.

A reasonable jury could conclude that Defendants' "meeting refusal" rationale is a post-hoc justification for retaliation and failure to accommodate, particularly where the record reflects that meeting attendance expectations were applied selectively. (Ex. C at 2-3)

Critically, the "same actor inference" does not shield Defendants where, as here, the record contains direct evidence of retaliatory animus, the "#stopscandohate" mockery, the "sneaky" comment, and the "avoid another Speak Up" email. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 573–74 (6th Cir. 2003). Because Defendants' stated reasons are contradicted by their own contemporaneous records and shifting explanations, a reasonable jury could find those reasons unworthy of credence.

## C. Plaintiff Has Established a Prima Facie Case of Discrimination

Under the McDonnell Douglas framework, a plaintiff establishes a prima facie case of discrimination by showing: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was treated differently than similarly situated non-protected employees. See *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973); see also Laster, 746 F.3d at 727. Plaintiff meets each element.

22

**(1) Protected Class:** Plaintiff is an Asian female, of South Korean national origin, over 50. (Undisputed.)

**(2) Qualified:** Plaintiff's 2022 "Leading Contributor" rating, merit increase, and full bonus establish her qualification beyond dispute, along with PMP, MBA, and Data Scientist certification. (Ex. B at 6-15)

**(3) Adverse action:** Plaintiff was removed from Core Data Lake (May 2022), stripped of her unique Data Analytics Project Manager position, removed from Demand Planning (January 2023), placed on forced administrative leave, and ultimately terminated, each an adverse action.

**(4) Less favorable treatment than similarly situated non-class members.**

Plaintiff has identified **seven comparators**, every relevant employee in the Data & Analytics and PMO departments, due to a cross-functional role (Exhibit B, F)

| Person | Race | | Age | Degree | Title | Pay in 2022 | Outcome |
|---|---|---|---|---|---|---|---|
| **Plaintiff** | **Asian** | F | >40 | BS Chem Eng, MBA, PMP, Data Science Cert | Data Analytics PM | $115K | Removed from Core Data; Terminated |
| Shawn M | White | M | >40 | BAS/BA-unaccredited Non-PMP | Lead Technical PM | $120K | Retained; Terminated |
| **Tanya P** | **Black** | F | >40 | BS Math, MS Math, DBA | Data Science Manager | Unknown | Removed from Core Data; Retained; Terminated |

23

| Michelle R | White | F | >40 | BA Info Systems | Data Analyst TechLead | $120K → $130K | Retained; Terminated |
|---|---|---|---|---|---|---|---|
| Julia F | White | F | <40 | BS CTIS | Sr. Data/Bus Analyst | Unknown | Retained; Resigned |
| Ashley K | White | F | <40 | High school diploma | Sr. Data Solution Architect | $130K | Retained; Promoted |
| Rosanna H | Hisp. White | F | >40 | BA Spanish Literature | Director, IT PMO | $185K | Retained; Resigned |
| Paul B | White | M | >40 | BA Art History | Director, Data & Analytics | $175K+ | Retained; Resigned |

Moreover, the record reveals **systematic exclusion of the only two minority women with advanced degrees and STEM credentials**, Plaintiff and Dr. Porter, from projects and promotional opportunities. At the same time, **every white counterpart was retained, promoted, or hired at higher pay**. The evidence is stark: on **January 13, 2023,** "Please do not include either Tanya Porter or Sohyon Warner." (Ex. A at 9) On **October 10, 2022,** "If this were a Catholic school, Sister Rosie would have separated those two already." (Ex. A at 3) The first is an **explicit exclusion directive** targeting the only two minority women. The second, made four days after Plaintiff's race complaint, reveals **discriminatory animus**.

Compounding this, Plaintiff, **the most credentialed employee in the department**, was **paid less than every known comparator.** This pay disparity, combined with the exclusion pattern, supports a powerful inference of

24

discrimination that a jury must resolve. *Beck-Wilson v. Principi*, 441 F.3d 353, 360 (6th Cir. 2006). Also, the record reflects that non-managerial personnel over 40 were terminated, further evidence of an age-discriminatory pattern that a jury should evaluate.

## D. The "Same Actor" Inference Does Not Apply:

Defendants invoke the "same actor" inference, arguing that because Hurst and Blaser participated in hiring Plaintiff, they could not have discriminated against her. But this inference "is not an irrebuttable presumption" and does not apply where, as here, there is evidence that the employer's attitude changed after the employee engaged in protected and whistle-blowing activities in September and October 2022. (Ex. D at 2-5, 21-26, 29-40) *Wexler*, 317 F.3d at 573–74. The record is replete with evidence of such changed attitudes: On **May 9, 2022**, praise for "excellent feedback from previous management" (Ex. C at 30); on **August 22, 2022**, the management praised that "We acknowledge your talent and the last thing we want to see is losing great resources" (Ex. C at 44); yet by **December 2022**, Hurst called Plaintiff  "becoming unbearable... toxic... needs to stop ASAP" (Ex. D at 82-84)

The same-actor inference does not shield an employer when glowing evaluations are followed by hostility after a protected activity. *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002).

25

**E. Defendants' Reliance on Privileged Investigations Is Unavailing**

Defendants invoke the existence of independent internal investigations as if that fact alone defeats Plaintiff's claims. But they cannot have it both ways: they cannot (1) assert attorney-client privilege over investigative materials; (2) decline to rely on their substantive content; and yet (3) argue the investigations prove the absence of discrimination.

This Court's February 5, 2026, Order (ECF 94) held only that two investigative reports were privileged, **not** that the investigations were neutral, reasonable, or defeated Plaintiff's claims. Privilege protects disclosure; it does not equal exoneration. Moreover, the record permits a jury to conclude that these investigations were defensive, if allowed to be used as a defense, rather than neutral: Investigations occurred while adverse actions continued; Complaints were narrowed or dismissed without objective evidence (Ex. E2 at 27, 28).  A reasonable jury could thus conclude that these investigations were not good-faith inquiries, but rather defensive efforts to build a record against Plaintiff while retaliation continued unabated.  That protected activity was reframed as misconduct; that leadership coordinated her termination; and that the CIO mocked her #StopAsianHate hashtag during the very investigation meant to be impartial.

26

In *Muflihi,* this Court denied summary judgment where the plaintiff showed the employer's investigation was inadequate. Slip Op. at 18 (plaintiff "was terminated after filing his complaints based on a shoddy investigation").

The same is true here. HR Compliance closed Plaintiff's "Speak Up" complaints in December 2022 and March 2023, while the EEOC investigation was ongoing. (Ex. E2 at 27–28) Despite Plaintiff submitting **screenshots, emails, files, text messages, and 38 pages of corroborating evidence from Dr. Porter**, HR could not produce **a single piece of objective evidence** to support management's vague "communication issues" claim. (Ex. E2 at 27–28)

Indeed, HR admitted management's allegation lacked documentation, while Plaintiff's 2022 performance review rated her as an **"Excellent Communicator"** by Hurst (Ex. B at 15)

## F. Defendants Failed to Accommodate Plaintiff's Medical Condition

To establish a prima facie case of failure to accommodate, Plaintiff must show: (1) disability; (2) qualified; (3) employer knew; (4) requested accommodation; (5) employer failed. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868–69 (6th Cir. 2007).

**1) Disability**: On **August 26, 2022**, during Defendants' structural removal of Plaintiff from her Data Analytics role, she was **diagnosed with hypertension** by her primary care physician and received an "elevated blood pressure reading," a

condition she had not experienced before employment at Gilbarco. (Ex. C at 45)

**Hypertension** is a physical impairment that substantially limits major life activities and constitutes a disability under the ADA. *See* 42 U.S.C. § 12102(1)

**2) Qualified**: Plaintiff's 2022 "Leading Contributor" rating and CEO-approved full bonus 3 weeks before termination establish her qualification. (Ex. B at 6-17) The requested accommodation in writing would not have eliminated any essential job function.

**(3) Employer knew; (4) Requested accommodation; (5) Employer failed:**

| Date | Requested: | Defendants Response | Exhibit |
|---|---|---|---|
| 1/26/23 | Requested an interim solution reporting directly to Martina Schoultz (to separate from harassers) | Denied | E1-24,25 |
| 1/26/23 | Requested transfer to another department as a loaner at no increased cost; "setting me up to go through psychological disturbance, further impairing my heart condition again and again." | Denied | E1-24,25 |
| 1/26/23 | Requested HR produce objective evidence supporting management's claim that she asked to be removed | Failed to Produce | E1-24,25 |
| 2/21/23 | Requested permanent transfer to a different department where expertise could be utilized | Denied | E1- 38-40 |
| 3/1/23 | Notified Blaser of accommodation request; requested communication limited to the minimum necessary **to protect well-being** | Ignored | A-28; E2-6 |
| 3/2/23 | Requested email-only communication due to documented distress and manager conduct due to his **"tone and anger'** | Denied | E2-4 |
| 3/2/23 | Requested participation in VBS Ignite Cohort E as a constructive alternative (no live projects) | Denied | E2-1 |

28

| 3/7/23 | Reiterated written-only communication request due to medical distress, "...communicate with you via email for my well-being." | Ignored | E2-29 |
|---|---|---|---|
| 3/15/23 | Objected to after-hours 2-on-1 meeting; reiterated email-only communication due to hostile environment and EEOC | Scheduled Anyway | E2-29 |
| 3/24/23 | Requested return of Demand Planning/Data Analytics projects | Denied | A-39; E2-35–40 |
| 3/30/23 | Reported medical distress (elevated heart condition, migraine); requested written communication | Refused. Terminated | E2-42 |

The Sixth Circuit has held that "an employer has a duty to engage in the interactive process" once accommodation is requested. *Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997). Defendants not only denied Plaintiff's requested accommodations but then relied on the consequences of that denial, her refusal to participate in hostile meetings, as the justification for termination. An employer cannot manufacture "insubordination" by first refusing reasonable accommodation and then disciplining the employee for attempting to protect her health.

Where, as here, an employer denies accommodation and terminates the employee within days and weeks of a formal request, a jury may infer an unlawful motive. *Talley v. Family Dollar Stores*, 542 F.3d 1099, 1107 (6th Cir. 2008).

## V. CONCLUSION

This case presents factual disputes requiring jury resolution:

- Were Plaintiff's reassignments neutral or retaliatory?

29

- Were similarly situated white employees treated more favorably?

- Is the Defendants' performance narrative pretextual?

- Did the workplace become retaliatorily hostile?

- Did Defendants fail to accommodate Plaintiff's medical concerns?

- Did Defendants discipline Plaintiff for requesting written communication after she disclosed a medical condition?

- Was termination causally connected to protected activity?

Under Rule 56, the Court must view the evidence in the light most favorable to Plaintiff and may not weigh credibility or resolve factual disputes. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). Because the record reflects competing evidence regarding motive, credibility, and the basis for Plaintiff's removal, those determinations are reserved for the jury. Plaintiff therefore respectfully requests that the Court deny Defendants' Motion for Summary Judgment.

**Respectfully submitted,**
/s/ Sohyon Warner
Sohyon Warner, Plaintiff, in Pro Se
2841 Lamplighter Lane
Bloomfield Hills, MI 48304
sohyon.warner@gmail.com
248.210.5504

Dated: March 24, 2026

30

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 24, 2026, I electronically filed the foregoing
Plaintiff's Opposition to Defendant's Motion for Summary Judgment with the
Clerk of Court using the CM/ECF system, which will send notice to all counsel of
record.

**Respectfully submitted,**
<u>/s/ Sohyon Warner</u>
Sohyon Warner, Plaintiff, in Pro Se
2841 Lamplighter Lane
Bloomfield Hills, MI 48304
sohyon.warner@gmail.com
248.210.5504