UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SOHYON WARNER,

Plaintiff,

v.

Case No. 24-12333
U.S. DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

GILBARCO, INC., GILBARCO, INC. (d/b/a GILBARCO VEEDER-ROOT) and VONTIER CORPORATION

Defendants.

______________________________/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF No. 95]**

Before the Court is Defendants' Motion for Summary Judgment, filed on February 11, 2026. Upon review of the parties' submissions, the Court concludes that oral argument will not aid in the disposition of this matter. The Court will resolve the Motion on the briefs. *See* E.D. Mich. L.R. 7.1(f)(2). For the following reasons, the Court GRANTS Defendants' Motion for Summary Judgment.

## I. BACKGROUND

Plaintiff Sohyon Warner ("Warner") is an Asian woman of South Korean national origin. ECF No. 7, PageID.34. In December 2021, a large manufacturer,

Defendant Gilbarco, Inc. ("Gilbarco"), whose parent company is Defendant Vontier Corporation ("Vontier"),[1] hired Warner for a remote working position as a Data Analytics Project Manager. ECF No. 10, PageID.52. At Gilbarco, Warner worked on a team led by Paul Blaser ("Blaser"), a white male, but also reported to Rosanna Hurst ("Hurst"), a Hispanic female. ECF No. 95-5, PageID.1213; ECF No. 10, PageID.53. Blaser and Hurst are Director-level employees who each played a role in hiring Warner. ECF No. 95, PageID.1035.

For the first several months, Warner worked on Blaser's team on the Core Data Lake Project. ECF No. 10, PageID.53. Warner's time with Blaser went south however, and she emailed Hurst to report her unhappiness: "It's hard to be part of the program with the program owner who doesn't want to be accountable." ECF No. 95–6, PageID.1218. In May of 2022, Warner was taken off the Core Data Lake Project and assigned to work on a different team. *Id.* Warner's hours, benefits, and salary remained the same. ECF No. 80-2, PageID.848–49.

Now on something called the "PCI Compliance" team, Warner became unsatisfied with this new detail, too. She viewed it as "low visibility," contrary to her skills and interests, and sought reassignment. *See id.* Hurst helped facilitate this second reassignment in part because she thought "SK is very talented in many ways

---

[1] Gilbarco and Vontier will be referred to jointly as "Defendants," herein.

. . . and [I want to] do my best to keep her in the company…." ECF No. 95-8, PageID.1228. This move required financial and logistical workarounds, but it finalized in August 2022, placing Warner on a team led by Ivan Ayma ("Ayma"), a Hispanic male. *See* ECF No. 95-9, PageID.1231. This new assignment was for Vontier and it was "high visibility," according to Warner. ECF No. 80-2, PageID.849.

But in October 2022, for reasons the parties dispute, frustrations mounted with Warner and her colleagues. These frustrations include disagreement about what things Warner should or should not need to accomplish an assignment and other unpleasant clashes about communication. ECF No. 95, PageID.1040. Warner's colleagues raised numerous work-related concerns about her performance and conduct. *See* ECF No.95-14, PageID.1265–1269. Specifically, on the morning of October 4, 2022, Ayma emailed his concerns about Warner to Hurst: "This is getting to the end of the line for me. I receive complaints all the time . . . I [would] rather be running the project without this person. It is causing conflict and confusion and not resolving any issues." *Id.*

Two days later, on October 6, 2022, Warner submitted a written complaint to Emily Heuser ("Heuser") in Defendants' Human Resources Department. ECF No. 95-15, PageID.1272. In the complaint, Warner stated that she feared potential retaliation and alleged that Ayma had discriminated against her for being an Asian

female. *Id.* As Defendants began an investigation into Warner's serious charges, Hurst worked to remedy the impasse using a familiar solution: reassigning Warner. ECF No. 95-16, PageID.1282. Warner left Vontier and returned to Gilbarco. *Id.*

In anticipation of Warner's return, Hurst communicated to colleagues that Hurst wanted to "avoid another 'Speak Up' from SK." ECF No. 110-6, PageID.2171. However, Warner's reunion with Gilbarco soured, too. In one January 13, 2023, interaction Warner had requested reimbursement for a business-related trip she wanted to take. Hurst denied the request, reasoning that "this is not a separate demand planning initiative." ECF No. 110-6, PageID.2174. The relationship between Warner and her colleagues, including Hurst, continued to fray.

Hurst reported her issues with Warner to Heuser on January 13, 2023. ECF No. 95-17, PageID.1285. Specifically, Hurst stated that other employees such as Blaser and Richard Ly had been "openly discussing the disruptions that SK is causing." *Id.* at PageID.1288.

On or around January 18, 2023, Warner submitted another complaint to Heuser, this time alleging discrimination and retaliation from Hurst and Blaser based on several unpleasant work-related conversations and an alleged conversation Warner had with Hurst that centered on Latin and Chinese culture. ECF No. 95-19, PageID.1297–1305. As part of information gathering to learn the cause of Warner's reassignments, Heuser admitted to Hurst that "there is not much I can find on the

'why' in writing to SK directly." ECF No. 110-6, PageID.2187.

Heuser suggested that Warner take a paid leave so that Heuser could "review all the details and figure out at least an interim solution." ECF No. 110-6, PageID.2183. Warner's reply to this suggestion was, "Thank you so much!" *Id.* Hurst too went on paid leave around this time, being "utterly fatigued with [Warner's] misconduct and blatant disrespect . . . [and] to care for her health and wellbeing." ECF No. 95, PageID.1043.

Warner filed a discrimination complaint with the EEOC on February 3, 2023, alleging discrimination based on her natural origin, race, age (over 50) and sex. ECF No. 110-6, PageID.2201. Upon return from her leave, Warner reported to Heuser that "GVR is setting me up to go through psychological disturbance, further impairing my heart condition again and again." ECF No. 110-6, PageID.2188. Heuser "escalated [Warner's] concerns to Vontier's Compliance Counsel."[1] ECF No. 95-4, PageID.1207.

As the weeks went by, problems continued. Blaser, now working with Warner again, struggled to schedule work-related meetings with her. Warner was evasive.

---

[1] Vontier's General Counsel and Compliance Counsel concluded their investigation of Warner's complaints of discrimination and retaliation in early March of 2023. ECF No. 73-7, PageID.770. The investigation included interviews with some twenty-something people, aside from Warner. ECF No. 73-2, PageID.757. They could not substantiate Warner's allegations, but the investigation and its related documents are privileged. ECF No. 95, PageID.1043.

*See* ECF No. 95-20, PageID.1310. Blaser stressed the necessity of these meetings: "We absolutely need to meet . . . we need a meeting more urgently than ever . . . Are you overwhelmed with informal work? If so, I can help free you up from that. There's a lot to talk about." ECF No. 95-21, PageID.1319. Warner explained her mounting absences to Blaser in several early March emails. On the morning of March 2, 2023, she wrote: "I have communicated to HR in writing and asked for [a] reasonable accommodation, which is an interim solution to protect me from further discrimination/harassment/retaliation/exclusion/abuse from you and Rosie [Hurst]." *Id.* at PageID.1318. Later that evening Warner wrote to Blaser:

> Your repeated toxic discriminatory behavior demonstrated that [you] desire to harm and abuse me. That is the reason why I shouldn't meet you. I know no white people went through what I am facing with you. Again, if you need to communicate with me, please use the email system going forward. Your discriminatory behavior is not welcome.

*Id.* at PageID.1317.

Warner filed another detailed complaint on March 6, 2023, alleging, among other claims, discrimination and retaliation. ECF No. 95-22, PageID.1325. Blaser still attempted to meet with Warner, with mixed results. He wrote her the following email in mid-March 2023:

> Hi SK, on March 7th I scheduled a one-on-one meeting with you which you did not attend. On March 13th I scheduled a meeting with you to discuss your comp increase. You did choose to attend that one . . . You did not attend our meeting on March 15 . . . I need to meet with you to discuss your work and projects . . . I need you to attend our meetings. I want to best understand your progress on work assignments and provide

> any support I may be able to offer . . . we are assigning you the One Jira project. It is a major, high-profile project for Retail Solutions . . . and needs you to lead the effort.

ECF No. 95-23, PageID.1328. Nothing changed; in response to Blaser's attempts, Warner continued to justify her refusal to attend meetings by accusing Blaser and others of discrimination and retaliation. In late March 2023, Blaser's penultimate email to Warner ended with:

> Please note that your further refusal to attend one-on-one meetings or to accept project management work is a refusal to meet the expectations of your role as a project manager on our team. Refusal to accept work assigned or refusal to attend scheduled meetings is insubordination that will result in disciplinary action, up to and including termination.

ECF No. 95-24, PageID.1332. Warner's absences did not let up, however. Heuser was also unsuccessful in meeting with her, despite the topic being "urgent . . . and it [cannot] be delayed." ECF No. 95-25, PageID.1334.

Warner was terminated on March 30, 2023. *Id.* She filed a suit against Gilbarco and Vontier on September 6, 2024, alleging that they discriminated against her based on her sex, race, and national origin, and retaliated against her for reporting that alleged discrimination, in violation of Title VII of the Civil Rights Act of 1964, Michigan's Elliot-Larsen Civil Rights Act, and 42 U.S. § 1981. *See* ECF No. 1. Defendants filed a Motion for Summary Judgment on February 11, 2026. *See* ECF No. 95. Warner filed her Response on March 24, 2026, and Defendants filed their Reply on April 7, 2026. *See* ECF No. 110, ECF No. 113.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if its resolution will affect the outcome of the lawsuit." *Martingale LLC v. City of Louisville*, 361 F.3d 297, 301 (6th Cir. 2004) (citation omitted). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Rocheleau v. Elder Living Const., LLC*, 814 F.3d 398, 400 (6th Cir. 2016) (citation omitted). The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Id.*

## III. ANALYSIS

### A. Title VII of the Civil Rights Act of 1964, Michigan's Elliot-Larsen Civil Rights Act, and Equal Rights Under the Law (§ 1981) – Discrimination Based on Gender, Race, National Origin

Employers may not discriminate "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

The Sixth Circuit has held that for employment discrimination claims, Michigan's Elliot-Larsen Civil Rights Act ("ELCRA") and § 1981 share the same analysis as Title VII of the Civil Rights Act of 1964 ("Title VII"). *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) ("We review claims of alleged race discrimination brought under § 1981 and the Elliott-Larsen Act under the same standards as claims of race discrimination brought under Title VII of the Civil Rights Act of 1964.").

The plaintiff carries the burden of proving discrimination, by direct or indirect evidence. *Jackson v. VHS Detroit Receiving Hosp., Inc.,* 814 F.3d 769, 775 (6th Cir. 2016). Direct evidence of discriminatory intent is "a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group." *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir. 2000).

Absent direct evidence, under the governing *McDonnell-Douglas* framework a plaintiff must satisfy the prima facie elements of discrimination, specifically that: 1) she is a member of a protected class, 2) she is qualified for the position, 3) she suffered an adverse action, and 4) employees outside of the plaintiff's class, but similarly situated as the plaintiff, were treated more favorably. *See McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). If the plaintiff establishes these elements, the burden shifts to the defendant to show that the adverse action was taken for nondiscriminatory reasons. *Id.* at 802. The plaintiff can then rebut by showing

that the defendant's stated reasons were not couched in-fact and were instead pretext for the real discriminatory reasons. *Id.* at 804.

To apply the summary judgment standard with *McDonnell-Douglas*, courts must determine whether there is enough evidence to warrant a genuine dispute of material fact at *each* of the three steps in the *McDonnell-Douglas* analysis. *Cline v. Catholic Diocese,* 206 F.3d 651, 661 (6th Cir. 1999). The party that fails to deliver in their step, is the party that loses summary judgment.

The Court first analyzes whether Warner's evidence of discriminatory intent is direct or indirect. *Jackson,* 814 F.3d at 775. The Court concludes that Warner has not offered sufficient evidence to constitute as direct evidence.

*i. Direct Evidence*

Recall that direct evidence of discrimination is an express statement by a decisionmaker of a "desire to remove employees in the protected group" or a facially discriminatory employment policy. *Nguyen,* 229 F.3d at 563. In *DiCarlo v. Potter,* 358 F.3d 408, 416 (6th Cir. 2004), a supervisor with decision-making authority allegedly called an Italian American postal worker a "dirty wop." *Id.* at 416. Weeks later, that postal worker was terminated based on a recommendation that that same supervisor made to his manager. *Id.* at 417. The court held that the comment by the supervisor, an apparent decisionmaker, constituted direct evidence of discriminatory intent, enough to survive summary judgment. *See id.*

One of the issues in *Million v. Warren Cnty*, No. 20-3312, 2021 U.S. App. LEXIS 10093, at *4 (6th Cir. Apr. 7, 2021) was a facially discriminatory employment policy. The plaintiff in that case was a female corrections officer. She alleged that the jail's policy of organizing shift assignments by seniority but limiting the number of female officers who could bid on a particular work shift, was discriminatory. *Id.,* 2021 U.S. App. LEXIS 10093, at *11. The policy resulted in male officers with less seniority getting their preferred shift choices over female officers with more seniority. The court held that this facially discriminatory employment policy was direct evidence. *Id.*

Warner does not offer any direct evidence. There is nothing on the record demonstrating relevant supervisors expressly mentioning any of Warner's protected classes. And Warner does not allege any facially discriminatory employment policies. While Warner alleges that Hurst had a "racial bias," "[exhibited] racism toward Northeastern Asians in general," and "generalizes and stereotypes Asians," those allegations are from Warner herself. ECF No. 95-19, PageID.1305. Evidence that consists solely of Warner's testimony, without other corroborating evidence, is not direct evidence of discrimination. *Alfaro v. Dana Container, Inc.* No. 04-72664, 2005 U.S. Dist. LEXIS 8336, at * 14–15 (E.D. Mich. May 9, 2005).

The non-testimonial evidence that Warner offers does not qualify as direct evidence, either. Warner argues that Blaser's statement "If this were a Catholic

school, Sister Rosie would have separated those two already," is explicit discriminatory animus. ECF No. 110, PageID.1939. But that comment is not expressly discriminatory; it is incomparable to the slur in *DiCarlo*, a textbook example of direct evidence of discriminatory intent. *Id.* at 416.

Likewise, Warner presents a comment made by Gilbarco's Chief Information Officer, Martina Schoultz ("Schoultz"), to Blaser and Heuser through email: "P.S. should I also start signing my mails with #*stopscandohate*?? (Sorry I couldn't resist, it's late . . . .)". ECF No. 110–2, PageID.1983. Warner's contention is that this mocking comment is direct evidence of discriminatory evidence. But this comment is not expressly discriminatory, and at the very least would require an inference to infer discrimination.[1] Direct evidence of unlawful discrimination requires *no* inference. *See Gray v. AutoZoners, LLC,* No. 22-1069, 2022 U.S. App. LEXIS 31584, at *8 (6th Cir. Nov. 15, 2022). This is not that.

Nor is the email Schoultz sent to Heuser and Blaser, concerning Warner: "As an immigrant female over 40 myself, I resent your comments that the situation has any bearing on [ethnic] background." ECF No. 110–7, PageID.2244. Aside from this being a draft email and no indication in the record that it was sent to Warner, these comments do not rise to the level of express discriminatory intent. If comments that

[1] If any, the inference is that Warner signed off her emails with "#stopasianhate," but one day signed off instead with "#stopscandohate," clearly a typo.

*deny* the existence of discrimination are evidence that discrimination *is* present, it would certainly require an inference.

Since there is no direct evidence of discrimination, Warner's claims require *McDonnell-Douglas* analysis for circumstantial or indirect evidence.

*ii. McDonnell-Douglas Analysis – Prima Facie*

"On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell-Douglas* inquiry." *Cline*, 206 F.3d at 661. For step one of *McDonnell-Douglas*, Warner must satisfy the prima facie elements of discrimination. *Id.* Both parties concede that Warner satisfies the first element, that Warner is a member of protected class. ECF No. 95, PageID.1048.

The parties disagree on whether Warner satisfies the second element, that she was qualified for her job. The prima facie requirements of *McDonnell-Douglas* are not onerous, but Warner must still produce evidence that she met the legitimate expectations of her employers. *Cline*, 206 F.3d 660–61. For this, Warner presents her qualifications, performance evaluations, and a salary increase as evidence that she was qualified for her role. ECF No. 110, PageID.1946. Despite Defendants counterarguments to this second element, the Sixth Circuit in *Cline* stressed that the district court must not rely on a defendant's evidence of nondiscriminatory motive at the prima facie stage of *McDonnell-Douglas*. And because this is meant to be a

minimal burden for plaintiffs, the Court finds that Warner has satisfied this qualification element based on the evidence presented. *Ledgerwood v. Nat. Amusements, Inc.* 625 F. Supp. 2d 466, 477 (E.D. Mich. Aug. 2007).

For the third element, adverse actions by the employer, many of Warner's contentions fall short. In *Muldrow v. City of St. Louis,* 601 U.S. 346, 358 (2024), the Supreme Court confirmed how Courts must analyze adverse actions in Title VII cases alleging discrimination or retaliation. Unlike retaliation claims, for discrimination claims the law does *not* distinguish between big or small harms; the standard of harm is lower. *Id.* Plaintiffs like Warner must only show "*some* injury respecting her employment terms or conditions." *Id.* at 359 (emphasis added). The plaintiff in *Muldrow* was transferred from

> [A] plainclothes job in a prestigious specialized division giving her substantial responsibility over priority investigations . . . to a uniformed job supervising one district's patrol officers . . . in which she was less involved in high-visibility matters . . . [h]er schedule became less regular, often requiring her to work weekends; and she lost her take-home car.

*Id.* at 977. The Sixth Circuit applied *Muldrow* in an age discrimination case. *Milczak v. Gen. Motors, LLC,* 102 F.4th 772, 787 (6th Cir. 2024). In *Milczak*, the plaintiff's transfer was deemed an adverse action because the transfer left him without the chance for overtime pay, he had to work later hours alone, and he could no longer use his skills. *Id.*

Warner alleges five separate adverse actions by Defendants:

1. Warner's removal from the Core Data Lake Project in May 2022
2. Warner's loss of her "unique Data Analytics Project Manager position"
3. Warner's removal from Demand Planning in January 2023
4. Warner's "Forced Administrative Leave" in January 2023
5. Warner's Termination in March 2023

ECF No. 110, PageID.1949. The parties stipulate that Warner's termination is an adverse action, but dispute whether the first four of the above events are adverse actions. ECF No. 95, PageID.1049. We first analyze actions one through three together because they are related, and can all be characterized as reassignments.

Warner offers very little evidence on the record that these reassignments constitute adverse actions, even with the lower standard of harm under *Muldrow*. Warner does not identify how any of these reassignments resulted in a worse off employment term or condition. *Id.* at 359. The vast majority of Warner's evidence comes from her own characterizations of these events, either in email communication to colleagues, the briefs, or her deposition. And for reasons unclear, Warner took no depositions, not even of the seemingly friendly witness for her, Tanya Porter. *See* ECF No. 110, PageID.1953. In her deposition, Warner spoke of her removal/reassignment from the Core Data Lake Project:

**Q.** And then let's go back to Core Data Lake; when did you start and end your work on that program?
**A.** I believe I was hired in December and I was demoted from that role in May.
**Q.** 2022?
**A.** May 2022.
**Q.** When you were placed on the PCI program, did that cause a reduction in your pay?

**A.** No.
**Q.** Did that cause a reduction in your benefits?
**A.** No.
**Q.** Did you get suspended or disciplined in conjunction with being moved to that project?
**A.** No.
**Q.** Did your hours on that project change?
**A.** No.
**Q.** Other than what you told me, did any other term and condition of your employment change as a result of being put on the PCI program?
**A.** I'm no longer in the high visible top program.

ECF No. 80–2, PageID.848–49. When given the opportunity, Warner did not allege identifiable and disadvantageous changes to her employment terms or conditions. The only similarity between Warner and the plaintiff in *Muldrow* is that they both were reassigned to "lower visibility" work. But the plaintiff *Muldrow* also had to start working weekends, lost a take-home car, and had to start wearing a uniform.

The record indicates that Warner was unhappy working on the Core Data Lake Project. She reported to Hurst that "It's hard to be part of the program with the program owner who doesn't want to be accountable." ECF No. 95-6, PageID.1221. If Warner's previous assignment left much to be desired for her, that cuts against the reassignment leaving her worse off. And regarding the loss of Warner's "unique Data Analytics Project Manager position," it is Warner's burden to provide evidence that her employment terms and conditions diminished because of the reassignments. Warner has not met this burden. ECF No. 110, PageID.1949.

Next, Warner alleges that her "forced" administrative leave was an adverse

action. However, this was paid leave. *See* ECF No. 95–18, PageID.1295. The Sixth Circuit has held that being placed on paid administrative leave is not an adverse action. *See Rizzo v. McDonough*, No. 21-5148, 2022 U.S. App. LEXIS 26426, at *7 (6th Cir. Sept. 21, 2022). To the extent that Warner's paid leave here was uniquely adverse or coupled with a term or condition to make her worse off, Warner offers nothing to advance this theory. All that remains and constitutes adverse action is the termination.

The last prima facie element requires that Warner demonstrate she is "similarly situated to [a] non-protected employee in all *relevant* respects," and that this comparator employee had received more favorable treatment. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir. 1998). The analysis requires the Court to consider the *Mitchell* factors: whether the employees "(1) engaged in the same conduct, (2) dealt with the same supervisor, and (3) were subject to the same standards." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992); *Johnson v. Ohio Dept. of Pub. Safety*, 942 F.3d 329, 331 (6th Cir. 2019). Alternatively, Warner can satisfy this final element by showing that she was replaced by a person outside her protected class. *See McDonnell-Douglas*, 411 U.S. at 802; *Hightower-Mathis v. NextCare Mich. Providers, PLLC*, No. 25-1623, 2026 U.S. App. LEXIS 1300, at *9 (6th Cir. Jan. 16, 2026) (quoting *Jackson v. Quanex Corp.,* 191 F.3d 647, 658 (6th Cir. 1999)).

To be sure, the *Mitchell* factors are not meant to be rigid or narrow. *Goodwin v. Newcomb Oil Col., LLC*, 2024 U.S. App. LEXIS 10239, at *9–10 (6th Cir. Apr. 26, 2024). "The key question is whether any differences . . . 'were in fact relevant to the [employer's] disciplinary decisions.'" *Id.* at *10 (quoting *Jackson v. FedEx Corp. Servs.*, 518 F.3d 388, 394 (6th Cir. 2008)).

In *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 777–78 (6th Cir. 2016), the Sixth Circuit held that the plaintiff, who worked at a mental health facility, had satisfied the comparator requirement. The plaintiff there was terminated for failing to conduct a proper search on a patient and failing to properly discharge another patient. But two other non-protected employees were cited by that employer for the same two violations, and were not fired, unlike the plaintiff. The Sixth Circuit held that those two non-terminated employees were sufficient comparators, that they were similarly situated in relevant aspects. *Id.* at 778.

Leading up to her termination, Warner failed to attend three separate meetings with her superiors. ECF No. 95-23, PageID.1328. Some of these meetings pertained to remedial measures in workflow and communication, and some of them pertained to briefing on "major, high-profile project[s]." *See id.* Blaser had even told Warner that her continued absences would be met with harsh discipline:

> Please note that your further refusal to attend one-on-one meetings or to accept project management work is a refusal to meet the expectations of your role as a project manager on our team. Refusal to accept work assigned or refusal to attend scheduled meetings is insubordination that

> will result in disciplinary action, up to and including termination.

ECF No. 95-24, PageID.1332. Warner was terminated shortly after this above warning. ECF No. 95-25, PageID.1334. Given these events, Warner needed to provide evidence of comparators that engaged in that same relevant conduct such as failing to attend meetings, even after explicit warning from the same supervisor, Blaser. *See Mitchell*, 964 F.2d at 577.

Warner offers seven comparators but fails to identify similar relevant conduct. ECF No. 110, PageID.1949. Instead, Warner compares their titles, salary, protected classes, credentials, and age. The only example of relevant conduct that Warner presents is when Blaser missed a meeting in February 2022. Hurst had written to him:

> [Blaser], I just read the meeting minutes listed below, but I don't see you as part of this call at all. I can only assume you were tied up in another call. I must admit that I am sending this email out of respect, and a bit [of] concern since you are the head of this Core Data Lake project.

ECF No. 110-4, PageID.2021–22. This comparator is insufficient because, as a director-level employee, Blaser was not subjected to the same standards as Warner and this is an instance of a *single* missed meeting. *See Spratt v. FCA US LLC*, 812 Fedd. Appx. 348, 353 (6th Cir. 2020). Warner missed at least three, including a meeting after she was specifically on notice that missing more meetings would result in discipline. Warner does not further allege any other similarities, and based on the

record, none are relevant to Defendants' disciplinary decisions. Warner fails to allege a sufficient comparator for the fourth and final prima facie element.

Alternatively, to satisfy the replacement theory for this final prima face element, Warner needs to provide evidence that she was replaced by an employee outside her protected class. *Bivens v. Zep, Inc.*, 147 F.4th 635, 651 (6th Cir. 2025) ("But what new hire can count as a 'replacement' for [plaintiff]? Only one who 'fill[s]' her 'position' or assumes her 'duties.'"). Warner did not do so; her briefing is threadbare regarding this issue. In the section titled "Post-Termination," Warner does not sufficiently allege that a non-protected person replaced her after her termination. Warner instead lists the alleged departures of several aforementioned employees–Blaser, Heuser, Hurst, Schoultz. This is backwards. The replacement argument requires a *replacing;* it requires an employee taking Warner's place.

Warner fails her burden to satisfy the prima facie elements for discrimination under step one of the *McDonnell-Douglas* analysis. Warner does not offer sufficient evidence that similarly situated employees outside of her protected classes were treated more favorably for the same relevant conduct, and Warner does not offer enough evidence that an employee outside her protected class replaced her.

*iii. McDonnell-Douglas Analysis: Defendant's Nondiscriminatory Motives*

Although Warner fails to meet her burden in step one of the *McDonnell-*

*Douglas* analysis, the prima facie elements, Defendants satisfy their own burden in step two by showing legitimate, nondiscriminatory reasons for the adverse action. *McDonnell-Douglas*, 411 U.S. at 803.

> If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

*Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 255–56 (1981).

Defendants contend that they did not terminate Warner because of race, sex, or national origin; they terminated her because of “significant performance issues, insubordination and inability to work well with any particular team over the course of her 15-month employment.” ECF No. 95, PageID.1049. Specifically, Defendants state that Warner was “refusing to attend meetings, to perform assigned work and to even discuss her work with management.” *Id.* at PageID.1055. The record reflects Warner’s successive no-shows to meetings despite clear, cautionary instruction from Blaser. ECF No. 95-24, PageID.1332. And before that, Warner’s clashes with colleagues and attempts to circumvent workflow policies are evidenced on the record. Hurst emailed Warner in early February, about a month before Warner’s termination:

> I wanted to understand what transpired from your perspective . . . I proceeded to share the feedback that I have received which you did not seem to disagree (from *name calling* to pointing out problems and inconsistencies with this Bl Project), even though you were never part of this Project to start with. I addressed the fact *that Richard felt extremely uncomfortable* with the line of questions. *Your behavior is against the code of business conduct* as we are committed to a professional and respectful workplace. *Verbal intimidation* is a form of harassment. I asked you to stop the behavior immediately as we cannot go calling people in the company and digging for information. *This can lead up to termination* . . . Since your tone of voice was elevated which to me is very disrespectful, I ended the call and asked you to please re-schedule when you calm down.

ECF No. 95-18, PageID.1292–93 (emphasis added). A month before this email, Blaser emailed Hurst and Schoultz about Warner's work and conduct:

> This is shadow work, *not authorized* by anyone . . . My team is now openly discussing the *disruptions that SK is causing*. For the love of God.

ECF No. 110–5, PageID.2147 (emphasis added). Several months before that email, a different supervisor, Ivan Ayma, addressed performance issues about Warner in an email to Hurst:

> This just keeps iterating. I have a 1:1 later [t]oday with her . . .
> . . . .
> This behavior of continuing to challenge and consume cycles discussing this topic needs to stop immediately. Enough time spent on discussing this. Please focus on the ask in support of the VDA team.

ECF No. 95-11, PageID.1248. Ayma had previously asked Warner to stop challenging the feedback she was given. *Id.* at PageID.1250.

Defendants' nondiscriminatory reasons boil down to the following: in the months leading up to her termination Warner was doing unauthorized work,

disrupting teams, verbally intimidating others, rejecting and challenging remedial feedback from her superiors, and skipping "urgent," mandatory meetings. Defendants have met their burden in this second *McDonnell-Douglas* step, since they have produced admissible evidence of legitimate, nondiscriminatory reasons for Warner's termination with sufficient clarity.

*iv. McDonnell-Douglas Analysis – Pretext*

Although Warner fails at the prima facie stage, the Court continues to the final step in *McDonnell-Douglas*, where Warner must rebut Defendants' proffered reasons for her termination by showing that those reasons were pretext for their actual, discriminatory reasons. Specifically, that those reasons were not based in fact, were insufficient to warrant termination, or did not actually motivate the adverse action. *McDonnell-Douglas*, 411 U.S. at 808; *Levine v. DeJoy*, 64 F.4th 789, 798 (6th Cir. 2023).

Unlike the retaliation section of Warner's briefing, the discrimination section does not formally or even informally mount a rebuttal under the third *McDonnell-Douglas* step. Nevertheless, the Court will generously incorporate her arguments of pretext from the retaliation section into the discrimination section.

Warner's argument that Defendants' reasons are not based in fact are not responsive to the proffered, nondiscriminatory reasons. To successfully rebut Defendants, Warner must provide evidence that the facts which underlie

Defendants' stated reasons for her termination simply never happened, and that Defendants "did not 'honestly believe'" those stated reasons. *Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 502 (6th Cir. 2007) (quoting *Braithwaite v. The Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001).

Recall Defendants' reasons for terminating Warner: she was doing unauthorized work, disrupting teams, verbally intimidating others, and skipping "urgent," mandatory meetings. Rather than attack these head-on, Warner states that her "Leading Contributor" rating for her 2022 work performance and her "full bonus awarded weeks before termination" in 2023 indicate that Defendants' "performance narrative lacks a factual basis." ECF No. 110, PageID.1946. Yet, a healthy sum of Warner's performance issues and insubordination came in early 2023, as shown by the emails above. ECF No. 95-18, PageID.1292–93. More importantly, the Sixth Circuit has held that "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) (quoting *Clay v. UPS*, 510 F.3d 695, 713–15 (6th Cir. 2007). That means this Court may not scrutinize the wisdom or folly of these kinds of employment decisions. *See Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998) ("[C]ourts should resist attempting to micro-manage the process used by employers in making their

employment decisions . . . ."). Put differently, so long as an employer showed a factual basis for a lawful employment decision, the subjective merit of that decision is ultimately not relevant.

Warner next argues that when Heuser wrote to Hurst that "[there's] not much that I can find on the 'why' in writing," that admission factually negated Defendants' reasons for terminating Warner. ECF No. 110, PageID.1946. For one, this email is about Warner's reassignments, and the reassignments here are not adverse actions. For two, in *Abdulnour* the Sixth Circuit held that post-hoc termination reasons, supported by affidavits, can satisfy Defendants' burden. *Abdulnour*, 502 F.3d at 504. ("[S]upervisor did not make contemporaneous records of his alleged poor performance. As the district court noted, however, Fed. R. Civ. P. 56(e) expressly allows affidavits drafted after the incident to be considered in support of a motion for summary judgment."). Defendants did indeed provide an affidavit of their relied-upon witness, Heuser. ECF No. 95-4, PageID.1203.

The remaining arguments of pretext consist of a series of one-off comments such as "avoid another 'Speak Up,'" "stopscandohate," and "sneaky." ECF No. 110, PageID.1946. Without tying these comments to Defendants' reasons for termination, they are insufficient to satisfy Warner's burden. *Carroll v. IDEMIA Identity and Sec. USA, LLC*, No. 23-6075, 2025 WL 1027867, at *8 (6th Cir. Apr. 7, 2025) ("[S]tray and isolated comments do not show pretext."); *Bergens v. Diverse Concepts, LLC*,

No. 25-5169, 2026 U.S. App. LEXIS 8377, at *8 (6th Cir. Mar. 18, 2026) (holding that comments that are not unambiguously discriminatory or egregiously offensive are not evidence of pretext). The Supreme Court held that plaintiffs do not need to produce "additional, independent evidence of discrimination" at the pretext stage, and that the prima facie evidence could be adequate. *Reeves v. Sanderson, Plumbing Prod.* 530 U.S. 133, 149 (2000). Still, the Court concludes that Warner's evidence is not enough to fully satisfy the prima facie stage, nor is it enough to satisfy the pretext stage.

To the extent Warner's argument about Defendants' investigation is applicable to her pretext argument, the Court addresses it here. Warner contends that Defendants' investigation of her internal discrimination and retaliation complaints was shoddy, and that this infers Defendants' reasons for terminating her were insufficient. The record is clear that Defendants made no reliance on their privileged investigation as justification for Warner's termination. Warner makes much of the investigation's inconclusive findings and asks the Court to do the same. We decline. The case law Warner cites in support, *Muflihi v. U.S. Steel Corp.*, No. 2:22-cv-12609, 2024 U.S. Dist. 227078, at *20–22 (E.D. Mich. Dec. 16, 2024), is distinguishable. The court there analyzed an employer's investigation into complaints *against* the plaintiff, rather than complaints on behalf of the plaintiff, as is the case here. *Muflihi* is not applicable to this suit.

In addressing Warner's rebuttal to Defendants' same-actor inference, her argument fails. The same-actor inference applies where the "same individual both hired and fired the employee," a sequence that infers a lack of discrimination. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 572 (6th Cir. 2003). The Sixth Circuit in *Wexler* considered how sister circuits approached the same-actor inference and the weight it should be afforded at the summary judgment stage. *Id.* at 572–74. Warner is correct that the same-actor inference is not mandatory, nor is it irrebuttable. But neither is it toothless. *See id.* The factfinder is permitted to draw this inference so long as it is applicable. It is not dispositive, but Defendants did not argue so. The weight of the inference depends on whether Warner has "otherwise raised a genuine issue of material fact." *Id.* at 573–74. Even at the summary judgment stage where facts are construed in favor of the non-movant, without a sufficient showing of a genuine dispute of material facts by Warner, the same-actor inference is permissible even if it is not dispositive. Warner's argument against the inference's applicability and strength here is a strawman and does nothing to meet her burden of producing evidence of pretext.

Warner has not satisfied the prima facie elements of discrimination because she did not provide similarly situated comparators or a replacement outside her protected class. Warner also failed to establish a triable issue of fact that Defendants' reasons for terminating her were pretextual.

B. Title VII, ELCRA, & § 1981 – Retaliation

A prima facie case for retaliation under Title VII, ELCRA, and § 1981 each require that: 1) the plaintiff has engaged in protected activity, 2) the defendant was aware of the protected activity, 3) the plaintiff suffered an adverse action, and 4) there was a causal connection between the protected activity and the adverse action. 42 U.S.C. § 2000e-3(a), Mich. Comp. Laws § 37.2701, *Newson v. NYX, LLC*, No. 25-2095, 2026 U.S. App. LEXIS 22103, at *8 (6th Cir. July 23, 2026) ("The standards for retaliation claims and discrimination claims, respectively, are the same across § 1981, ELCRA, and Title VII.")

Like the evidentiary routes above, to prove their claim plaintiff must present direct or circumstantial evidence of retaliation. Direct evidence of retaliation "requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action." *Imwalle v. Reliance Med. Prods.,* 515 F.3d 531, 543 (6th Cir. 2008). In the absence of direct evidence, the analysis for retaliation follows the *McDonnell-Douglas* framework detailed above. *Id.*

Like our analysis for the discrimination claims above, we begin the retaliation analysis by categorizing Warner's evidence.

*i. Direct Evidence*

Direct evidence of retaliation "requires no inferences… [that] retaliation was

a motivating factor." *Imwalle,* 515 F.3d at 543. A salesman plaintiff in *Yazdian v. ConMed Endoscopic Techs, Inc.,* 793 F.3d 634, 648 (6th Cir. 2015) was terminated after informing his territory manager that the manager was creating a hostile work environment. That statement to the manager was protected activity; the statement was used "to complain about repeated abusive discriminatory comments or treatment." *Id.* at 646. Yet the manager testified that the salesman's assertion motivated the termination. This incredible admission on the record left no doubt for the court to hold that admission as direct evidence of retaliation. *Id.* at 648.

Warner does not present direct evidence of retaliation. The evidence she presents is circumstantial and requires the *McDonnell-Douglas* framework.

*ii. McDonnell-Douglas Analysis – Prima Facie*

Warner must satisfy the prima facie elements for retaliation, that: (1) she engaged in protected activity, (2) the employer knew she engaged in protected activity, (3) the employer took an adverse action against her, and (4) the protected activity was a but-for cause of the adverse activity. *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020).

Warner's reports to Heuser and her EEOC complaints satisfy the first two elements. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (2014) (holding that filing EEOC charges, complaints to management, and "less formal protests of discriminatory employment practices" are protected activity). However, for adverse

actions, the analysis for retaliation is different from discrimination. *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006) held that the standard of harm for retaliation is higher than that of discrimination. *Burlington*, 548 U.S. at 57.

> [T]he [retaliation] provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant . . . that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.

*Id.* In *Burlington*, the plaintiff, a woman, complained of gender discrimination to leadership. The plaintiff had been operating a forklift, but after her complaint she was moved to more arduous tasks, even though they were also in her job description. The Supreme Court held that this reassignment was materially adverse in a retaliation context. *Id.* at 57, 70. And, the Court later affirmed the *Burlington* standard for retaliation claims in *Muldrow*. *Id.* at 976.

What Warner alleges as adverse actions–specifically, the reassignments–did not satisfy the lower standard for discrimination, which only required that Warner be "worse off." *Id.* at 974. Thus, those adverse actions cannot satisfy the higher standard for retaliation. The reassignments did not make Warner worse off, so they could not be "materially adverse" under *Burlington*.

Warner argues that the temporal proximity alone between her protected activity and termination satisfies the final element of the prima facie step for retaliation, the but-for causal connection between the protected activity and adverse

action. ECF No. 110, PageID.1943–44. She cites *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008), which holds that temporal proximity can be sufficient evidence of causation, and *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555 (6th Cir. 2004), which held that a three-month gap between protected activity and termination is "significant enough to constitute sufficient evidence of a causal connection." *Id.* at 563.

The shortest temporal proximity is the time between Warner's complaint to Heuser on March 6, 2023, echoing previous allegations, and Warner's termination on March 30, 2023. ECF No. 95-22, PageID.1325; ECF No. 95-25, PageID.1334. Given that the termination occurred several weeks later, with the temporal proximity inference Warner satisfies her burden to meet the prima facie elements at this stage.

*iii.* *McDonnell-Douglas Analysis – Defendant's Nonretaliatory Motives*

For Defendants' burden at this second stage of *McDonnell-Douglas*, they reiterate that Warner was "refusing to attend meetings, to perform assigned work and to even discuss her work with management." ECF No. 95, PageID.1055. They cite *Matthews v. City of Maple Heights*, No. 92-3737, 1993 U.S. App. LEXIS 28625, at *1 (6th Cir. Nov. 1, 1993), which holds that an employer can "properly fire an employee who refuses to perform an assigned task." Id. at *7. Defendants contend that they took no disciplinary action until Plaintiff refused meetings and certain work assignments. ECF No. 95, PageID.1055.

Defendants next address Warner's contention that an email Hurst sent to colleagues in early January 2023 "explicitly links removal decisions to protected activity." ECF No. 110, PageID.1946; ECF No. 110-2, PageID.1963. This Hurst email read, "[N]ow that SK is back . . . I do want to discuss further to avoid another 'Speak Up' from SK or even Tanya–I don't want to go through that again." ECF No. 110-2, PageID.1963. A "Speak Up" is the name for an internal complaint filed by employees of Defendants. *See* ECF No. 110, PageID.1933. Defendants argue that this comment was in good faith and "shows Hurst was only interested in resolving the issues that were provoking Plaintiff to file reports in the first place." ECF No. 113, PageID.2371. They cite *Finley v. Higbee Co.*, Case No. 1:97-cv-2809, 1998 U.S. Dist. LEXIS 21010, at *21 (N.D. Ohio Dec. 18, 1998), a case that relied on the Sixth Circuit's holding in *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 874 (6th Cir. 1997). Neither case is on point for the issues, here. *Blankenship* and *Finley* concerned cases of harassment; more specifically, the good faith response analysis which centered on an employer's liability for harassment by its workers. *Blankenship*, 123 F.3d at 872; *Finley*, 1998 U.S. Dist. LEXIS 21010, at *24–25. This is especially important for Title VII harassment claims, where the final prima facie element requires an employer to have "failed to implement prompt and appropriate corrective action." *Blankenship,* 123 F.3d at 872 (quoting *Rabidue v. Osceola Ref. Co., Div. of Texas-American Petrochemicals*, 805 F.2d 611, 621 (6th Cir. 1986). Yet

and still, to the extent that Defendants rely on this argument to fulfill their burden, Defendants otherwise have provided sufficient nonretaliatory reasons for Warner's termination by their above proffered reasons and evidence.

*iv. McDonnell-Douglas Analysis - Pretext*

The final burden, Warner's showing of pretext, is not satisfied. Warner's pretext argument for discrimination is the same as her pretext argument for retaliation.[1] That pretext argument failed in the discrimination claim for lack of sufficient evidence to create a prima face case and a triable issue of pretext, and so too does that pretext argument fail for retaliation. Warner has not met her burden of production for this final, pretext stage of the *McDonnell-Douglas* analysis.

As a final matter, Warner's response introduces new claims and arguments that are impermissible at this stage. Warner raises disability discrimination, failure to accommodate, age discrimination, and seemingly–pay discrimination. *See* ECF No. 110. This Court denied Warner's previous attempt at leave to add new claims and will not entertain those new claims, here. ECF No. 78. Warner cannot raise new legal claims in her response to summary judgment. *Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007); *Tucker v. Union of Needletrades, Indus., & Textile Emples.*, 407 F.3d 784, 788 (6th Cir. 2005).

---

[1] Recall that the Court generously incorporated Warner's pretext for retaliation arguments into her pretext for discrimination arguments.

Warner has failed to establish a triable issue of fact that Defendants' reasons for terminating her were a pretext to hide retaliation. Defendants are entitled to summary judgment.

## IV. CONCLUSION

The reasons above show that there is no remaining issue of triable fact. Defendants' Motion for Summary Judgment [ECF No. 95] is **GRANTED**.

**SO ORDERED.**

**Dated**: October 19, 2026

/s/Gershwin A. Drain
GERSHWIN A. DRAIN
United States District Judge